IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

RICHARD BLACK,

Plaintiff,

vs.

Civ. Action No.
9:08-CV-0231 (DNH/DEP)

BRIAN FISCHER, Commissioner, *et al.,*

Defendants.

---

APPEARANCES: OF COUNSEL:

FOR PLAINTIFF:

RICHARD BLACK, *Pro Se*
1260 Burke Ave., Apt. 1-D
Bronx, NY 10469

FOR DEFENDANTS:

HON. ANDREW M. CUOMO
Attorney General of
the State of New York
The Capitol
Albany, NY 12224

STEVEN H. SCHWARTZ, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Richard Black, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983 and the Religious Land Use And Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), against several employees of the New York State Department of Correctional Services ("DOCS"), including the agency's commissioner, alleging deprivation of his civil rights. In his complaint, plaintiff asserts that the defendants unlawfully interfered with his protected free religious exercise rights under the First Amendment and the RLUIPA by failing to honor a religious designation change request and by disciplining him for wearing a beard consistent with his Jewish religious beliefs but in violation of prison regulations. Plaintiff's complaint seeks both monetary and declaratory relief, including a finding that the DOCS directive precluding inmates from changing a religious designation within twelve months of a previous change, or within twelve months of entering disciplinary special housing unit ("SHU") confinement, is unconstitutional.

Currently pending before the court is defendants' motion seeking dismissal of plaintiff's complaint on various grounds, including lack of personal involvement, the failure to state a claim upon which relief can be granted, and qualified immunity. Having carefully considered the record now before the court in light of defendants' motion and plaintiff's arguments

in opposition, I find that defendants have established entitlement to the relief sought, and therefore recommend that their motion be granted.

## I. BACKGROUND[1]

At the times relevant to his claims, plaintiff was a prison inmate entrusted to the care and custody of the DOCS and designated initially to the Mid-State Correctional Facility ("Mid-State"), located in Marcy, New York, and later to the Southport Correctional Facility ("Southport"), located in Pine City, New York. *See generally* Complaint (Dkt. No. 1). Although the record is not entirely clear regarding this issue, it appears that during all or some of the relevant times, beginning on January 19, 2007, plaintiff was relegated to SHU confinement.[2] *See, e.g.,* Stanley Decl. (Dkt. No. 54-

---

[1] In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964). Portions of the background description which follows have been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

[2] Inmates may be placed in SHU for a variety of reasons, including for disciplinary purposes. *Lee v. Coughlin*, 26 F. Supp.2d 615, 618 (S.D.N.Y. 1998) (quoting, *inter alia*, 7 NYCRR § 301.6); 7 NYCRR § 301.7. Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 NYCRR pt. 304. They are allowed two showers per week and one hour of outdoor exercise per day, and are entitled to unlimited legal visits and

3) ¶¶ 6-8.

1. Religious Designation

On April 23, 2007, while at Mid-State, plaintiff completed a form indicating a desire to change his religious designation from "non-specified" to "Jewish".[3] Amended Complaint (Dkt. No. 12) § IV ¶ 1; Stanley Decl. (Dkt. No. 54-3) ¶¶ 3-4. That change was initially approved by defendant S.R. Gerstein, the Rabbi assigned to Mid-State, on April 23, 2007, and additionally on April 30, 2007 by the coordinating Chaplain at the facility. Amended Complaint (Dkt. No. 12) §IV, ¶ 1; *see also* Stanley Decl. (Dkt. No. 54-4) ¶ 4 and Defendants' Exh. J (Dkt. No. 54-15) p. 43.

Changes in religious designation are controlled by DOCS Directive No. 4202. Stanley Decl. (Dkt. No. 54-3) ¶¶ 3, 5. Under that provision, an inmate's change of religious designation is not final until entered into the

---

one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.* Unlike inmates in general population or under keeplock confinement, however, inmates in SHU do not have access to their personal property. *Grant v. Riley*, No. 89 CIV. 0359, 1996 WL 727441, at *1 n. 1 (S.D.N.Y. Dec. 17, 1996).

[3] Defendants question the sincerity of plaintiff's desire to be designated as Jewish, based upon a written statement made by Black to defendant Stanley, received on January 18, 2008, asking if he is "able to receive anything from family dealing with [his] belief [,] which is Islamic faith. . .", indicating that the items sought by him were head coverings, pendants and a prayer shawl. Schwartz Decl. (Dkt. No. 54-4) Exh. J, p. 17.

official religious census at the prison where the inmate is housed by inmate records personnel. *Id.* ¶ 5. The DOCS directive provides that "[i]t is expected that a change will be accomplished within 30 days." DOCS Directive No. 4202(H).

DOCS Directive No. 4202 was revised, effective on April 24, 2007, in two relevant respects. Stanley Decl. (Dkt. No. 54-3) ¶ 6. The first change affected the frequency with which inmates can change religions, extending the limitation on making such requests from six months to once every twelve months. *Id.* The other added the proviso that "[c]hanges of religious designation shall not be permitted while a Superintendent's proceeding is pending, and for the duration of an inmate's confinement to a cell, room or Special Housing Unit, but not to exceed twelve months from the commencement of such confinement." *Id.* In light of this amendment plaintiff's change of religious designation was never effectuated, and plaintiff was advised by letter received on or about May 14, 2007 from Rabbi Gerstein that the requested change had been denied.[4] Amended

---

[4] The rescission of the preliminary approval of plaintiff's Jewish designation request pursuant to DOCS Directive No. 4202 appears to have had an unfortunate but unintended effect, being listed as a change of designation on plaintiff's record occurring on May 7, 2007, apparently leading plaintiff to believe that he could not reapply for a change of designation until one year later, in May of 2008. In her declaration, however, Chaplain Stanley points out that given his circumstances

Complaint (Dkt. No. 12) § IV ¶ 3.

Black was transferred out of Mid-State and into Southport on July 3, 2007 and was apparently placed in SHU confinement at that facility. Amended Complaint (Dkt. No. 12) § IV ¶ 6; Stanley Decl. (Dkt. No. 54-3) ¶¶ 7, 8. While at Southport, plaintiff again submitted a change of religious designation form, on May 14, 2008, seeking to modify his religion from "non-specified" to "Jewish". Stanley Decl. (Dkt. No. 54-3) ¶ 8. This time the change was approved, and became effective on June 2, 2008. *Id.* ¶ 8 and Defendants' Exh. L (Dkt No. 54-17).

2. Disciplinary Action

On January 9, 2008, Corrections Officer D. Tadder, a defendant in this action, issued a misbehavior report charging Black with violating Disciplinary Rules 110.32, relating to grooming standards, and 106.10, for failing to obey a director order. Defendants' Exh. E (Dkt .No. 54-10). The disciplinary charge was issued based upon the fact that at that time plaintiff

---

plaintiff could have applied for a new designation as early as January 19, 2007. Stanley Decl. (Dkt. No. 54-3) ¶ 8. In any event for this mistake, which led plaintiff to postpone his application until four months after he was entitled to reapply, at best represents a potential misapplication of DOCS Directive No. 4202, a matter which does not rise to a level of constitutional significance. *See Cabassa v. Gummerson*, 01-CV-1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept. 24, 2008).

wore a beard approximately four inches long and braided, in violation of DOCS policies regarding facial hair, as well as his failure to comply with directives by defendant Tadder on several occasions that he trim his beard.[5] *Id.*; *see also* Amended Complaint (Dkt. No. 12) § IV ¶¶ 7-10.

A disciplinary hearing was convened on January 11, 2008 by Lieutenant Richard Donohue, also a defendant in this action, to address the charges set forth in the misbehavior report. Amended Complaint (Dkt. No. 12) § IV, ¶ 11; Defendants' Exh. F (Dkt. No. 54-11). At the close of the hearing, at which testimony was received from Corrections Officer Tadder and the plaintiff, the hearing officer found Black guilty on both counts and imposed a penalty of thirty days of keeplock confinement.[6] Defendants'

---

[5] The DOCS Directive related to grooming standards in effect at the time provided that absent a court order or an exemption based upon documented evidence of membership in a religion that had a genuine belief against trimming of beards, "[a]n inmate may grow a beard. . . but . . . [the hair] may not exceed one (1) inch in length. . .". DOCS Directive No. 4914 at iii(b)(1); *see also* Defendants' Exh. D (Dkt. No. 54-9). A religious designation of Jewish apparently would have qualified plaintiff to receive a permit exempting him from the one inch beard rule. *See* Defendant's Exh. I (Dkt. No. 54-14) (letter dated February 19, 2008 from William M. Gonzalez, Esq., DOCS Deputy Counsel, to plaintiff Richard Black).

[6] Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *Warburton v. Goord*, 14 F. Supp.2d 289, 293 (W.D.N.Y. 1998) (citing *Gittens*); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n.2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)). Inmate conditions while keeplocked are substantially the same

Exh. E (Dkt. No. 54-10). The hearing officer's determination was affirmed on appeal by Captain Harry Hetrick, another defendant named in plaintiff's complaint, and plaintiff was scheduled to begin his thirty-day period of keeplock confinement on December 9, 2009, apparently in light of earlier–imposed disciplinary SHU and keeplock confinements yet to be served. Amended Complaint (Dkt. No. 12) § IV, ¶ 12; Defendants' Exh. H (Dkt. No. 54-13).

### 3. Grievances And Communications Regarding Alleged Violations

Plaintiff, who is seemingly well versed in inmate grievance procedures, lodged two grievances as a result of the events relevant to his claims.[7] In the first, filed on November 13, 2007 while at Southport and designated as SPT-42607-07, Black alleged that he was denied the right to

---

as in the general population. *Lee v. Coughlin*, 26 F. Supp.2d at 628. While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

[7] Prior to commencement of this action, plaintiff filed and pursued to completion twelve grievances, including one while incarcerated at the Franklin Correctional Facility and eleven while at Southport. *See* Bellamy Decl. (Dkt. No. 54-1) ¶ 3 and Exh. 1.

practice the religion of his choice as a result of the denial of his request to change his designation. Defendants' Exh. A (Dkt. No. 54-6). That grievance was denied by the Inmate Grievance Review Committee ("IGRC") at Southport, and later by the superintendent's designee at the facility. *Id.* In the superintendent's denial it was noted that an inmate who, like the plaintiff, is in SHU confinement may not change religious designation until twelve months after commencement of his or her SHU confinement. *Id.*; *see also* Defendants' Exh. C (Dkt. No. 54-8) p. 4. That determination was upheld on appeal to the DOCS Central Office Review Committee ("CORC"). *See* Defendants' Exh. A (Dkt. No. 54-6) p. 1.

Plaintiff's second grievance, designated as SPT-43202-08, was directed toward the January 7, 2008 misbehavior report issued by Corrections Officer Tadder, alleging that the corrections officer threatened and harassed him and informed him not to bother signing up for recreation if he could not hide his beard. Defendants' Exh. B (Dkt. No. 54-7). That grievance was denied by defendant Napoli, the superintendent at Southport, after an investigation which included interviews of both the plaintiff and Corrections Officer Tadder. *Id.* p. 4. The grievance denial was upheld on appeal to the CORC, which noted that plaintiff had received a

misbehavior report based upon his interactions with Officer Tadder and was found guilty, following a hearing, in connection with those charges. *Id.* at p. 1.

In addition to filing grievances, plaintiff communicated in writing with several individuals regarding his religious designation and related circumstances, including his desire to wear a beard. Officials at the DOCS central office who received letters from the plaintiff regarding those issues include Deputy Counsel William Gonzalez, Commissioner Brian Fischer, Deputy Commissioner Lucien LeClaire, Deputy Commissioner Kenneth S. Pearlman, Director of Ministerial Services Mark Leonard, Assistant Director Omega B. Alston, and Director of Special Housing/Inmate Disciplinary Programs N. Bezio. *See* Defendants' Exh. I (Dkt. No. 54-14). With one exception, each of these individuals responded by letter to the plaintiff; in the case of Commissioner Fischer, the matter was referred to Gayle Haponick, who answered on his behalf. *Id.* In addition, plaintiff wrote to or otherwise communicated with officials at both Southport and Mid-State regarding the relevant issues, including David Napoli, the superintendent at Southport; Angela Bartlett, the deputy superintendent; David Tadder, a corrections officer, Richard Donahue a corrections lieutenant at Southport;

Harry Hetrick, a corrections captain at Southport; and Chaplin Theresa Stanley and Rabbi Stanley Gerstein, both assigned to Mid-State. *See* Exh. J (Dkt. No. 54-15).

II. PROCEDURAL HISTORY

Plaintiff commenced this action on February 27, 2008 and later filed an amended complaint, the operative pleading now before the court, on June 11, 2008. Dkt. No. 12. As defendants, plaintiff's amended complaint names DOCS Commissioner Brian Fischer; Deputy Commissioners Lucien J. LeClaire and Kenneth S. Perlman; Assistant Director Omega B. Alson; Rabbi Gerstein; Chaplain T. Stanley; Southport Superintendent D. Napoli; Deputy Superintendents A. Bartlett and J. Colvin; N. Bezio, the DOCS Director of SHU and Inmate Disciplinary Programs; Corrections Captain H. Hetrick; Corrections Officer D. Tadder; Corrections Lieutenant R. Donohue; Deputy DOCS Counsel William Gonzalez; and Mark Leonard, the DOCS Director of Ministerial, Family and Volunteer Services. *Id.* In his complaint, plaintiff describes his legal claims in broad terms, making specific reference to infringement of his rights to "free speech, free exercise, due process, and equal protection" under the First and Fourteenth Amendments, as well as violation of the RLUIPA, and additionally alleges

violation of his right to be free of the Eighth Amendment's guaranty against cruel and unusual punishment.[8] Plaintiff's complaint seeks declaratory relief together with compensatory damages in the amount of $1 million against each of the defendants, as well as punitive damages in an additional unspecified sum.

On May 19, 2009, following the joinder of issue and completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint. Dkt. No. 54. In their motion defendants assert several grounds for relief, arguing that 1) the record does not support plaintiff's claims, as a matter of law; 2) plaintiff has failed adequately to demonstrate the personal involvement of various of the defendants in the alleged unconstitutional acts; 3) plaintiff has not identified the deprivation of a constitutionally cognizable liberty interest sufficient to support a due

---

[8] Though not referenced in his complaint, in an attached declaration plaintiff alleges that defendant Tadder "has repeatedly harassed, threatened, deprived recreation [sic] and made slur [sic] comments." *See* Dkt. No. 12 (attached declaration at ¶ 7). Assuming the truth of those allegations, and that they are properly considered despite not being included in plaintiff's complaint, they are nonetheless insufficient to support a constitutional claim. A conclusory statement that plaintiff was deprived of recreation, in the face of a summary judgment motion is insufficient to establish a constitutional deprivation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). The remaining allegations claim harassment, threats and slurs which, though repugnant if they in fact occurred, do not support a constitutional claim. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986).

process claim; and 4) in any event defendants are entitled to qualified immunity. *Id.* Plaintiff has since responded in opposition defendants' motion by the filing of a declaration, with exhibits, and a memorandum of law. Dkt. No. 57.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168

F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Personal Involvement

In their motion, defendants first challenge the sufficiency of plaintiff's allegations of personal involvement on the part of defendants Fischer, LeClaire, Leonard, Napoli and Colvin. This portion of defendants' motion is based upon their contention that plaintiff's assertion of their "constructive notice" of the facts stated in the amended complaint, *see* Amended Complaint (Dkt No. 12) § IV ¶¶ 14-17, does not suffice to establish their

liability for constitutional deprivations.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The five individual defendants on whose behalf this portion of defendants' motion is brought are not alleged to have had direct involvement in the events giving rise to plaintiff's claims. Instead, they appear to be named exclusively based upon their supervisory roles with the DOCS as well as plaintiff's contention that in their official capacities they should be charged with having "constructive notice" of the constitutional deprivations alleged.

It is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no

*respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. “Instead, a viable claim for relief under section 1983 must show that the defendants were personally involved in the alleged constitutional violation.” *Sorrentino v. Outhouse*, No. 9:03-CV-0104, 2006 WL 2052307, at *3 (N.D.N.Y. July 21, 2006) (McAvoy, S. J.) (citing *Thomas v. Irvin*, 981 F. Supp. 794, 801 (W.D.N.Y. 1997)).

Personal involvement is not limited to direct participation in the alleged violation, however, but may be shown where there is actual or constructive notice of the deprivation and gross negligence or deliberate indifference by failing to act. *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004); *see also, Rahman v. Fisher*, 607 F.Supp.2d 580, 585 (S.D.N.Y. 2009). Accordingly, culpability on the part of a supervisory official for a civil rights violation can be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or

5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007); *see also Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

From the record now before the court it appears that the plaintiff attempted to place various DOCS officials on notice of the alleged constitutional violations and elicit their help in remedying the situation. As defendants acknowledge in their statement of material facts not in dispute, submitted pursuant to Northern District of New York Local Rule 7.1(a)(3), plaintiff wrote to several DOCS officials including, pertinently, defendants Fischer, LeClaire, and Leonard regarding the alleged violations.[9] *See* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 54-5) ¶ 18; Defendants' Exh. I (Dkt. No. 54-14).

Plaintiff's claims against those supervisory defendants appear to rest upon theory of constructive notice based upon letters he wrote to them

---

[9] While acknowledging in their Local Rule Statement 7.1(a)(3) that letters were sent by the plaintiff to those defendants, by contrast in their memorandum of law defendants argue that "plaintiff does not even allege that he communicated with LeClaire or Leonard, and there is no record of defendants Fischer, DiNapoli [sic] or Colvin having personally received a letter from plaintiff complaining about the matters alleged in the Complaint, much less responding to such letter." *See* Defendants' Memorandum of Law (Dkt. No. 54-19) at p. 5.

complaining of the violations now at issue. It is true that the mere writing of letters alone to a defendant does not suffice to establish the recipient's personal involvement in constitutional violations addressed in the letter. *See Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin*, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).[10] When a recipient has responded to such a letter, however, under certain circumstances that additional fact can establish a supervisor's knowledge of a violation and, if it is ongoing, an ability to remedy the wrong sufficient to establish liability. *Ross v. Wood*, No. 9:05-CV-1112, 2009 WL 3199539, at *13 (N.D.N.Y. Sept. 30, 2009) (Scullin, S.J. & Lowe, M.J.) (quoting *Walker v. Pataro*, No. 99 Civ. 4607, 2002 WL 664040, at *12-13 (S.D.N.Y. Apr. 23, 2002)).

It appears from the record now before the court that plaintiff wrote to

---

[10] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

defendants LeClaire and Leonard and received responses directly from both of those individuals. Defendants' Exh. I (Dkt. No. 54-14). In light of the ongoing nature of the religious designation violation alleged, this could suffice to establish those defendants' personal involvement. *Wingate v.Gives*, No. 05 Civ. 1872, 2008 WL 5649089, at * 14 (S.D.N.Y. Apr. 13, 2008) (noting that where a supervisory official receives, reviews, and responds to an inmate complaint, personal involvement may be established if the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong) (citations omitted).

With regard to Commissioner Fischer and Superintendent Napoli, the record reflects that in both instances letters sent by the plaintiff to these defendants were referred to other individuals for response. Defendants' Exhs. I (Dkt. No. 54-14) and J (Dkt. No. 54-15). Standing alone, these facts do not suffice to establish their awareness of an ongoing violation and ability to remedy the situation, and therefore do not provide a basis to find personal involvement or liability under section 1983. *See, e.g., Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (warden who referred letter to subordinate not personally involved).

The last defendant involved in this aspect of the pending motion,

Deputy Superintendent J. Colvin, appears from the record not to have had any involvement in the matters alleged. The only indication in the record of Deputy Superintendent Colvin's role concerns his denial of plaintiff's request for permission to receive packages from his family, a request that was denied based upon his SHU confinement unrelated to this case. *See* Defendants' Exh. K (Dkt. No. 54-16). The record is devoid of evidence suggesting defendant Colvin's participation in any of the matters forming the underpinnings of plaintiff's claims in this case.

Based upon the foregoing, I recommend that plaintiff's claims against defendants Fischer, Napoli and Colvin be dismissed based upon lack of personal involvement, but that his claims against defendants LeClaire and Leonard not be dismissed on that basis.

C. Religious Exercise/Qualified Immunity

At the heart of plaintiff's complaint is his claim that because defendants failed to honor his request for a change in religious designation, they impermissibly interfered with his right to freely exercise his chosen religion, as guaranteed under the First Amendment and the RLUIPA. In their motion defendants both challenge the legal sufficiency of plaintiff's First Amendment claim and additionally maintain that in following

DOCS directives regarding changes in religious designations, they reasonably believed they were not violating the plaintiff's protected rights, and are therefore entitled to qualified immunity from suit.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. ___, 129 S.Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the

Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson*, 555 U.S. at ___, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[11] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 n.9 (citing *Saucier*).[12] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to

---

[11] In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

[12] In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." 577 F.3d at 433, n.11 (citation omitted).

exercise their sound discretion in deciding which of the . . . prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[13] *Pearson*, 555 U.S. at ___, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey*, 567 F.3d at 61(citing *Pearson*, 555 U.S. at ___, 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, ____ U.S. ___, 129 S.Ct. at 818). In this

---

[13] Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, ___ U.S. at ___, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

case, I have chosen to engage in an analysis of whether the circumstances presented meet the second prong of the test – that is, whether the particular right at stake was clearly established at the time of the alleged constitutional violation.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith*, 21 F.3d 496, 500 (2d Cir. 1994) (quoting *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin*, 577 F.3d at 433 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would

conclude that the conduct in question is lawful, there is no immunity." *Okin*, 577 F.3d at 433 (citing *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995)).

In general terms, the rights at stake in this case under the First Amendment and the RLUIPA were clearly established at the relevant times. While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of that right in a prison setting requires careful balancing of the religious rights of prison inmates against the legitimate

interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Salahuddin,* 993 F.2d at 308. When determining whether a refusal by prison officials to permit an inmate's attendance at a religious service or event impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right . . . is 'reasonably related to legitimate penological interests.'" *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir. 1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404).

As was previously noted, plaintiff has also asserted a claim under the RLUIPA, which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person – 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling

governmental interest.

42 U.S.C. § 2000cc-1(a). Claims under the RLUIPA are analyzed utilizing principles similar to those which inform the analysis of plaintiff's free exercise claim, although there are subtle distinctions between the two provisions and their application in a prison setting. *See Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006). The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Harnett v. Barr*, 538 F. Supp.2d 511, 520 (N.D.N.Y. 2008) (quoting 42 U.S.C. § 2000cc-5(7)(A)). Under the RLUIPA, courts apply a burden shifting analysis. *See id.* at 520. The plaintiff bears the initial burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus*, 200 F.Supp.2d 280, 297 (S.D.N.Y. 2002)(citing 42 U.S.C. § 2000cc-2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest, and that it represents the least restrictive means of achieving that interest. *Hartnett*, 538 F.Supp.2d at 520.

The fact that both the First Amendment and the RLUIPA apply in the prison setting and prohibit those interferences with an inmate's right to exercise his or her religious beliefs which are not inconsistent with

legitimate penological concerns does not necessarily mean that defendants cannot avail themselves of qualified immunity. When analyzing qualified immunity, "[f]or a right to be clearly established it 'must have been recognized in a particularized rather than a general sense.'" *Farid v. Ellen,* 2010 WL 308971, at * 9, ___ F.3d ___ (2d Cir. 2010) (citing and quoting *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007)). The analysis must therefore focus on the right in question "at the appropriate level of specificity." *Id.* (citing and quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 1700 (1999)). When measured against these principles, the specific question here presented is whether it was objectively reasonable for defendants to believe that plaintiff, who was being held in SHU confinement at the time of his request, did not have a clearly established constitutional right to change his religious designation at any time, without limitation.

While the defendants have not squarely stated as much in their motion, they appear to take the position that plaintiff's change of religious designation request submitted on April 23, 2007 was denied in view of the amended provisions of DOCS Directive No. 4202, which took effect on the following day, based upon the fact that plaintiff had not been in SHU

confinement for a year prior to making the designation.[14] *See, e.g.* Stanley Decl. (Dkt. No. 54-3) ¶¶ 4-6. In making that determination, prison officials were following the DOCS directive, which was adopted after specific consideration of the Tenth Circuit's decision in *Beerheide v. Suthers,* 286 F.3d 1179 (10th Cir. 2002), and was based upon penological concerns, supported by an empirical study, that compared to the general population a disproportionate number of SHU inmates have attempted to change their stated affiliation to Judaism, resulting in a strain on the delivery of prison food services.[15] *See* Leonard Decl. (Dkt. No. 54-2) ¶¶ 4-16. Considering the Tenth Circuit's decision in *Beerheide,* which seems to have tacitly approved a similar restriction in Colorado, along with the fact that there is a lack of any clear contrary guidance from either the Supreme Court or the Second Circuit, I find that reasonable prison officials in defendants'

---

[14] Plaintiff may be contending that his rights were violated when prison officials refused to apply the prior version of DOCS Directive No. 4202, in effect on the date his designation request change was made, instead retroactively applying the revised version. As was noted previously, however, a violation of DOCS policies and directives does not give rise to a cognizable constitutional claim. *Cabassa*, 2008 WL 4416411, at *6 n.24.

[15] The need to regulate the distribution of special religious diets can constitute a legitimate penological concern sufficient to override First Amendment and RLUIPA rights. *See, e.g., Tapp v. Stanley*, No. 04-CV-6400 CJS, 2008 WL 4934592, at *8 (W.D.N.Y. Nov. 17, 2008).

circumstances could have concluded that there was no clearly established right of an inmate in SHU to change his or her religious designation at any time. Accordingly, I conclude that the defendants, who are sued for damages in their individual capacities, are entitled to qualified immunity from suit in connection with plaintiff's First Amendment and RLUIPA claims.

D. <u>Procedural Due Process</u>

In his complaint, plaintiff also asserts a claim for deprivation of procedural due process, in violation of the Fourteenth Amendment, arising out of the issuance of a misbehavior report concerning his beard and the resulting disciplinary proceedings, leading to a finding of guilt and a penalty of keeplock confinement. Defendants also seek dismissal of this cause of action.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*,

91 F.3d 349, 351-52 (2d Cir. 1996). The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff*, the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence". *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768 (1985).

In this instance it is uncontroverted that the disciplinary proceedings against the plaintiff resulted in a punishment of thirty days of keeplock confinement. Case law in this circuit is clear that a thirty-day period of

confinement under ordinary keeplock conditions does not constitute a cognizable liberty interest deprivation and thereby trigger the procedural requirements of the Fourteenth Amendment. *Rodriguez v. McGinnis*, 1 F. Supp.2d 244, 248 (S.D.N.Y. 1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock . . . confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin*.") (quoting *Williams v. Keane*, No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997)). Indeed, in its seminal decision in *Sandin v. Conner,* the Supreme Court found that a thirty-day period of disciplinary confinement fell short of a liberty interest deprivation sufficient to support a procedural due process claim. 515 U.S. 472, 115 S.Ct. 2293 (1995). Accordingly, I recommend dismissal of plaintiff's due process claim based upon plaintiff's failure to establish a liberty interest deprivation of constitutional significance.

E. Equal Protection

Although plaintiff's complaint does not provide illumination regarding this aspect of his case, it includes reference to the denial of equal protection in the description of the legal claims asserted. Defendants seek dismissal of this cause of action.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

Plaintiff's complaint fails to meet several of the critical elements of an equal protection claim, including by failing to demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful for discrimination, or as a result of being a member of an identifiable suspect class. *Giano*, 54 F.3d at 1057. Plaintiff has therefore

failed to establish a cognizable cause of action for the denial of equal protection.

IV. SUMMARY AND RECOMMENDATION

Plaintiff's claims in this action, though somewhat diverse, emanate from a request for a change in religious designation, denied as a result of a DOCS directive precluding the making of such a request given plaintiff's circumstances. In light of the lack of clear guidance from the courts concerning the propriety of such a regulation and the existence of at least one court of appeals decision seemingly approving a restriction similar to that included in the DOCS directive, I recommend a finding that the defendants in this case are shielded from liabilty for damages on the basis of qualified immunity. I further find that defendants Fischer, Napoli and Colvin are entitled to dismissal of plaintiff's claims against them on the separate and independent basis of lack of personal involvement, and that plaintiff has failed to state a cognizable cause of action for denial of due process or equal protection under the Fourteenth Amendment. Accordingly it is hereby respectfully

RECOMMENDED that defendants' motion (Dkt. No. 54) be GRANTED, and that all of plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: February 4, 2010
Syracuse, New York





Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Joel GRANT Plaintiff,
v.
Sup't D. RILEY, Capt. W. Thorne, Lt. T. Healey, Sgt. J. Buonato, Sgt. W. Connolly, C.O. Hess, C.O. Wilbur, C.O. McHugh, C.O. Hinden Defendants.
**No. 89 CIV. 0359 (BSJ).**

Dec. 17, 1996.

Joel Grant, plaintiff pro se.

Dennis C. Vacco, Attorney General of the State of New York, Joseph Mirabella, Assistant Attorney General, New York City, for defendants.

MEMORANDUM & ORDER

JONES, DISTRICT COURT.

***1** Plaintiff *pro se* Joel Grant, a former inmate of the New York State Department of Correctional Services ("DOCS"), while incarcerated initiated this action pursuant to 42 U.S.C. § 1983, alleging that defendants violated his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. On November 23 1993, the Court granted defendants' motion for summary judgment with respect to plaintiff's claims under the First, Fourth, and Eighth Amendments, but allowed his cause of action against defendants Riley, Wilbur, and Healey with respect to the alleged Fourteenth Amendment violation to survive.

In light of new case law, defendants move once again for summary judgment on the due process claim. For the following reasons, the motion is GRANTED.

BACKGROUND

At all times relevant to this motion, plaintiff was an inmate at the Fishkill Correctional Facility ("Fishkill"). In mid-November 1988, plaintiff was informed that he was to be taken to a hospital outside the prison for treatment of a leg problem. Defendant Wilbur, a corrections officer, was scheduled to act as an escort on that excursion.

Plaintiff, however, feared Wilbur, believing that the officer harbored ill will towards him due to plaintiff's earlier filing of a grievance. As a result, plaintiff balked at the attempt to transport him to the hospital and signed a refusal form to that effect. That form contains a handwritten statement warning plaintiff that he could be the subject of a misbehavior report if he refused to go the hospital and that he might be liable for costs incurred due to the cancelled trip. Plaintiff alleges that the warning was not on the form when he signed it.

Due to plaintiff's refusal to go to the hospital, a misbehavior report was filed. At a disciplinary hearing held December 1, 1989, plaintiff was found guilty of violating call slip procedures. Accordingly, the hearing officer, defendant Thomas Healey, sentenced him to ten days in keeplock.

Plaintiff appealed his sentence to defendant Riley. On December 5, 1989, Riley excused plaintiff from serving the last five days of his sentence. Plaintiff thus served a total of 5 days in keeplock for refusing to travel to the hospital.

At Fishkill in 1988, the conditions imposed upon DOCS' inmates confined to keeplock differed from those kept in general population.[FN1] For instance, keeplocked inmates were permitted two showers a week, while those in general population could take three. In addition, keeplocked inmates could not participate in prison programs, in which those in general population spent most of their time (although there was and is neither a regulation or directive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

guaranteeing inmates time spent in a program, nor law requiring inmates to participate in any level of programming). Despite these differences, however, keeplocked inmates were (1) permitted access to library materials and personal property and (2) entitled to the same level of exercise and visitation rights as those in general population. Moreover, there is no indication that they could not leave their cell to obtain medical help. Plaintiff does not allege that the circumstances surrounding his keeplock confinement differed significantly from these general conditions imposed on keeplocked inmates.

FN1. In addition, the conditions imposed upon inmates in keeplock differed from those imposed upon inmates confined to Special Housing Units ("SHU"). In 1988, inmates were placed in SHUs for, among other things, administrative reasons or protective custody. Those in keeplock had *more* freedom than those in SHUs. For instance, keeplocked inmates had access to personal property, while those in SHU did not. Additionally, keeplocked inmates had general visitation rights, while those in SHUs were permitted only one day per week of visitation.

DISCUSSION

***2** Defendants Riley, Wilbur, and Healey move for reconsideration of the Court's earlier denial of their motion for summary judgment with regard to plaintiff's claim that they violated his due process rights. An intervening change in controlling law is a major ground justifying reconsideration. *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1254 (2d Cir. 1992); *see also Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1383 (1983) (finding that law of case doctrine "directs a court's discretion," but does not limit its power to reconsider earlier decisions). Since such case law is present here, *see infra,* reconsideration is appropriate.

In reconsidering, the Court must apply the well-settled law governing motions for summary judgment, which dictates that summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56; *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986); *Mays v. Mahoney,* 23 F.3d 660, 662 (2d Cir. 1994). To grant a motion for summary judgment, the Court must determine that a reasonable fact finder could not find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2511-12 (1986). Thus, the moving party bears the burden of proving the absence of a genuine issue of material fact. *Akickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970). If the moving party meets this burden, the burden shifts to the non-moving party to present evidence of specific facts showing that a genuine issue exists. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

On June 19, 1995, the Supreme Court decided *Sandin v. Connor,* -- U.S. --, 115 S.Ct. 2293 (1995). In *Sandin,* the Court held that constitutional liberty interests:

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at --, 115 S.Ct. at 2300. Applying these principles to the facts before it, the Court held that a prisoner's placement in segregated confinement for 30 days did not work a major disruption in his environment and therefore did not present the kind of atypical, significant deprivation in which a state might conceivably create a liberty interest. *Id.* at --, 115 S.Ct. at 2297-2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law.").

Although decided more than five years after the events surrounding plaintiff's disciplinary hearing took place, *Sandin* applies retroactively and thus controls this case.[FN2] *Samuels v. Mockry et al.,* 77 F.3d 34, 37 (2d Cir. 1996); *see also Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341 (1983) ( "as a rule, judicial decisions apply retroactively"). Therefore, to prevail here Grant must at least establish that the confinement he complains of created an atypical and significant hardship in his prison environment. [FN3] *See Frazier v. Coughlin,* 81 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

313, 317 (2d Cir. 1996) (explaining *Sandin* in light of other cases discussing inmates' liberty interests); *Uzzell v. Scully,* 893 F. Supp. 259, 263 (S.D.N.Y. 1995) (applying *Sandin*) ("a prisoner does not have a protected liberty interest in remaining free from... [segregated] confinement").

FN2. Plaintiff complains in his response to defendants' motion for summary judgment that defendants procrastinated in order to wait for *Sandin* to be decided and thereafter move for summary judgment behind its weighty authority. There is no evidence at all, however, to justify this allegation. Rather, plaintiff originally moved for summary judgment on this claim *before* the Supreme Court decided *Sandin* and, as stated, now properly moves to reargue based on new controlling law.

FN3. The Court notes that in addition to showing an atypical and significant hardship, Grant must also prove that New York State has granted its inmates a protected liberty interest in remaining free from the confinement about which he complains. *See Frazier,* 81 F.3d at 317.

***3** However, there is no evidence that plaintiff's ten-day sentence in keeplock -- of which, only five days were served -- amounted to the kind of atypical and significant hardship necessary to implicate a liberty interest; keeplock did not work a major disruption in his prison environment. Rather, at the relevant time the only significant differences between keeplocked inmates and those in general population at Fishkill related to their ability to leave their cells and participate in prison programs -- those in keeplock could not participate, while those in general population spent most of their time in various modules (although no regulation requires this). Additionally, the record is clear that keeplocked prisoners maintained many of the privileges available to those in the general population. For instance, keeplocked inmates not only had access to library books and periodicals, but also were entitled to the same amount of exercise as those in general population. Moreover, their visitation rights were not curbed at all. Simply put, therefore, Grant's keeplock did not implicate a liberty interest. *See Uzzell,* 893 F. Supp. at 363 (keeplock does not invoke liberty interest).

Accordingly, defendants' motion is GRANTED. The Clerk of the Court is directed to enter judgment to this effect.

So ordered.

S.D.N.Y.,1996.
Grant v. Riley
Not Reported in F.Supp., 1996 WL 727441 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Larry TINSLEY, Plaintiff,
v.
Gary GREENE, Deputy Superintendent of Great Meadow Correctional Facility; Jim Lanfear, Maintenance Supervisor, Great Meadow Correctional Facility; Gary Yule, Corrections Officer, Great Meadow Correctional Facility; and David Roberts, Senior Counselor, Great Meadow Correctional Facility, Defendants.
**No. 95-CV-1765 (RSP/DRH).**

March 31, 1997.

Larry Tinsley, Pro Se.

Dennis C. Vacco, New York State Attorney General, Darren O'Connor, Assistant Attorney General, of counsel, for Defendants.

ORDER

POOLER, District Judge.

***1** The above matter comes to me following a report-recommendation and order by Magistrate Judge David R. Homer, duly filed on the 13th day of September, 1996. Dkt. No. 24. Following ten days from the service thereof, the clerk has sent me the entire file, including any objections thereto. Plaintiff Larry Tinsley filed objections. Dkt. Nos. 25, 26.

In his report-recommendation, Magistrate Judge Homer advises that Tinsley failed to establish or raise a genuine issue of material fact regarding the nature of his confinement. Report-recommendation, Dkt. No. 24, at 9-10. There is no dispute that prison officials confined Tinsley to keeplock and loss of some privileges for 60 days after they conducted a search of his cell, found a marijuana cigarette in the cell, and found Tinsley guilty of possessing a controlled substance after a Tier III disciplinary hearing. Tinsley's conviction and sentence were affirmed on administrative appeal. In his lawsuit under 42 U.S.C. § 1983, Tinsley raises several charges to the manner in which defendants conducted the search and disciplinary hearing. However, Tinsley failed to specify in any manner that his punishment posed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, ----, 115 S.Ct. 2293, 1300, 132 L.Ed.2d 418, ---- (1995). Without this showing, plaintiff failed to allege a deprivation of his Fourteenth Amendment due process liberty interest, and his civil rights claim must fail. *Id.*

In his objections to the report-recommendation, Tinsley makes general attacks regarding the alleged bias of Magistrate Judge David Homer and argues that the magistrate judge has misconstrued his claims. Plaintiff also asks me to reconsider defendants' summary judgment motion and review plaintiffs memorandum opposing the motion. However, Tinsley has not raised any allegation regarding the nature of his punishment, which is the threshold issue under *Sandin.* I have reviewed the entire file in this matter, including plaintiff's many submissions, and I find that he failed to raised any issue of fact to support an alleged deprivation of his due process liberty interests. Magistrate Judge Homer's thorough report-recommendation is neither biased nor a mischaracterization of plaintiffs claims.

For the foregoing reasons, it is therefore

ORDERED that the report-recommendation of September 13, 1996, is approved, and

ORDERED that plaintiffs' motion for default summary judgment is denied as moot, and

ORDERED that defendants' motion for summary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

judgment is granted, and it is further

ORDERED that the clerk serve a copy of this order upon the parties by regular mail.

IT IS SO ORDERED.
HOMER, United States Magistrate Judge.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff a New York State Department of Correctional Services (DOCS) inmate currently confined at the Great Meadow Correctional Facility (Great Meadow), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments in connection with a search of his cell and ensuing disciplinary hearing. Plaintiff seeks compensatory and punitive damages as well as injunctive relief.

***2** Presently pending are defendants' motion for summary judgment (Docket No. 17), plaintiff's letter-memorandum requesting summary judgment by default (Docket No. 11), and plaintiff's motions for a pre-trial conference (Docket No. 20) and for appointment of counsel (Docket No. 21). For the reasons stated below, it is recommended that the defendants' motion be granted and that plaintiff's motions be denied.

I. BACKGROUND

On October 30, 1995, while plaintiff was incarcerated at Great Meadow, defendant Greene received information from a confidential source that plaintiff was concealing escape materials. Defendant Greene ordered the search of plaintiff's prison cell. The search was executed by Corrections Officer Rando and defendant Yule and was supervised by Sergeant Smith. No escape materials were found. However, the officers found a rolled cigarette in plaintiff's cell. The cigarette tested positive for marijuana. Plaintiff was placed in keeplock [FN2] and was given a contraband receipt for the cigarette that was removed from his cell.

FN2. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

Plaintiff was served with a misbehavior report which charged him with possession of a controlled substance. A Tier III disciplinary hearing [FN3] was commenced on November 3, 1995 before defendant Lanfear as the hearing officer. During the hearing, plaintiff claimed that defendant Greene failed to corroborate the reliability of the confidential informant, the search was improperly supervised, he did not receive the requisite contraband slip, defendants did not remove any contraband item from plaintiff's cell, and defendants failed to sign the misbehavior report. Plaintiff also objected when witnesses were not called in the order he had requested.

FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 254.7(iii), 270.3(a) (1995); *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

At the conclusion of the hearing on November 7, 1995, defendant Lanfear found plaintiff guilty based upon the statement in the misbehavior report submitted by C.O. Rando endorsed by C.O. Yule. Testimony during hearing by C.O. Yule verified the report and stated the substance was found in Tinsley's cell. Testimony during hearing by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sgt. Sawyer stated he received the item found by C.O. Rando and tested same which proved positive for controlled substance. Testimony was considered during hearing by Tinsley.

Defs.' Statement Pursuant to Rule 7.1(f) (Docket No. 17), Ex. A, p. 16. Plaintiff was sentenced to confinement in keeplock for sixty days and loss of packages, commissary and telephone privileges for sixty days. Shortly after this action was commenced, plaintiff's conviction and sentence were affirmed on administrative appeal.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994); *see also* *Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord* *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

***3** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *American Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also* *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). The nonmovant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Discussion

The defendants move for summary judgment on the grounds that (1) plaintiff's due process allegations fail to state a claim, (2) plaintiff's hearing was conducted in accordance with constitutional requirements, (3) the search of plaintiff's cell did not violate any of plaintiff's constitutional rights, and (4) defendants are entitled to qualified immunity.

#### 1. Due Process Liberty Interest

Plaintiff contends that his due process rights were violated because the November 3-7, 1995 disciplinary hearing was improperly executed, and as a result, he was wrongly confined to sixty days keeplock.[FN4] In their motion for summary judgment, defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), plaintiff lacked any liberty interest protected by the Due Process Clause.

> FN4. New York regulations permit placement in keeplock for both disciplinary and administrative reasons. These include, among others, punishment for misconduct and protective custody. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.1-.7 (1995).

A due process claim as alleged by plaintiff will lie under section 1983 only where the alleged violation infringed a cognizable liberty interest. *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995). Under *Sandin,* a court must first determine whether the deprivation of which an inmate complains merits the protections afforded by the Due Process Clause. A protected liberty interest

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. nonetheless imposes *atypical and significant hardship on the inmate in relation to the*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*ordinary incidents of prison life.*

*Id.* at 2300 (emphasis added). The Court held that confinement of the plaintiff for thirty days in a segregated housing unit infringed no liberty interest protected by the Due Process Clause. *Id.* at 2302.

At first blush *Sandin* appeared to mark a radical change in the litigation of inmates' due process claims. It appeared to suggest that the number of sufficiently stated claims would be drastically reduced. *See* *Orellana v. Kyle,* 65 F.3d 29, 31-32 (5th Cir.1995), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996) ("it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty' status.... [T]he ambit of [inmates'] due process liberty claims has been dramatically narrowed.").

Indeed, several circuit courts have rejected prisoners' due process claims under *Sandin* where the deprivation complained of was solely confinement in segregated housing. *See, e.g.,* *Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (indefinite confinement in administrative segregation for affiliation with gang not atypical and significant under *Sandin* ); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996) (segregation without more implicates no liberty interest); *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir.1995)(placement in administrative segregation not atypical and significant in context of life sentence).

***4** Several judges in this district have adopted this position. *See* *Polanco v. Allan,* No. 93-CV-1498, 1996 WL 377074, at *2 (N.D.N.Y. July 5, 1996) (McAvoy, C.J.) (confinement in a special housing unit (SHU) for up to one year not protected by Due Process Clause); *Figueroa v. Selsky,* No. 91-CV-510 (N.D.N.Y. Oct. 5, 1995) (Scullin, J.) (seven and one-half months in SHU not protected); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (McAvoy, C.J.) (197 days in SHU not protected); *Ocasio v. Coughlin,* No. 94-CV-530 (N.D.N.Y. Feb. 5, 1996) (Scullin, J.) (180 days in SHU not protected); *Gonzalez v. Coughlin,* No. 94-CV-1119 (N.D.N.Y. Jan. 10, 1996) (Report-Recommendation of M.J. Hurd) (163 days in keeplock not protected), *adopted,* (N.D.N.Y. May 6, 1996) (Cholakis, J.), *appeal docketed,* No. 96-2494 (2d Cir. June 10, 1996); *Taylor v. Mitchell,* No. 91-CV-1445 (N.D.N.Y. Feb. 5, 1996) (Cholakis, J.) (sixty days in SHU not protected); *Cargill v. Casey,* No. 95-CV-1620, 1996 WL 227859, at *2 (N.D.N.Y. May 2, 1996) (Pooler, J.) (dismissing as frivolous complaint alleging due process violation resulting in keeplock confinement for thirty days). Under these cases, based solely on its duration, plaintiff's confinement in keeplock for sixty days would not constitute a cognizable liberty interest under *Sandin.*

Other circuits, however, have viewed *Sandin* less as a durational, bright line bar to statement of a claim than as an additional issue of fact for litigation. *See, e.g.,* *Bryan v. Duckworth,* 88 F.3d 431, 433-34 (7th Cir.1996) (question of fact whether disciplinary segregation was atypical and significant under *Sandin* ); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.1996) (noting *Sandin* decided by only 5-4 majority and holding that segregation for one year provided basis for assuming atypical and significant deprivation under *Sandin* ); *Gotcher v. Wood,* 66 F.3d 1097, 1101 (9th Cir.1995) (placement in disciplinary segregation presents issue of fact whether it constitutes an atypical and significant deprivation under *Sandin* ).

The Second Circuit appears generally to be following the Seventh, Ninth and Eleventh Circuits. The Second Circuit has not yet definitively addressed the effect of *Sandin* on its prior holdings. *See* *Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995). It has recently held, however, that *Sandin* does apply retroactively and, it appears, that a plaintiff bears the burden of proving that the deprivation in question imposed an atypical and significant hardship. *See* *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *Samuels v. Mockry,* 77 F.3d 34, 37-38 (2d Cir.1996); *see also* *Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996) (dicta that whether confinement in SHU is "atypical and significant" under *Sandin* presents question of fact). One judge in this district has concluded from these cases that fact-finding is required to resolve whether a deprivation is atypical and significant. *Compare* *Silas v. Coughlin,* No. 95-CV-1526, 1996 WL 227857, at *1 (N.D.N.Y. April 29, 1996) (Pooler, J.) (denying motion to dismiss due process claim where plaintiff was confined in SHU for 182 days, holding that Second Circuit's interpretation of *Sandin* mandated further fact-finding as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to nature of plaintiff's alleged deprivation from confinement), *with Cargill v. Casey, supra* (due process claim based on confinement in keeplock for thirty days dismissed as frivolous).

***5** Under these cases, consideration must be given to whether a plaintiff has established, or raised, a genuine question of fact concerning his disciplinary confinement. Here, plaintiff has raised no question of fact concerning his confinement in keeplock. Plaintiff has not alleged rare, unique or unusual hardships of the kind cited in *Sandin* as examples of atypical and significant deprivations. 515 U.S. at ----, 115 S.Ct. at 2300 (transfer to a mental hospital and involuntary administration of psychotropic drugs), or that detention in keeplock imposed a hardship on plaintiff because of his special, unique or unusual condition while incarcerated. *See Delaney v. Selsky,* 899 F.Supp. at 927-28 (question of fact whether confinement in SHU created atypical and significant deprivation for inmate who alleged such confinement caused back problems because of his unusual height of nearly seven feet).

Segregated confinement is a known and usual aspect of incarceration in the New York prison system. *See Sandin v. Conner,* 515 U.S. at ----, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). The existence of keeplock has been authorized by statute, N.Y. Correct. Law § 112(1) (McKinney 1987), and implemented by DOCS regulations. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995). Those regulations describe the conditions and restrictions of confinement in keeplock. *Id.* at pts. 302-05. The deprivations are, therefore, part of the New York prison "regime ... to be normally expected" by one serving a sentence in that system. *Sandin v. Conner,* 515 U.S. at ----, 115 S. Ct. at 2302.

Moreover. confinement in keeplock or SHU may result not only from the imposition of discipline, as here. Inmates may also be placed in keeplock or SHU for reasons of administration, N.Y. Comp.Codes R. & Regs. tit. 7, § 301.4(b) (1995); protection, *id.* at § 301.5; detention, *id.* at § 301.3; reception, diagnosis and treatment, *id.* at pt. 306; or for any other reason. *Id.* at 301.7(a). The conditions for inmates confined in keeplock, including plaintiff, are the same regardless of the reason for placement there. *Id.* at pts. 302-05.[FN5]

FN5. Inmates confined for reasons of protection receive somewhat greater privileges. *See, e.g.,*N.Y. Comp.Codes R. & Regs. tit. 7, § 330.4 (1995) (three hours per day outside cell).

Inmates in the New York system have no right to be incarcerated in any particular institution, cell or block of cells, nor do they enjoy a right to be housed in the general prison population or to participate in any particular program offered at an institution. *Cf. Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no right to remain in particular prison created by state law); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to good time credits created by state statute). Such matters are committed to the discretion of prison authorities. This grant of broad discretion to prison authorities comports with a principle rationale of *Sandin* that

federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.... Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims....

***6**515 U.S. at ---- - ----, 115 S.Ct. at 2299-2300.

Here, plaintiff contends at best that his keeplock confinement was "atypical and significant" under *Sandin* because it subjected him to retaliation, caused closer monitoring by DOCS, affected his transfer to other institutions, and impaired his eligibility for certain prison programs. Pl. Mem. of Law at p. 21. These contentions are conclusory and unsupported in any way. They are also unsworn and unsigned. For these reasons alone, plaintiff's contentions should be rejected as failing to raise any issue of fact under *Sandin.*

On their merits as well, however, these contentions should be rejected. While there may be cases where confinement in keeplock might subject an inmate to retaliation from other inmates or guards such that keeplock confinement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

imposed "atypical and significant" hardships, no such hardship has been demonstrated here by the non-specific, conclusory assertions of plaintiff. As to the contentions regarding plaintiff's monitoring status and his eligibility for transfer and prison programs, all concern matters for which plaintiff has no special rights or interests, all were known to follow from disciplinary confinement as a regular part of DOCS' regime, and plaintiff has asserted no hardship atypical or significant as to him concerning these matters.

For these reasons plaintiff has failed to meet his burden of demonstrating the existence of any factual issue under *Sandin.* Accordingly, defendants' motion on this ground should be granted.

2. Due Process

Defendants assert that, notwithstanding *Sandin,* plaintiff was not denied due process.

The Due Process Clause requires that an inmate faced with disciplinary confinement has a right to at least twenty-four hours advance notice of the charges against him and to be informed of the reasons for the action taken and the evidence relied upon by the hearing officer. In addition, an inmate has the right to call witnesses and present evidence in his defense "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 564-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983). These rights implicitly include the right to make a statement in the inmate's defense and the right to marshal the facts. *See Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Where an inmate is illiterate or where the charges are unusually complex, the inmate is entitled to seek the assistance of another inmate or an employee. *Wolff v. McDonnell,* 418 U.S. at 570. The Second Circuit has extended this right, and directed that inmates who are confined pending a hearing be provided with some form of assistance. *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Corrections officials are required only to provide inmates with the opportunity to exercise these due process rights. *See, e.g., Maiid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982) ("although [the inmate] had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right").

***7** Here, plaintiff argues first that the hearing officer failed to call witnesses in the requested order. However, due process does not mandate that plaintiff be permitted to call his witnesses in a particular order.

Second, plaintiff alleges that the hearing officer failed to conduct an in camera inquiry into the original source of information on which the search was authorized to determine if that source was reliable. However, the issues at the hearing were the results of the search, not the reasons why the search was initiated. The hearing officer's decision did not rest in any part on the information from the confidential informant. Due process thus did not require inquiry into the reliability of the original information.

Third, plaintiff contends that although the original misbehavior report contains the signatures of both defendant Yule and Officer Rando, his copy reflects only defendant Yule's signature. However, an inmate has no right to receive a statement of charges signed by any particular official.[FN6]

FN6. A misbehavior report is to be made by the employee who has observed the incident. Where another employee has personal knowledge of the facts, he shall, where appropriate, endorse his name on the other employee's report. N.Y. Comp.Codes R. & Regs. tit. 7, § 251-3.1(b) (1995). The misbehavior report here was signed by J. Rando and endorsed by G. Yules as an employee witness, and it is endorsed by the area supervisor. *See* Defs.' Statement Pursuant to Rule 7.1(f), Ex. A, p. 1, Inmate Misbehavior Report.

Fourth, plaintiff claims that defendant Roberts failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

provide him with various documents plaintiff requested pursuant to New York's Freedom of Information Law after the disciplinary hearing concluded. This claim as well falls outside the scope of the Due Process Clause as described by the cases discussed above. Defendants' failure to provide the requested documents did not violate plaintiff's constitutional right.

Accordingly, defendants' motion should be granted on this ground as well. [FN7]

FN7. Throughout his complaint and pleadings, plaintiff refers jointly to his right to due process/equal protection. The facts and arguments in plaintiff's complaint and pleadings point only to a due process claim. No facts or arguments relating to the Equal Protection Clause are asserted. Nevertheless, to the extent plaintiff's complaint is deemed to assert a claim for violation of the Equal Protection Clause, defendants' motion for summary judgment should be granted as to that claim as well.

3. Cell Search

Plaintiff alleges that the search of his cell on October 30, 1995 violated his Fourth Amendment protection against unreasonable searches and seizures. [FN8] In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights. *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) (Kaplan, J.). Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights. [FN9] Defendants' motion for summary judgment as to claims regarding the search of plaintiff's cell should be granted.

FN8. In his complaint plaintiff also appears to allege that the search violated his Fourteenth Amendment right to due process because he received a receipt for the seizure of the marijuana five hours after the search was conducted and never received any report of the search. To the extent plaintiff asserts such a claim, summary judgment should be granted to the defendants for the reasons set forth in subsections 1 and 2 above.

FN9. Nor can an inmate recover under section 1983 for intentional destruction of his personal property by a state employee, as long as the state provides a meaningful post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. at 533. New York provides such a remedy in section 9 of the New York Court of Claims Act. *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Plaintiff may pursue any claim regarding destruction of his personal property in state court.

4. *Qualified Immunity*

Defendants argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity.

A government official is entitled to qualified immunity if his or her conduct did not violate "a clearly established" constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). The contours of the right must be established to the extent that a reasonable official would recognize his acts violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The following factors must be considered to determine whether a right is clearly established:

***8** (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). A determination in favor of a public officer based on qualified immunity is appropriate when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to recognize that his conduct violated the right. *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir.1993).

Here, among other reasons, the defendants could not reasonably have known that the search of plaintiff's cell violated any of his Fourth Amendment rights or that plaintiff's due process rights were violated by the failure to call witnesses in the order requested by plaintiff. *Cf. Walker v. Bates,* 23 F.3d 652, 656-57 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (prison disciplinary hearing officer entitled to qualified immunity in suit claiming violation of due process from denial of prisoner's right to call witnesses in disciplinary hearing); *Cookish v. Powell,* 945 F.2d 441, 449 (1st Cir.1991) (prison official entitled to qualified immunity from charge of violating prisoner's Fourth Amendment rights by conducting body cavity search in view of prison guards of opposite sex). Therefore, the defendants' motion on this ground should be granted.

## III. APPOINTMENT OF COUNSEL

Also pending is a renewed application by plaintiff for appointment of counsel (Docket No. 21). A review of the file in this matter reveals that the issues in dispute in this case are not overly complex. Further, there has been no indication that plaintiff has been unable to investigate the critical facts of this case. Finally, no special reason appears why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Therefore, based upon the existing record in this case, appointment of counsel is unwarranted.[FN10]

> FN10. Also pending is plaintiff's motion for a pre-trial conference and evidentiary hearing (Docket No. 23). This motion is untimely and is hereby denied. Plaintiff has also moved for summary judgment by default (Docket No. 11) in response to defendants' request for an extension of time to answer the complaint. This extension was granted by order dated March 15, 1996 and defendants have answered. Accordingly, it is recommended that this motion be denied as moot.

## IV. CONCLUSION

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion for summary judgment be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment by default be DENIED; and it is hereby

ORDERED that plaintiff's renewed motion for appointment of counsel is DENIED without prejudice; and it is further

ORDERED that plaintiff's motion for a pre-trial conference and an evidentiary hearing is DENIED; and it is further

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.

***9** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Tinsley v. Greene

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Bernard SORRENTINO, Plaintiff,
v.
Robert OUTHOUSE, Sheriff, Cayuga County; John Mack, Lieutenant, Cayuga County Jail; Douglas Butler, Sergeant, Cayuga County Jail, Defendants.
**No. 9:03-CV-0104.**

July 21, 2006.

Bernard J. Sorrentino, Romulus, NY, pro se.

Lisa Marie Robinson, Kenneth M. Alweis, Goldberg, Segalla Law Firm, Syracuse, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior United States District Judge.

**I. BACKGROUND**

***1** In this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Inmate Bernard Sorrentino ("Plaintiff") alleges that Cayuga County Jail Lieutenant John Mack, Sergeant Douglas Butler, and Cayuga County Sheriff Robert Outhouse (collectively "Defendants") violated his constitutional rights when (1) documents prepared by Plaintiff for use in his defense at trial were confiscated; (2) Plaintiff was placed in solitary confinement; (3) Plaintiff was denied access to the law library; (4) Plaintiff was given inadequate medical care; (5) Defendants retaliated in response to Plaintiff voicing complaints; and (6) Plaintiff was attacked by another inmate due to Defendants' deliberate indifference to security and supervision despite Plaintiff's voiced fears. (Pl.'s Aff. ¶ 2).

Currently before the Court is Defendants' motion for summary judgment. Defendants' motion raises the following issues: (1) whether the injunctive relief sought by Plaintiff must be dismissed for mootness; (2) whether Plaintiff is not entitled to punitive damages because this action was brought against the Defendants in their official capacities; (3) whether Defendants are entitled to qualified immunity; (4) whether Plaintiff's action should be dismissed because Defendants had no personal involvement; (5) whether Plaintiff's causes of action against Defendant Outhouse based on New York state law should be dismissed because Plaintiff has failed to comply with New York's General Municipal Law; and (6) whether Plaintiff's cause of action based on the seizure of his printed materials must be dismissed under the doctrine of collateral estoppel.

For the reasons discussed below, Defendants' motion for summary judgment is granted.

**II. STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists. *Santiago v. C.O. Campisi Shield # 4592,* 91 F.Supp.2d 665, 669 (S.D.N.Y.2000). There is no issue for trial unless there is sufficient factual disagreement such that the evidence submitted to a reasonable jury could return a verdict favoring the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Therefore, the moving party's burden is satisfied if that party establishes that an essential element of the nonmoving party's case is unsupported by evidence. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 466 (S.D.N.Y.1998).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

If the moving party meets its burden, the burden then shifts to the nonmoving party to present sufficient evidence to support a jury verdict in its favor. *Aziz Zarif Shabazz,* 994 F.Supp. at 466. Simply making vague, conclusory allegations or broad denials of the pleading will not defeat an otherwise properly supported motion for summary judgment. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003). The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). In determining whether to grant summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences from the submitted materials in a light most favorable to the non-moving party. *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004). Summary judgment should be granted only when it is apparent that no rational trier of fact could find in favor of the nonmoving party because evidence supporting its claim is lacking. *Aziz Zarif Shabazz,* 994 F.Supp. at 467.

***2** Furthermore, where a party is proceeding *pro se,* the Court must construe the *pro se* litigant's pleadings and papers liberally [FN1] and interpret them to raise the strongest arguments that they suggest. *Veloz v. New York,* 339 F.Supp.2d 505, 513 (S.D.N.Y.2004). However, the application of this lenient standard does not relieve Plaintiff of the requirement to allege specific facts or particular laws that have been violated to defeat a motion for summary judgment. *Veloz,* 339 F.Supp.2d at 513. It further does not excuse the Plaintiff from following the procedural formalities of Local Rule 7.1(a)(3). [FN2] *Govan,* 289 F.Supp.2d at 295. Generally a dismissal of a *pro se* complaint is justified when it is beyond doubt that the plaintiff cannot prove facts in support of his claim which would entitle him to relief. *Platsky v. C.I.A.,* 953 F.2d 26, 28 (2d Cir.1991). However, because the local rules impose a strict requirement that parties provide specific record citations in support of their statement of material facts, the Court may grant summary judgment on that basis even when a *pro se* party is involved. *Govan,* 289 F.Supp.2d at 295.

FN1. To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan,* 289 F.Supp.2d at 295. The Court has an obligation to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training. *Id.*

FN2. The courts of the Northern District adhere to a strict application of Local Rule 7.1(a)(3) requirement on summary judgment motions, specifically providing that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *Govan,* 289 F.Supp.2d at 295. Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." *Id. See also, Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999).

**III. DISCUSSION**

***A. Statement of Material Facts***

Plaintiff did not file a statement of undisputed material facts in compliance with Local Rule 7.1(a)(3). Consequently, the Court will accept the properly supported facts contained in the Defendants' 7.1 statement as true for purposes of this motion.

Plaintiff is currently incarcerated at the Five Points Correctional Facility. (Pl.'s Dep. 6, Feb. 24, 2005). This action was commenced on January 24, 2003 against Cayuga County Sheriff Robert Outhouse and Lieutenant John Mack and Sergeant Douglas Butler at the Cayuga County Jail. In 2002, Plaintiff was convicted for the murder of his wife. (Pl.'s Dep. 6). From the time of his arrest until shortly after his conviction in early 2003, Plaintiff was incarcerated at the Cayuga County Jail for ten months, from approximately April, 2002 until February, 2003. (Pl.'s Dep. 7). Plaintiff's claims are based on varying acts and omissions that occurred between the time periods of April 2002 through February 2003, while Plaintiff was detained at the Cayuga County Jail for the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

purpose of attending trial in connection with his criminal indictment. (Pl.'s Aff. ¶ 2).

Approximately five months into his incarceration, Plaintiff was placed in the Cayuga County Jail's Restricted Housing Unit (RHU). (Pl.'s Dep. 11-12). Plaintiff alleged that he was placed in the solitary confines of RHU for approximately 90 days. (Pl.'s Aff. ¶ 3). Plaintiff was placed in RHU because he received five misbehavior reports in a span of twelve days. (Pl.'s Dep. 13-16).

Plaintiff also alleged he was denied adequate medical care. However, Plaintiff made contradictory statements whether he suffered from any physical illnesses or injuries that required medical attention. (Pl.'s Dep. 33-34). Plaintiff received his prescribed medication and treatment on a daily basis, whenever it was required. (Wallace Dep. 7, Feb. 24, 2005). Plaintiff further alleged that he was denied proper mental health care at the Jail but again contradicted himself and stated he did not require such treatment. (Pl.'s Dep. 34). Instead, Plaintiff “just wanted to talk” with a woman on the medical staff. *Id.* Plaintiff did not suffer from any continuous mental health problem. (Pl.'s Dep. 35).

***3** Plaintiff next alleged that he was improperly denied access to the law library. Plaintiff stated that he made daily requests to visit the law library. (Pl.'s Dep. 36). Although Plaintiff was granted access to the law library, not every request was granted. (Pl.'s Dep. 37). There were occasions when Plaintiff was denied access based on safety and security concerns when there was a lack of available escorts. (Hurd Dep. 24, Feb. 24, 2005). Nevertheless, Plaintiff was never denied access to the law library when an escorting officer was available. (Hurd Dep. 25).

Plaintiff further alleged that his research documents were improperly seized by Defendants. Specifically, Plaintiff complained about the seizure of medical studies on the drug Prozac, which Plaintiff intended to introduce at his criminal trial. (Pl.'s Dep. 59). This seizure was supervised by Defendant Butler. (Butler Aff. ¶ 9-10).

Finally, Plaintiff alleged that Defendants were liable for injuries he sustained in an altercation with another inmate, James Holmquist, in the dormitory shared by the two individuals. (Pl.'s Dep. 39). There were no officials around at the outset of the fight, but once the corrections officers saw the altercation occurring, they arrived on scene without delay and stopped it. (Pl.'s Dep. 45).

***B. Personal Involvement***

The Defendants contend they were not personally involved in the alleged constitutional violations. The doctrine of *respondent superior* does not apply to actions under 42 U.S.C. § 1983. *Porter v. Selsky,* 287 F.Supp.2d 180, 184 (W.D.N.Y.2003). Because *respondeat superior* cannot provide a basis for liability under § 1983, Defendants may not be held liable merely because they held a high position of authority. *Veloz,* 339 F.Supp.2d at 519. Instead, a viable a claim for relief under § 1983 must show that the Defendants were personally involved in the alleged constitutional violation. *Thomas v. Irvin,* 981 F.Supp. 794, 801 (W.D.N.Y.1997). Personal involvement includes not only direct participation in the alleged violation but also actual or constructive notice of the deprivation. *Patterson,* 375 F.3d at 229.

More specifically, personal involvement of Defendants as ranking officials in their individual capacities may be established by evidence that they (1) participated directly in the alleged constitutional violation; (2) failed to remedy a wrong after being informed of a violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) were grossly negligent in supervising subordinates who committed the alleged wrongful acts; or (5) exhibited deliberate indifference to the rights of Plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *Colon,* 58 F.3d at 873. Thus, personal responsibility on the part of the Defendants' must be established because proof of mere linkage in the prison chain of command does not establish liability. *Veloz,* 339 F.Supp.2d at 519.

***1. Defendants Outhouse and Mack***

***4** Plaintiff fails to establish personal involvement by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants Outhouse and Mack. Plaintiff claims that Defendants Outhouse and Mack are liable because as figures of authority they failed to take supervisory action to prevent conduct by subordinates which allegedly caused him injuries. (Pl.'s Dep. 56). However, there is no evidence that Defendants Outhouse and Mack directly participated in the alleged violations, had knowledge of the alleged violations as supervisors, failed to remedy the alleged violations, or were grossly negligent or exhibited deliberate indifference to Plaintiff's rights.

More specifically, Defendant Outhouse was not the Sheriff of Cayuga County during most of Plaintiff's incarceration at the Cayuga County Jail. (Outhouse Aff. ¶ 5). Plaintiff was incarcerated at the Cayuga County Jail in April, 2002, and remained there approximately ten months, while defendant Outhouse became Sheriff of Cayuga County in 2003. (Outhouse Aff. ¶ 6). Consequently, Plaintiff was unable to state specific incidents where Defendant Outhouse instructed, or was aware of, any of the wrongful behavior alleged by Plaintiff. (Pl.'s Dep. 49). For example, Plaintiff has no written documentation from Defendant Outhouse denying Plaintiff access to the law library, (Pl.'s Dep. 48), and Plaintiff cannot specifically state that Defendant Outhouse denied Plaintiff medical care. (Pl.'s Dep. 48-49).

Similarly, Plaintiff makes broad allegations that because Defendant Mack is a ranking officer he is liable for his failure to review all requests made by inmates. (Pl.'s Dep. 56). To the extent that his request to access the law library was denied, for example, Plaintiff believes that liability should fall on Defendant Mack as the superior officer who should have reviewed Plaintiff's request and provided access. (Pl.'s Dep. 54). Plaintiff's argument essentially seeks to impose liability based on Defendant Mack's connection in the prison chain of command, which does not establish Defendant Mack's personal involvement. As such, Plaintiff is unable to state that defendant Mack ever denied Plaintiff medical care, or that Defendant Mack was responsible for confiscating his research documents. (Pl.'s Dep. 55).

In sum, there is insufficient evidence upon which a jury could reasonably conclude that Defendants Outhouse and Mack (1) were personally involved, had notice, or authorized subordinates to confine Plaintiff in RHU and oversee Plaintiff's mistreatment and harassment (Outhouse Aff. ¶ 8-11), (Mack Aff. ¶ 5, 12-13); (2) were personally involved in the provision or denial of physical and mental health care to Plaintiff (Outhouse Aff. ¶ 13), (Mack Aff. ¶ 11); (3) were personally involved, had notice, or authorized improper denial of Plaintiff's access to the law library (Outhouse Aff. ¶ 19), (Mack Aff. ¶ 10); (4) were personally involved or present at the altercation between Plaintiff and inmate James Holmquist (Outhouse Aff. ¶ 21), (Mack Aff. ¶ 8); or (5) were personally involved, had notice, or authorized subordinates to improperly seize printed medical research documents from Plaintiff's cell (Outhouse Aff. ¶ 23), (Mack Aff. ¶ 6-7).

***5** Because the records do not indicate that Defendants Outhouse and Mack were grossly negligent in managing subordinates who allegedly committed constitutional violations, or that they were advised about violations but failed to take remedial action, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's claims against Defendant Outhouse and Mack for lack of personal involvement.

***2. Defendant Butler***

Like Defendants Outhouse and Mack, Defendant Butler lacked personal involvement in most of the alleged constitutional violations. For example, Plaintiff alleges that Defendant Butler was responsible for Plaintiff's placement in RHU, but has no evidence to support this claim.[FN3] (Pl.'s Dep. 51). Plaintiff also could not affirmatively state that Defendant Butler denied him medical care. (Pl.'s Dep. 52). However, unlike Defendants Outhouse and Mack, Defendant Butler did supervise the confiscation of research documents from Plaintiff's cell. Therefore, the claims asserting violations when Plaintiff was placed in RHU, provided inadequate medical care, and denied access to the law library are dismissed against Defendant Butler for lack of personal involvement but the claim alleging involvement in the confiscation of documents is not.

FN3. Defendant Butler also was not personally involved in, did not have notice of, and did not authorize Plaintiff's alleged mistreatment and harassment. (Butler Aff. ¶ 7).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*C. Eighth Amendment Standard*

Assuming that Defendants were personally involved in the alleged violations, the Plaintiff can claim violation of the Eighth Amendment which prohibits the infliction of "cruel and unusual punishments" on prisoners. *Veloz,* 339 F.Supp.2d at 521. The Eighth Amendment imposes duties on Defendants to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, medical care, and reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,* 511 U.S. 825, 832-833 (1994). To establish a violation of the Eighth Amendment, Plaintiff must allege acts or omissions demonstrating deliberate indifference to a substantial risk of serious harm. *Veloz,* 339 F.Supp.2d at 521. Deliberate indifference embodies both an objective and a subjective component. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Objectively, the alleged deprivation must be sufficiently serious. *Id.* Subjectively, the charged official must act with a sufficiently culpable state of mind, which requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Id.*

*1. Protection from Assault*

The Eighth Amendment's prohibition against cruel and unusual punishment includes Plaintiff's right to be protected from the violent conduct of other inmates. *Farmer,* 511 U.S. at 833. To have a viable claim based on a failure to prevent harm from the assaultive conduct of other inmates, Plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm and that the Defendants were deliberately indifferent to Plaintiff's health and safety. *Porter,* 287 F.Supp.2d at 185. Defendants' duty under the Eighth Amendment is to ensure reasonable safety. *Id.* at 186. However, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. *Farmer,* 511 U.S. at 843.

***6** Plaintiff alleges that Defendants failed to take reasonable steps or precautions to avert potential harm against him by another inmate, James Holmquist, on January 2003. (Pl.'s Compl. ¶ 7). The altercation took place in the dormitory room shared by Plaintiff and Mr. Holmquist. (Pl.'s Dep. 39). At the time of the altercation, there were no corrections officers in the dormitory room. (Pl.'s Dep. 45). Once the officers saw the altercation, they proceeded to stop the fight without delay. (Pl.'s Dep. 45). Plaintiff was subsequently provided with prompt and adequate medical treatment for the injuries sustained in the fight. (Pl.'s Dep. 43). Plaintiff asserts that Defendants were deliberately indifferent and grossly negligent in protecting Plaintiff's health and safety due to their inadequate supervision of the area in which Plaintiff was attacked. (Pl.'s Compl. ¶ 7). Plaintiff further alleges that Defendants' deliberate indifference was also manifested by their refusal to grant Plaintiff's request for transfer out of the dormitory where the altercation occurred from concern over arguments and hostilities that were building in the dormitory. (Pl.'s Dep. 39).

Plaintiff's allegations are inconsistent with other facts relevant to his relationship with Mr. Holmquist. There is no evidence of any history between Plaintiff and Mr. Holmquist that would have warned Defendants of a potential risk of assault. (Pl.'s Dep 38). Plaintiff's fears stem from seeing fights among other inmates in the prison rather than direct threats made to him. (Pl.'s Dep. 40). In fact, Mr. Holmquist apologized to Plaintiff after the fight when he realized that he had mistaken Plaintiff for another inmate who had talked bad about him. (Pl.'s Dep. 42). Therefore, Plaintiff was not under any substantial risk of serious harm from other inmates. More importantly, Defendants could not have been deliberately indifferent because they were not aware of a substantial risk of assault to Plaintiff. Although the Defendants did not avert the fight, prison officials responded to the altercation by promptly breaking up the fight and providing Plaintiff with necessary medical attention. Because Plaintiff was not subjected to a substantial risk of serious harm, and because there is no evidence of deliberate indifference, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's claim that Defendants failed to protect Plaintiff from the assaultive conduct of another inmate.

*2. Prison Condition*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff also has a right to be free from conditions of confinement that impose an excessive risk to Plaintiff's health or safety. *Thomas,* 981 F.Supp. at 800. In order to establish that this right has been violated, Plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, constituting serious deprivation of basic human needs, or of the minimal civilized measure of life's necessities. *Govan,* 289 F.Supp.2d at 296. Moreover, Plaintiff must establish that the official acted or failed to act with deliberate indifference to the inmate's health or safety. *Thomas,* 981 F.Supp. at 800. In assessing the constitutionality of prison conditions, the Court must remember that conditions that are restrictive and harsh are an element of the penalty that criminal offenders pay to society for their offenses. *Govan,* 289 F.Supp.2d at 296.

***7** Plaintiff alleges that his confinement to the restrictions of RHU was a constitutional violation because he was isolated in cold conditions. (Pl.'s Compl. ¶ 6(E)(3)). However, Plaintiff fails to show that the conditions of his confinement in RHU imposed an excessive risk to his health and safety to which Defendants were deliberately indifferent. Alleging that RHU was cold does not show how Plaintiff was actually harmed, or likely to be harmed, by the conditions of RHU and thereby subjected to risk of serious harm. Accordingly, Plaintiff has failed to establish a violation of his Eighth Amendment rights. Because it cannot be said that Plaintiff was deprived of life's basic necessities while in the RHU simply because it was cold, Defendants are entitled to summary judgment dismissing this claim.

***3. Medical Care***

The Eighth Amendment further protects Plaintiff from inadequate medical care. *Hathaway,* 37 F.3d at 66. Violation of the Eighth Amendment is established if the deprivation of adequate medical care is sufficiently serious, manifesting a condition of urgency that may produce death, degeneration, or extreme pain. *Id.* Deliberate indifference to Plaintiff's medical need is demonstrated by proof that Defendants intentionally denied or delayed access to medical care or interfered with the treatment once prescribed. *Veloz,* 339 F.Supp.2d at 521. Negligent treatment or medical malpractice, or a claim based on the fact that Plaintiff prefers a different treatment are insufficient to state an Eighth Amendment claim. *Id.*

Plaintiff did not have medical conditions constituting a sufficiently serious medical condition for purposes of the Eighth Amendment. Plaintiff initially alleged that he was denied proper mental health care but retracted this allegation when he stated that he did not require such treatment because he “just wanted to talk” with a woman working for the Cayuga County Jail medical staff. (Pl.'s Dep. 34). Furthermore, Plaintiff does not suffer from any continuous mental health condition that can potentially cause death, degeneration, or extreme pain. (Pl.'s Dep. 35).

Plaintiff has complained of problems with his ear and was injured in a fight with Mr. Holmquist from which he suffered a concussion, a fractured shoulder, and facial cuts. (Pl.'s Dep 43). Assuming these conditions were sufficiently serious, Defendants did not act with deliberate indifference because Defendants responded to Plaintiff's medical complaints, providing treatment for his ear and to the injuries he suffered from his fight with Mr. Holmquist. (Wallace Dep. 8-9). No reasonable fact finder could conclude that Defendants treated Plaintiff with deliberate indifference as to his medical needs and, therefore, Defendants' motion for summary judgment is granted with respect to Plaintiff's claim of inadequate medical care.

***D. First Amendment***

Assuming that Defendants were personally involved in denying Plaintiff access to the law library, Plaintiff can claim violation of the First Amendment which provides prisoners a right of access to the courts that prison officials may not impede. *Lewis v. Casey,* 518 U.S. 343, 346, 351 (1996). This constitutional right, in turn, give rise to a number of derivative rights, including the right to access legal materials needed to prepare cases such as materials from a law library. *Amaker v. Goord,* 2002 WL 523371, at * 11 (S.D.N.Y. Mar. 29, 2002) (citing *Bounds v. Smith,* 430 U.S. 817 (1917)).

***8** To establish a violation of the fundamental right of access to the courts, Plaintiff must show actual injury

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

caused by the alleged deprivation. *Lewis,* 518 U.S. at 353, and n. 4 (inmates must show "that nonfrivolous legal claim has been frustrated or was being impeded" due to the action or inaction of prison officials). However, even if prisoners are not provided with access to a prison library, the right of access to courts is not infringed where prisoners are provided with appointed counsel. *Bounds,* 430 U.S. at 830-831;*Spates v. Manson,* 644 F.2d 80, 84-85 (2d Cir.1981) ("the right to represent oneself in criminal proceedings, [though] protected by the Sixth Amendment, does not carry with it a right to state-financed library resources where state-financed legal assistance is available."); *Abodeen v. Bufardi,* No. 03-0072 (2d Cir. Sept. 18, 2003) (affirmed that "the right of access to courts is not infringed where prisoners are provided with appointed counsel[,] even if they are not supplied with an adequate prison library.").

Plaintiff alleges that Defendants acted in violation of his rights when he was denied access to the law library in preparation for his criminal trial. (Pl.'s Compl. ¶ 6). Plaintiff made daily requests to visit the law library and his requests were granted except for security reasons when an escort was unavailable. (Hurd Dep. 24). Even if Plaintiff was denied access to the law library when an escort was available, he still does not have a valid First Amendment claim because he was provided counsel during his criminal trial. Plaintiff fails to demonstrate any actual injury arising from the denial of access to the law library when an escort was unavailable.

***E. Eleventh Amendment***

While states are protected by the Eleventh Amendment from suits brought by a private party, municipalities are not. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70 (1989). To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). Defendants are not state officials who are protected under the Eleventh Amendment, but rather municipal officials, and therefore the Eleventh Amendment does not bar this action.

***F. Qualified Immunity***

Defendants assert that they are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions in the course of their duties are immune from civil liability provided that their actions do not violate a clearly established statutory or constitutional right of which a reasonable official comparably placed would have known. *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1106 (S.D.N.Y.1995). In evaluating a motion for summary judgment on the basis of qualified immunity, the Court must first inquire whether, construing the facts most favorably to the Plaintiff, the facts show that the Defendants violated a constitutional right. *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002); *see also, Saucier v. Katz,* 533 U.S. 194, 201 (2001). If the Court finds that the Defendants did not violate a constitutional right, the Court will proceed no further. *Loria v. Gorman,* 306 F.3d 1271, 1281 (2d Cir.2002). If the Court finds that there has been a constitutional violation, the Court must determine the objective reasonableness of the Defendants' belief in the lawfulness of their actions. *Loria,* 306 F.3d at 1282. *See also, Saucier,* 533 U.S. at 201. If the Defendants reasonably believed that their actions did not violate Plaintiff's rights, they are entitled to qualified immunity even if that belief was mistaken.[FN4] *Loria,* 306 F.3d at 1282. However, if their belief was not objectively reasonable, qualified immunity will not apply. *Id.*

> FN4. The objective reasonableness test is met, and the Defendants are entitled to immunity, if officials of reasonable competence could disagree on the legality of the Defendants' actions. *Thomas,* 981 F.Supp. at 802.

***9** In this case, Plaintiff emphasizes that the confiscation of his research documents under the supervision of Defendant Butler violated his constitutional rights. (Pl.'s Compl. ¶ 6). The documents that were allegedly seized improperly from Plaintiff's dormitory bunk were studies related to the drug Prozac, which Plaintiff intended to introduce at his criminal trial to show that the drug caused him to become mentally unstable and murder his wife. (Pl.'s Dep. 61). Defendant Butler supervised the confiscation of Plaintiff's documents pursuant to the Cayuga County Jail's rules and regulations limiting the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

number of non-privileged documents which prisoners can keep in their living area to ensure safety and security. (Butler Aff. ¶ 11). Cayuga County Jail's rule against possession of excessive papers was created pursuant to the Minimum Standards and Regulations for Management of County Jails and Penitentiaries (hereinafter "Minimum Standards"), which are promulgated by the New York State Department of Corrections. (Butler Aff. ¶ 11). Part 7004.3 of the Minimum Standards specifically authorize correctional facility officials to inspect incoming prisoner correspondence, excluding any privileged correspondence, to ensure the absence of contraband.[FN5] (Butler Aff. ¶ 12). According to the Minimum Standards, "privileged" correspondence is defined as legal correspondence from an attorney or any individual under the direct supervision of an attorney. (Butler Aff. ¶ 13). The Cayuga County Jail's rule against possession of excessive non-privileged documents allows inmates to have no more than five pieces of non-privileged correspondence, with any excess non-privileged correspondence subject to seizure. (Butler Aff. ¶ 16). Plaintiff violated the rule and possessed one hundred sheets of materials, which was grossly over the limit of five non-privileged pieces of paper. (Pl.'s Dep. 60). No privileged materials were seized from Plaintiff during the search. (Butler Aff. ¶ 18). The studies on Prozac were non-privileged documents because they were sent by Plaintiff's sister, not his attorney or anyone associated with his attorney. (Pl.'s Dep. 61).

FN5. Part 7004.3 of the Minimum Standards states: "Incoming prisoner correspondence other than privileged correspondence may be opened and inspected outside the presence of the intended prisoner recipient. Such correspondence may be opened and inspected solely to ensure the absence of contraband." (Exhibit "A" to Butler Aff .).

Confiscating Plaintiff's research documents was not a violation of his constitutional rights because, in addition to the reasons set forth *supra* at section III(D), restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests and are not an exaggerated response to such objectives. *Beard v. Banks,* 126 S.Ct. 2572, 2578 (2006). In *Beard,* a Pennsylvania prison policy denying inmates access to newspapers, magazines, and photographs was not found to be a violation of prisoners' First Amendment rights.[FN6] 126 S.Ct. at 2575. The court determined that the Pennsylvania policy served several penological objectives, one of which was to minimize the amount of property in the hands of prisoners, which made it easier for correctional officers to detect concealed contraband and provide security. *Id.* at 2579. In its finding, the court considered four factors relevant in determining the reasonableness of the regulation at issue: (1) whether the regulation has a valid, rational connection to a legitimate governmental interest; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are ready alternatives to the regulation. *Beard,* 126 S.Ct. at 2579. *See also* *Turner v. Safley,* 482 U.S. 78, 89-91 (1987).

FN6. A controlling rationale for the court's decision was deferring to the professional judgment of prison officials, who reached an experience-based conclusion that certain restrictive policies were necessary to further legitimate penological goals. *Beard,* 126 S.Ct. at 2579. *See also,* *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003).

***10** In this case, the Cayuga County Jail promulgated rules and regulations limiting the number of printed materials which a prisoner may keep in his living area to ensure safety, security, and order at the correctional facility and reduce the risk of fire. (Butler Aff. ¶ 15). The regulation restricting the amount of documents held by Plaintiff bear a rational relation to Cayuga County Jail's valid penological interests in maintaining internal security. The regulation promotes internal security by reducing the risk of hidden contraband or the risk of fire that can undermine prison safety. Plaintiff also had alternative means of exercising his right to retain important documents. Plaintiff had the option of consulting with his counsel during his criminal trial to make sure that the Prozac documents were sent from the attorney's office so that it was privileged and not subject to seizure. Furthermore, the impact an accommodation of Plaintiff's asserted right would have on the prison is that it would impair the ability of corrections officers to maintain security and also undermine the rules promulgated by the Cayuga County Jail in accordance with the Minimum Standards. When accommodation will have an impact on the prison, courts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

are particularly deferential to prison administrators' regulatory judgments. *Overton v. Bazzetta,* 539 U.S. 126, 135 (2003). Finally, there is no ready alternative to regulating the possession of non-privileged documents that undermines the reasonableness of the regulation. The alternative is to allow possession of a larger volume of non-privileged documents, but that would undermine the Cayuga County Jail's interest in maintaining prison safety. Because there is no ready alternative that fully accommodates Plaintiff's rights at *de minimis* cost to Cayuga County Jail's valid penological interests, the policy restricting possession of non-privileged documents is reasonable. *Turner,* 482 U.S. at 91. In light of this, the actions taken by Defendants did not violate Plaintiff's constitutional rights. Alternatively, assuming Defendants violated Plaintiff's constitutional rights, they would be entitled to qualified immunity because officials of reasonable competence could disagree on the legality of the confiscation of the non-privileged documents. *Thomas,* 981 F.Supp. at 802. Accordingly, Defendants are entitled to summary judgment insofar as it is based on the seizure of Plaintiff's documents.

***G. Retaliation***

Prison officials may not retaliate against prisoners for the exercise of the right to petition the government for the redress of grievances. *Colon,* 58 F.3d at 872. However, claims of retaliation must be examined with skepticism and care because prisoners will often take exception to the decisions and actions by prison officials, easily fabricating claims of retaliation. *Id.* Because retaliation claims can easily be fabricated, plaintiffs bear a heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial. *Aziz Zarif Shabazz,* 994 F.Supp. at 467.

***11** In order to assert a claim of retaliation successfully, the Plaintiff must show that he engaged in conduct that was constitutionally protected and that retaliation against the protected conduct was a substantial or motivating factor in Defendants' actions. *Aziz Zarif Shabazz,* 994 F.Supp. at 468. If the Plaintiff carries that burden, the Defendants must show by a preponderance of the evidence that they would have disciplined the Plaintiff even in the absence of the protected conduct. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Thus, Defendants' action may be upheld if the action would have been taken based on the proper reasons alone. *Graham,* 89 F.3d at 79. A finding of sufficient permissible reasons to justify Defendants' action is determined in the context of prison administration where the Court recognizes that prison officials have broad administrative and discretionary authority. *Id.*

Plaintiff alleges that when he voiced several complaints about prison conditions and attempted to file grievances after being involved with several disagreements with prison officials, a series of retaliatory activities ensued. (Pl.'s Compl. ¶ 6). Plaintiff claims he was placed in solitary confinement in the RHU, denied access to the law library, provided inadequate medical care, and his documents were confiscated. (Pl.'s Compl. ¶ 6). As discussed previously, Plaintiff was provided adequate medical care when necessary and only denied access to the library for security reasons when an escort was unavailable. Moreover, confiscating Plaintiff's documents was a reasonable means to maintaining Cayuga County Jail's penological interest in prison safety.

With respect to Plaintiff's placement in RHU, Plaintiff relies on conclusory allegations of retaliation, vaguely asserting that it is common practice in Cayuga County Jail to place inmates in the solitary confines of RHU whom they considered to be problematic and personally disliked for repeated complaints and grievance filings. (Pl.'s Compl. ¶ 6(E)(2)). Plaintiff successfully shows that his filing the grievance was the constitutionally protected conduct that may have improperly motivated retaliation. However, he is unsuccessful in proving that the protected act he engaged in was in fact a motivation behind the alleged retaliation. Contrarily, Defendants meet their burden in showing that they would have punished Plaintiff regardless of his repeated complaints because Defendants were prompted to place Plaintiff in RHU after Plaintiff received five misbehavior reports within a span of twelve days.[FN7] (Pl.'s Dep. 13-16). Plaintiff's protected act was the right to file grievances, yet what motivated Plaintiff's confinement was his breach of prison rules, which is not constitutionally protected conduct. Plaintiff has no credible proof to controvert the arguments and evidence offered by Defendants, which show that there was cause for placing Plaintiff in RHU. Plaintiff's broad and unsubstantiated allegations of retaliation cannot defeat Defendants' motion for summary judgment. The Court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

grants Defendants' motion for summary judgment dismissing Plaintiff's claim of retaliation.

FN7. Plaintiff received one citation each on 9/14/02, 9/19/02, 9/24/02, and two on 9/26/02. Misbehavior included threats against officials, attempts to incite other inmates, flooding his cell with water, and violating the dress code. (Exhibits L-Q Defs.' Mot. Summ. J.)

**H.** ***Motion for Leave to Amend***

***12** Plaintiff's motion for leave to file an amended complaint (Dkt. No. 44) is denied as both untimely and futile. Magistrate Judge Homer set December 30, 2004 as the deadline for filing non-dispositive motions. The instant motion was not filed until June 15, 2006, long after the deadline has passed. Moreover, Plaintiff fails to demonstrate good cause for the delay. According to Plaintiff, he came across another inmate who believed that Defendants had an unofficial policy of placing "trouble" inmates in RHU without a hearing and that the proposed Defendant Elser was responsible for implementing that policy. Plaintiff, however, should have been well aware of the relevant facts pertaining to him and should have known whether he was placed in the RHU without a hearing. Further, in his February 2005 discovery responses, Plaintiff indicated that Elser should be added as a Defendant. Nevertheless, he waited an unreasonable period of time before seeking leave to add Elser as a Defendant. Accordingly, Plaintiff's motion is untimely.

In any event, Plaintiff's due process claim with respect to his placement in the RHU is without merit. "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citation and internal quotation marks omitted). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U .S. 472, 484, 115 S.Ct. 2293 (1995)). "[W]ith respect to 'normal' SHU confinement, [the Second Circuit has] held that a 101-day confinement does not meet the *Sandin* standard of atypicality." *Id.* (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). "[U]nder abnormal or unusual SHU conditions, periods of confinement of less than 101 days may implicate a liberty interest." *Id.*

Here, Defendants contend that Plaintiff was placed in the RHU for thirty days. Plaintiff contends that he was in the RHU for ninety days. Even assuming Plaintiff was in the RHU for ninety days, he has presented no evidence concerning his confinement in the RHU to suggest that it presented conditions abnormal or unusual from typical RHU confinement. Accordingly, the due process claim must be dismissed and it would be futile to add Elser with respect to that claim.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED,** Plaintiff's Complaint is DISMISSED and Plaintiff's motion for leave to file an amended complaint is **DENIED.** The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Sorrentino v. Outhouse
Not Reported in F.Supp.2d, 2006 WL 2052307 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

***1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.)[FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name.[FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Com pl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

***2** Greenwaldt also claims that Recore denied his appeal of the disciplinary hearing judgment. (Am. Compl. ¶¶

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63).

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

*DISCUSSION*

***3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief."' *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21;*Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,*434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263;*Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934;*see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

***4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,*17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt; (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra.* The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

II. *The Temporary Release Program*

A. *Conspiracy Claims*

***5** As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

***6** It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, Correction Law § 851*et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 *et seq.,* contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

Correction Law § 855(9). Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 *et seq.* In addition, courts that have considered whether inmates in New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

***7** However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond the comprehension of the plaintiff.... Plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it has been held that:

> Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See* *Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995
Greenwaldt v. Coughlin
Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michael A. ROSS, Plaintiff,
v.
Robert WOOD, Superintendent; Jackie Kelly; and Bennett, Defendants.
**No. 9:05-CV-1112 (FJS/GHL).**

Sept. 30, 2009.

Michael A. Ross, Pine City, NY, pro se.

Office of the New York State Attorney General, James Seaman, AAG, of Counsel, Albany, NY, for Defendants.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Gerald J. Rock, Esq., of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior District Judge.

## I. INTRODUCTION

***1** Currently before the Court are Magistrate Judge Lowe's May 26, 2009 Report-Recommendation and Plaintiff's objections thereto. *See* Dkt. Nos. 57, 59.

## II. BACKGROUND

In his complaint, Plaintiff alleges that Defendants Wood, Kelly and Bennett falsely advised him that a state-court wrongful death action filed against him would not result in money being removed from his inmate account, offered him assistance in defending that action, failed to take the promised action and, thereby, caused him to lose a substantial amount of money.

Defendants moved for summary judgment on the following grounds: (1) Plaintiff did not exhaust his administrative remedies; (2) Plaintiff had not alleged that Defendant Woods was personally involved in any of the alleged violations and could not raise a triable issue of fact that Defendant Kelly was personally involved in any violations that occurred after August 2003; (3) Plaintiff did not state a claim for denial of access to the courts or due process violations; (4) Plaintiff did not establish that Defendant Kelly was the proximate cause of any injury; and (5) Defendants were entitled to qualified immunity. *See* Dkt. No. 50. Plaintiff opposed Defendants' motion. *See* Dkt. No. 52.

In a Report-Recommendation dated May 26, 2009, Magistrate Judge Lowe recommended that this Court grant Defendants' motion. Specifically, he found that Defendants were not entitled to summary judgment on the ground that Plaintiff had not exhausted his administrative remedies. However, he found that they were entitled to summary judgment because Plaintiff had failed to demonstrate that Defendant Woods was personally involved in any of the alleged violations, had failed to state a claim that Defendants had denied him his right to access to the courts, had failed to state a due process claim against Defendant Bennett, and had failed to state a First Amendment claim against Defendant Bennet for searching his cell.

Plaintiff filed timely objections to Magistrate Judge Lowe's recommendations. In his objections, Plaintiff appears to argue that Magistrate Judge Lowe should have recommended that the Court provide him with an opportunity to amend his complaint.[FN1] Plaintiff also asserts that Defendants Kelly and Bennett "intentionally plotted together to take that which was plaintiff [sic] his property, his money in his account." *See* Plaintiff's Objections at 3. He further claims that "the post deprivation remedy that [Magistrate Judge] Lowe

recommend[ed][he] seek in the court of claims is no longer available to [him].” *See id.*

FN1. Plaintiff appears to make this argument only with respect to his claim against Defendant Kelly.

### III. DISCUSSION

#### A. Standard of review

In reviewing a magistrate judge's report-recommendation, the district court may decide to accept, reject or modify those recommendations. *See*28 U.S.C. § 636(b)(1). The court conducts a *de novo* review of the portions of the magistrate judge's recommendations to which a party objects. *See Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991). *De novo* review is not required, however, if a party fails to file specific objections. *See Wilds v. United Parcel Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003) (noting that where “no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record”). Nor is a court required to conduct *de novo* review where the parties' objections to the magistrate judge's recommendation repeat the arguments that the parties made in the original pleadings. *See Edwards v. Fischer,* 414 F.Supp.2d 342, 346-47 (S.D.N.Y.2006) (citations omitted). Finally, even if the parties file no objections, the court must ensure that the face of the record contains no clear error. *See Wilds,* 262 F.Supp.2d at 169 (quotation omitted).

#### B. Plaintiff's Fourth Amendment claim against Defendant Bennett

***2** Magistrate Judge Lowe noted that, although Defendants did not address Plaintiff's “potential” Fourth Amendment claim, he would address this claim *sua sponte* pursuant to 28 U.S.C. § 1915(e) (2)(B). Magistrate Judge Lowe then went on to explain that the Fourth Amendment's proscription against unreasonable searches does not apply within the confines of a prison cell. *See* Report-Recommendation at 5 n. 1 (citation omitted). Therefore, he recommended that this Court dismiss Plaintiff's Fourth Amendment claim against Defendant Bennett, which was based on Plaintiff's assertion that Defendant Bennett searched his cell, trashed it, and confiscated his legal documents. *See id.* at 4-5 (citing Dkt. No. 14 at ¶ 7(27)).

Plaintiff did not object to this recommendation. Since Magistrate Judge Lowe correctly noted that searches of prison cells do not implicate any protected constitutional right, the Court adopts Magistrate Judge Lowe's recommendation and grants Defendants' motion for summary judgment with respect to Plaintiff's Fourth Amendment claim against Defendant Bennett. *See DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) (noting that “[s]earches of prison cells, even arbitrary searches, implicate no protected constitutional rights” (citation omitted)), *aff'd without opinion,*122 F.3d 1055 (2d Cir.1995).

#### C. Plaintiff's claims against Defendant Woods

In his complaint, Plaintiff alleged that Defendant Woods denied or ignored his grievances. However, Magistrate Judge Lowe found that “Plaintiff ha[d] not alleged or produced [any] evidence raising a genuine issue of material fact that Defendant Woods was personally involved in any of the alleged violations” of his constitutional rights; and, therefore, he recommended that the Court grant Defendants' motion for summary judgment with respect to Plaintiff's claims against Defendant Woods. *See* Report-Recommendation at 23. Plaintiff did not object to this recommendation.

To hold a supervisory official liable for a constitutional violation, a plaintiff must establish that the official either (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing the subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation had occurred. *See Colon v.. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted). Furthermore, an allegation that a

supervisory official failed to respond to a grievance is insufficient to establish personal involvement. *See* *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000) (citations omitted); *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) (citations omitted).

Since Plaintiff has come forward with no evidence to show that Defendant Woods had any involvement in the alleged violations of his constitutional rights, the Court adopts Magistrate Judge Lowe's recommendation and grants Defendants' motion for summary judgment with respect to Plaintiff's claims against Defendant Woods.

**D. Plaintiff's access-to-the-courts claim**

***3** Magistrate Judge Lowe noted that Plaintiff's access-to-the-courts claim concerned his defense of a wrongful death action filed in state court. Magistrate Judge Lowe found that such an action does not trigger a First Amendment right of access to the courts because it does not concern the validity of an inmate's sentence or the conditions of his confinement. *See* Report-Recommendation at 25-26 (citations and footnote omitted). Therefore, he recommended that the Court grant Defendants' motion for summary judgment with respect to this claim. Plaintiff does not object to this recommendation.

The First Amendment provides inmates with the right to petition the Government for redress of grievances. This right requires states "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith,* 430 U.S. 817, 825 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996). This right, however, is limited to guaranteeing that inmates have the tools they " 'need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.' " *Collins v. Goord,* 438 F.Supp. 399, 416 (S.D.N.Y.2006) (quotation omitted). Furthermore, " '[i]mpairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.' " *Id.* (quotation omitted). Moreover, a plaintiff must not only show that the defendants interfered with his right of access to the courts but also that he suffered an actual injury. *See* *Lewis,* 518 U.S. at 353-54.

As Magistrate Judge Lowe noted, Plaintiff's defense of a wrongful death action does not trigger a First Amendment right-of-access-to-the-courts claim. Therefore, the Court adopts Magistrate Judge Lowe's recommendation and grants Defendants' motion for summary judgment with respect to this claim.

**E. Plaintiff's due process claim**

Magistrate Judge Lowe construed Plaintiff's complaint liberally to contain a due process claim based on his allegation about the removal of money from his inmate account and Defendant Bennett's removal of items from his cell. Magistrate Judge Lowe found that, because New York afforded Plaintiff an adequate post-deprivation remedy in the form of a Court of Claims action, he could not sustain a Fourteenth Amendment due process claim. Therefore, Magistrate Judge Lowe recommended that the Court grant Defendants' motion for summary judgment with respect to this claim.

Plaintiff objects to this recommendation, arguing that Defendants Kelly and Bennett intentionally plotted to take money from his account and that he does not need to seek any other post-deprivation remedy as long as he can show that a violation occurred. *See* Plaintiff's Objections at 3. Furthermore, Plaintiff argues that a court-of-claims remedy is no longer available to him and that for the Court "to even suggest that ... a clear violation has taken place but in order for [Plaintiff] to obtain redress [he] must go court shopping ... is not how justice [sic] suppose to work." *See id.*. Therefore, he asserts that the Court should allow him to have his claim heard before a trier of fact. *See id.* at 5.

***4** "[T]he Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient postdeprivation remedies are provided." *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (citation omitted). Furthermore, because "[t]he fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner ... as long as a meaningful

postdeprivation remedy is provided, the Fourteenth Amendment is satisfied." *Id.* (internal citation omitted). "New York ... affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action." *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also* *DeMaio,* 877 F.Supp. at 95.

Despite Plaintiff's assertion to the contrary, Magistrate Judge Lowe did not, in any way, insinuate that he believed that a violation of Plaintiff's due process rights had occurred. To the contrary, Magistrate Judge Lowe explained that, as a matter of law, Plaintiff could not sustain a due process claim based on his allegation that Defendants removed money from his inmate account and property from his cell because New York provided him with an adequate post-deprivation remedy for any loss that he suffered and that was all that the Fourteenth Amendment required.[FN2]

> FN2. Furthermore, to the extent that Plaintiff is requesting an opportunity to amend this claim, such an amendment would be futile because the problem with Plaintiff's due process claim is substantive and repleading would not cure that defect. *See* *Rhodes v. Hoy,* No. 9:05-CV-836, 2007 WL 1343649, *3 (N.D.N.Y. May 5, 2007) (citation omitted).

Therefore, because New York has provided Plaintiff with an adequate post-deprivation remedy, the Court adopts Magistrate Judge Lowe's recommendation and grants Defendants' motion for summary judgment with respect to Plaintiff's due process claim.

## IV. CONCLUSION

After reviewing the entire file in this matter, including Magistrate Judge Lowe's Report-Recommendation and Plaintiff's objections thereto and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Lowe's May 26, 2009 Report-Recommendation is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Plaintiff's Fourth Amendment claim against Defendant Bennett is **DISMISSED** *sua sponte* pursuant to 28 U.S .C. § 1915(e)(2); and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

## *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Michael A. Ross alleges that Defendants Roberts Woods (Superintendent of Upstate Correctional Facility), Jackie Kelly (Institutional Steward of Upstate Correctional Facility), and James Bennett (a correctional officer at Upstate Correctional Facility) falsely advised him that a state court wrongful death action filed against him would not result in money being removed from his inmate account, offered him assistance defending that action, failed to take the promised actions, and thus caused Plaintiff to lose a substantial sum of money. Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 50.) For the reasons that follow, I recommend that Defendants' motion be granted.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

***5** The operative complaint is the amended complaint. (Dkt. No. 14.) It alleges that:

On October 11, 2002, Plaintiff received a $34,857.57 check from the settlement of a medical malpractice suit. (Dkt. No. 14 at ¶ 7(1).)

On January 13, 2003, a temporary injunction was issued freezing Plaintiff's inmate account at Upstate Correctional Facility. (Dkt. No. 14 at ¶ 7(2).) Plaintiff's complaint does not explicitly explain the reason for this injunction. However, the documents before the Court show that it was issued to prevent Plaintiff from disbursing the settlement funds while the representative of the victim of the crime of which Plaintiff was convicted pursued a civil action against Plaintiff. (Dkt.50-17, Ex. D.) On April 4, 2003, a preliminary injunction was issued continuing the temporary restraining order. (Dkt. No. 14 at ¶ 7(3).)

On April 5, 2003, Defendant Jackie Kelly visited Plaintiff at his cell and told him about the injunction. She advised him that the injunction was not valid, that Plaintiff would get his money back, and that she was sending someone to help him. (Dkt. No. 14 at ¶¶ 6, 7(4).)

Shortly thereafter, the law library supervisor, Defendant Bennett, took the injunction order "to make a copy and do an appeal ." (Dkt. No. 14 at ¶ 7 (5).)

On July 31, 2003, a wrongful death complaint was filed against Plaintiff on behalf of the estate of Samuel Hines. The complaint was not signed. The complaint alleged that Plaintiff murdered Samuel Hines on January 27, 1990, that Plaintiff had "come into certain monies," and that Samuel Hines' estate was entitled to $1 million under Executive Law 632-a. (Dkt. No. 14 at ¶ 7 (6), Ex. 1.)

Defendant Bennet came to Plaintiff's cell a few days later, said the complaint was not valid, and told Plaintiff he would take care of it. (Dkt. No. 14 at ¶ 7(7).)

On November 6, 2003, an unsigned notice of motion and affirmation were filed in the wrongful death action. (Dkt. No. 14 at ¶ 7(8).) A couple of days later, Defendant Bennett made a copy of the motion and told Plaintiff he would respond to it. (Dkt. No. 14 at ¶ 7(9) .)

On May 4, 2004, a notice of trial was filed in the wrongful death action. (Dkt. No. 14 at ¶ 7(10).) Defendant Bennett made a copy of the notice "to continue preparing [Plaintiff's] legal work." (Dkt. No. 14 at ¶ 7(11).)

On May 25, 2004, the state court, after finding that Plaitniff had defaulted by not answering the wrongful death complaint, entered judgment against Plaintiff for $200,000. (Dkt. No. 14 at ¶ 7(12), Ex. 2.)

Plaintiff wrote to Judge Partnow "to find out if any of this was true." He did not receive any response. (Dkt. No. 14 at ¶ 7(15).)

During the first week of July 2004, Defendant Kelly told Plaintiff that he did not need to write to anyone because the "documents were without signatures" and assured Plaintiff that he would get his money back. (Dkt. No. 14 at ¶ 7(17).) Immediately thereafter, Defendant Bennett visited Plaintiff's cell and showed Plaintiff "some law rule about unsigned documents." (Dkt. No. 14 at ¶ 7(18).)

***6** On July 30, 2004, Plaintiff received an "Execution With Notice to Garnishee." It directed the sheriff to satisfy the wrongful death judgment from Plaintiff's inmate account. It was not signed. (Dkt. No. 14 at ¶ 7(20), Ex. 3.)

In late August 2004, Defendant Kelly spoke to Plaintiff and noted that the attorney representing Samuel Hines' estate in the wrongful death action had a potential conflict of interest because his law firm was involved in the underlying criminal action. (Dkt. No. 14 at ¶ 7(22).)

On August 23, 2004, Plaintiff received an unsigned final judgment notice. (Dkt. No. 14 at ¶ 7(19).)

On February 14, 2005, Defendant Kelly placed a million dollar surcharge on Plaintiff's account. (Dkt. No. 14 at ¶

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

7(24).)

On February 14, 2005, the state court filed a final decision and order directing that the funds be removed from Plaintiff's account. (Dkt. No. 14 at ¶ 7(25).) Plaintiff alleges that all of his funds were taken, including "the ten percent ... that were exempt." (Dkt. No. 14 at ¶ 7(28).)

On July 27, 2005, Defendant Bennett searched Plaintiff's cell, "trashed it," and confiscated Plaintiff's legal documents. (Dkt. No. 14 at ¶ 7(27).)

On August 16, 2005, Plaintiff asked Defendant Bennett "why he did what he did." Defendant Bennett "acted as if he did not know" what Plaintiff was talking about. (Dkt. No. 14 at ¶ 7(29).)

Plaintiff alleges that he filed several institutional grievances about the facts underlying the complaint and appealed them to the highest level. One complaint was denied. Plaintiff received no response to the others. (Dkt. No. 14 at ¶ 4(b).)

Plaintiff requests $30 million in damages. (Dkt. No. 14 at ¶ 9 .)

As Defendants note (Dkt. No. 50-24 at 7) and Plaintiff acknowledges (Dkt. No. 52-2 at 6), the complaint does not identify the legal theory under which Plaintiff is proceeding. I have construed the complaint as alleging that all Defendants violated Plaintiff's right to due process and right of access to the courts and that Defendant Bennett violated Plaintiff's Fourth Amendment rights [FN1].

FN1. Defendants do not address Plaintiff's potential Fourth Amendment claim. I address it *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619 (1989) [internal quotation marks and citation omitted]. The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer* 468 U.S. 517, 526 (1984); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995). Therefore, I recommend that Plaintiff's Fourth Amendment claim against Defendant Bennett be dismissed.

**B. Summary of Grounds in Support of Defendants' Motion**

Defendants argue that (1) Plaintiff's claims regarding alleged legal work should be dismissed because he did not exhaust available administrative remedies; (2) Plaintiff has not alleged that Defendant Woods was personally involved in any of the alleged violations and cannot raise a triable issue of fact that Defendant Kelly was personally involved in any violations alleged to have occurred after August 2003; (3) Plaintiff has not stated a cause of action for denial of access to courts or due process violations; (4) Plaintiff cannot establish that Defendant Kelly was the proximate cause of any injury; and (5) they are entitled to qualified immunity. (Dkt. No. 50-24.)

**C. Summary of Plaintiff's Response to Defendants' Arguments**

In response, Plaintiff argues that (1) he exhausted his administrative remedies; (2) Defendant Woods was personally involved in the alleged violations; (3) he has stated a cause of action for denial of access to the courts because "surely there was something Plaintiff could [have] done to prevent a default judgment" had Defendants not acted as they did; (4) Defendants Kelly and Bennett were the proximate cause of him losing the money from his inmate account; and (5) Defendants are not entitled to qualified immunity. (Dkt. No. 52-2.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**II. APPLICABLE LEGAL STANDARDS**

**A. Legal Standard Governing Motions for Summary Judgment**

***7** Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN2] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN3] In determining whether a genuine issue of material [FN4] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN5]

FN2. *Matsushita,* 475 U.S. at 585-86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

FN3. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

FN4. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

FN5. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[FN6] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

FN6. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ....“

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN7] or (2) a challenge to the legal cognizability of the claim.[FN8]

FN7. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr .S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN8. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

***8** Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN9] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN10] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN11]

FN9. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) [citation omitted].

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN10. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also* *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN11. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord,* *Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN12] However, it is well established that even this liberal notice pleading standard "has its limits." [FN13] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN14]

FN12. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN13. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN14. *See, e.g., Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964-1974 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord,* *Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69[FN15] (2007).[FN16] Rather than turning on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN15. All references to *Bell Atlantic* will cite the Supreme Court Reporter rather than the United States Reports. The United States Reports version of the case does not include page numbers at this time.

FN16. The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

More specifically, the Court reasoned that, by requiring that a pleading "show [ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

***9** As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).[FN17] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN18]

FN17. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

FN18. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN19] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN19. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN20] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN21] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN20. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN21.*Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN22] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN23] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN24] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN25] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN26]

FN22. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN23.*Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN24.*Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also*Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN25.*Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN26.*Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

***10** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [FN27] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [FN28] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN29] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN30]

FN27. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN28. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN29. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

adverse party").

FN30. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 50-24 at 3-5.) Defendants are not entitled to summary judgment on this ground because Plaintiff has raised a genuine issue of material fact that he exhausted his administrative remedies.

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN31] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN32] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN33] *First,* an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN34]

FN31. 42 U.S.C. § 1997e.

FN32. *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

FN33. 7 N.Y.C.R.R. § 701.7.

FN34. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

***11** Here, the Director of the Inmate Grievance Program for the Department of Correctional Services has provided the Court with a list of grievances filed by Plaintiff while he was housed at Upstate. (Dkt. No. 50-4, Ex. A.) The Director has not provided the Court with the grievances themselves. The Director declares that "none of the grievances concerned alleged improper conduct with respect to the plaintiff's inmate account" and that the list does not "suggest that [Plaintiff] filed any grievance appeals with CORC concerning allegations that staff at Upstate Correctional Facility promised to assist [P]laintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

with any personal litigation ... but then failed to do so." (Dkt. No. 50-4 at ¶¶ 9-10.) However, the dates and captions of two items on the list indicate that the grievances may have concerned some of the issues raised in the lawsuit. On August 16, 2005, the same day that Plaintiff alleges he confronted Defendant Bennett regarding his alleged conduct, Plaintiff filed a grievance captioned on the list as "Alleges CO Set Him Up." He filed a grievance with the same title two days later, on August 18, 2005. (Dkt. No. 50-4, Ex. A.) Without the benefit of the grievances themselves, the Court is unable to determine whether or not Plaintiff's grievances involved the conduct at issue here. Thus, the evidence submitted by Defendants does not establish that Plaintiff failed to exhaust his administrative remedies.

In an affidavit filed in opposition to the motion for summary judgment, Plaintiff states that when he did not receive a response to his grievances, he appealed to the next level as directed by the regulations. (Dkt. No. 52-6 at ¶ 7.) He has attached to his affidavit copies of a September 2, 2005, letter from Defendant Woods (the superintendent of the facility, with whom Plaintiff would have to file an appeal from any decision or non-decision of the IGRC) rejecting several grievances (one of which was clearly labeled "appeal to superintendent of a grievance of 3-31-04") and directing Plaintiff to "send this directly to the Grievance Office for processing." (Dkt. No. 52-6, Ex. A.) Plaintiff has also submitted two documents titled "appeal to CORC of grievance" that address his concerns regarding Defendant Bennett and the million-dollar surcharge. *Id.* These documents suggest that Plaintiff followed DOCS procedure by filing grievances at the next level when the IGRC and Defendant Woods failed to respond. Plaintiff's opposition papers thus raise a genuine issue of material fact regarding his exhaustion of administrative remedies.

Defendants' reply does not address Plaintiff's assertions regarding the exhaustion of administrative remedies. Rather, the reply addresses only the issues of personal involvement and the constitutional merits, asserting that Plaintiff's "opposition raises no additional questions concerning the[ ] other grounds." (Dkt. No. 56 at 1.)

In light of the foregoing, I recommend that Defendants' motion for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies be denied.

**B. Personal Involvement by Defendant Woods and Kelly**

***12** Defendants argue that Plaintiff's claims against Defendant Woods should be dismissed because he was not personally involved in any alleged constitutional violation and that all claims against Defendant Kelly relating to events after August 2003 should be dismissed for lack of personal involvement. Defendants are correct as to Defendant Woods but have not shown that they are correct regarding Defendant Kelly.

1. *Woods*

The complaint alleges that Defendant Woods denied or ignored Plaintiff's grievances. (Dkt. No. 14 at ¶ 4.) In opposition to the motion for summary judgment, Plaintiff states that Defendant Woods was "more than aware" of the actions of Defendants Kelly and Bennett and that it is the unwritten policy of Upstate Correctional Facility to commend employees for violating prisoners' rights. (Dkt. No. 52-2 at 4.) Defendants argue that the complaint does not adequately allege, and Plaintiff cannot raise a genuine issue of material fact showing, that Defendant Woods was personally involved in any of the alleged violations. (Dkt. No. 50-24 at 5-7.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN35] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN36] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN37] In other words, supervisory officials may not be held liable merely

because they held a position of authority.[FN38] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN39]

FN35. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN36. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN37. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN38. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN39. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). District Court decisions in this Circuit have established that:

> ***13** where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable ... At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them. Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.

*Walker v. Pataro,* No. 99 CIV. 4607, 2002 WL 664040, at *12-13 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted) (collecting and analyzing decisions) [FN40].

FN40. The undersigned will provide a copy of this unpublished decision to Plaintiff in light of the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Plaintiff has not alleged or produced evidence raising a genuine issue of material fact that Defendant Woods was personally involved in any of the alleged violations. Therefore, I recommend that all claims against Defendant Woods be dismissed for lack of personal involvement.

2. *Kelly*

Plaintiff's complaint describes four incidents regarding Defendant Kelly. He alleges that (1) In April 2003, Defendant Kelly visited his cell, told him the injunction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

was invalid, assured Plaintiff that he would get his money back, and said she would send someone to help him; (2) In July 2004, Defendant Kelly assured him again that he would get his money back because the "documents were without signatures"; (3) In August 2004, Defendant Kelly raised an issue with Plaintiff regarding the possible conflict of the lawyer representing the estate of Samuel Hines; and (4) On February 14, 2005, Defendant Kelly placed a million dollar surcharge on Plaintiff's account. (Dkt. No. 14.) Defendants argue that Plaintiff has insufficiently pleaded or proved Defendant Kelly's personal involvement in the second, third, and fourth incidents because Defendant Kelly left her employment at Upstate in August 2003 and never returned. (Dkt. No. 50-24 at 7.) Defendants cite no legal authority for this argument. Rather, the law upon which they rely relates entirely to claims against supervisory officials and the absence of *respondeat superior* liability in section 1983 claims. This law is inapplicable to Plaintiff's allegations against Defendant Kelly. I decline to address this argument in light of Defendants' failure to cite applicable law and my finding, discussed below, that Plaintiff's claims against Defendant Kelly should be dismissed on the constitutional merits. Even if I were to address this argument, Defendants' evidence that Kelly left Upstate in August 2003 would be insufficient to merit judgment as a matter of law in Kelly's favor. Rather, it would create a genuine issue of material fact that would need to be resolved by the trier of fact.

**C. Access to the Courts**

***14** Defendants argue that Plaintiff has failed to state a claim, or produce evidence raising a genuine issue of material fact, that Defendants violated his First Amendment right of access to the courts. (Dkt. No. 50-24 at 8-10.) Defendants are correct.

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [FN41] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [FN42] This right does not, however, guarantee prisoners access to the courts to pursue or defend against *any* claim. The Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." [FN43] " 'Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.' " [FN44] Moreover, even in the context of direct appeals, *habeas corpus* proceedings, or civil rights actions concerning the conditions of confinement, the right of access to the courts "is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [FN45] As a result, to state a claim for denial of access to the courts, a plaintiff must show both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury.[FN46]

FN41. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN42. *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN43. *Collins,* 423 F.Supp.2d at 415-16 (quoting *Lewis,* 518 U.S. at 355).

FN44. *Id.*

FN45. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN46. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946

(N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff's complaint concerns his defense of a wrongful death action filed in state court. The First Amendment right of access to the courts is not triggered by such an action, because a state wrongful death action does not concern the validity of an inmate's sentence or the conditions of his confinement. *Lewis,* 518 U.S. at 354; *Woods v. Purington,* No. Civ. 02-1385-BR, 2004 WL 792783, at *3 (D.Or. Mar. 1, 2004)[FN47]. Thus, Defendants did not deny Plaintiff his right of access to the courts. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's access to the courts claim.

FN47. Defendants cited this case in their memorandum of law and served a copy of the decision on Plaintiff.

**D. Due Process**

Construing the complaint liberally, I have deemed Plaintiff's allegations about the removal of money from his inmate account and Defendant Bennett's removal of items from his cell as a due process claim. Defendants argue that Plaintiff has not stated a claim, or produced evidence raising a genuine issue of material fact, that Defendants violated his right to due process. (Dkt. No. 50-24 at 10-11.) Defendants are correct.

With respect to the stolen or lost property, the Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient postdeprivation remedies are provided. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 1914, 68 L .Ed.2d 420 (1981)). The fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner. *Parratt,* 451 U.S. at 540, 101 S.Ct. at 1915. Therefore, as long as a meaningful postdeprivation remedy is provided, the Fourteenth Amendment is satisfied.

***15** *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action." *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001). Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's due process claims.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 50) be ***GRANTED;*** and it is further

**RECOMMENDED** that the Court *sua sponte* dismiss Plaintiff's Fourth Amendment claim against Defendant Bennett pursuant to 28 U.S.C. § 1915(e)(2); and it is further

**RECOMMENDED** that the Court enter judgment in favor of Defendants; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Walker v. Pataro,* No. 99 CIV. 4607, 2002 WL 664040 (S.D.N.Y. Apr. 23, 2002).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Ross v. Wood
Slip Copy, 2009 WL 3199539 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Lamont H. WALKER, Plaintiff,
v.
Joseph PATARO, Steven Lowry, David Thacker, sued in their individual capacities, and Ada Perez, Robert Ercole and Wayne Strack, sued in their individual and official capacities, Defendants.
**No. 99CIV.4607(GBD)(AJP).**

April 23, 2002.

REPORT AND RECOMMENDATION

PECK, Magistrate J.

***1** Pro se plaintiff Lamont Walker brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants retaliated against him-by moving him to a different housing unit which resulted in his loss of his higher paying prison job-for filing a grievance against a correction officer while in custody at the Fishkill Correctional Facility. (Dkt. No. 2: Compl.)

Defendants moved for summary judgment, arguing that: (1) Walker's damage claims against defendants in their official capacities should be dismissed pursuant to the Eleventh Amendment (Dkt. No. 31: Defs. Br. at 20-21); (2) defendants Lowry, Perez, Strack and Ercole were not personally involved in Walker's housing and job transfers (*id.* at 13-17); (3) Walker was moved to a different housing unit to accommodate his initial grievance (*i.e.,* to move him away from the correction officer he claimed was harassing him), not in retaliation for it, and the resulting job change was incidental to his housing move (*id.* at 7-12); and (4) defendants are entitled to qualified immunity (*id.* at 17-19).

For the reasons set forth below, defendants' summary judgment motion should be: (1) GRANTED as to defendants in their official capacities because the Eleventh Amendment bars such damage claims; (2) GRANTED as to defendants Lowry and Perez for lack of personal involvement; and (3) DENIED in all other respects. The parties shall file their Joint Proposed Pretrial Order by May 31, 2002.

FACTS

*The Parties*

Lamont Walker is an inmate under the custody of the New York State Department of Correctional Services ("DOCS"); at the time relevant to this action (December 1998 and January 1999), Walker was incarcerated at the Fishkill Correctional Facility. (Walker 56.1 Stmt. ¶ 1; Dkt. No. 33: Defs. 56.1 Stmt. ¶ 1; Dkt. No. 2: Compl. ¶ 1.) FN1 At the relevant time, all defendants were employed by DOCS at Fishkill: Joseph Pataro as a Lieutenant, Steven Lowry and David Thacker as Captains, Ada Perez as the Deputy Superintendent for Correctional Facility Program Services, Robert Ercole as the Deputy Superintendent for Security Services, and Wayne Strack as Superintendent. (Walker 56.1 Stmt. ¶¶ 2-6; Defs. 56.1 Stmt. ¶¶ 2-7; Com pl. ¶ ¶ 2-6; Dkt. No. 32: Pataro Aff. ¶ 1; Lowry Aff. ¶ 2; Thacker Aff. ¶ 1; Perez Aff. ¶ 2; Ercole Aff. ¶ 1; Strack Aff. ¶ 1.)

FN1. Reference to paragraphs in the complaint are to the sub-paragraphs in Section IV of the complaint.

Walker's Grievance Against Correction Officer Woodard and Prison Officials' Move of *Walker to a Different Housing Unit, Resulting in a Job Change*

On November 24, 1998, Walker filed a grievance about an incident involving Correctional Officer ("C.O.") Woodard, alleging that C.O. Woodard verbally harassed and abused Walker, disrespected Walker, abused his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

authority, and threatened Walker with Special Housing Unit ("SHU") confinement. (Dkt. No. 2: Compl. ¶ 8; Walker 56.1 Stmt. ¶ 7; Walker Aff. ¶ 2 & Ex. 1: 11/24/98 Inmate Grievance Complaint; Dkt. No. 33: Defs. 56.1 Stmt. ¶ 8.)

***2** On December 1, 1998, Sergeant Pickett interviewed Walker as part of Fishkill's investigation of his grievance. (Compl. ¶ 8; Walker 56.1 Stmt. ¶ 8; Defs. 56.1 Stmt. ¶ 9; *see also* Walker Aff. ¶ 2.) Sgt. Pickett's report stated that Walker said that he tries to avoid C.O. Woodard and that Walker felt "uncomfortable" in his current housing unit when C.O. Woodard was on duty. [FN2] (Walker Aff. Ex. 2: 12/1/98 Grievance Investigation Memo; Dkt. No. 32: Ercole Aff. ¶ 4 & Ex. 1; Dkt. No. 32: Thacker Aff. ¶ 4 & Ex. 1.)

> FN2. Sgt. Pickett records that Walker told him: "Now I try to avoid [C.O. Woodard]. He now works on nights ... and I'm uncomfortable on my unit, I leave the TV room when he's on to avoid him ...." (Walker Aff. Ex. 2.) Walker also cited two specific incidents in which he alleged that C.O. Woodard harassed him in the stairwell and threatened to punish him for advising his fellow porters how to perform their duties correctly. (*Id.*)

On December 18, 1998, Acting Superintendent Ercole responded to Walker's grievance, as follows:

Your grievance # 17055-98 filed 11/24/98 has been investigated by Sgt. Pickett. You were interviewed on 12/1/98 concerning your allegations toward Officer Woodard.

At this time you verbalized your complaint but failed to show any harassing language or verbal abuse from Officer Woodard.

Officer Woodard was interviewed and stated that he has at no time "verbally abused or threatened" you.

Based upon review of information received in investigation reports I can find nothing to substantiate your grievance at this time.

However, *to make you feel more comfortable while at Fishkill, I will have you moved to another [housing] unit where you will be under the supervision of other Officers.*

(Compl. Ex. A: 12/18/98 Ercole Memo to Walker, emphasis added; *see also* Defs. 56.1 Stmt. ¶ 10; Ercole Aff. ¶ 5; Walker 56.1 Stmt. ¶ 9; Walker Aff. ¶ 4.)

At the time of his grievance, Walker was housed in Building 21A, the building in which C.O. Woodard was stationed. (Pataro Aff. ¶ 3; Walker 56.1 Stmt. ¶ 9; Compl. ¶ 9; Defs. 56.1 Stmt. ¶ 10.) Walker was employed as a "porter pool group leader assistant" for Building 21A, which required that Walker live in Building 21A or the adjoining Building 21. (Walker Aff. ¶ 3; Compl. ¶ 9; Walker 56.1 Stmt. ¶ 14; Defs. 56.1 Stmt. ¶ 15; Dkt. No. 32: Steckelman Aff. Exs. 1-2: Walker Dep. at 35-37; Perez Aff. ¶¶ 5-6.)

On December 18, 1998, at the direction of Captain Thacker, Lieutenant Pataro arranged for Walker to be moved from Building 21A to the Main building at Fishkill. (Walker Aff. ¶ 3; Pataro Aff. ¶ 3; Thacker Aff. ¶ 5; *see* Walker 56.1 Stmt. ¶¶ 13-14; Defs. 56.1 Stmt. ¶ 12.) Walker alleges that a C.O. Sylvester informed Lt. Pataro that Walker would lose his job if he was transferred out of the 21 complex and that Lt. Pataro responded "he's going to have to get another job." (Compl. ¶ 9; Walker Aff. ¶ 3.)

The position of porter pool group leader assistant in the Main building was filled by another inmate and thus not available to Walker. (Steckelman Aff. ¶ 4 & Ex. 3: Walker Dep. at 39; Perez Aff. ¶ 6; Defs. 56.1 Stmt. ¶ 16.) As a result, Walker worked in the general porter pool for the Main building. (Perez Aff. ¶ 6; Defs. 56.1 Stmt. ¶¶ 14-17.) The pay rate for a porter pool group leader assistant is greater than for the general porter pool.[FN3] (Walker Aff. Ex. 12: Inmate Program Assignment; Steckelman Aff. Ex. 4: Walker Dep. at 40.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. A porter pool group leader earned approximately 25 cents per hour while porter pool workers earned approximately 10 cents per hour. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

***3** Walker worked in the Main building porter pool until January 6, 1999, when he requested and was granted a transfer to the barbershop .[FN4] (Compl. Ex. F: 1/6/99 Request for Change of Program; Perez Aff. ¶ 5 & Ex. 1; *see* Walker Aff. Ex. 12; Steckelman Aff. Ex. 4: Walker Dep. at 39-40; Defs. 56.1 Stmt. ¶ 17.)

FN4. The hourly pay rate for the barbershop job was approximately 18 cents. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

On July 15, 1999, Walker was transferred to the position of porter pool group leader assistant for Building 21. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

*Walker's Retaliation Grievance*

On December 21, 1998, Walker filed another grievance, alleging that his transfer to the Main building was in retaliation for his prior grievance against C.O. Woodard, and requesting that he be reinstated to his original housing and job assignments.[FN5] (Compl. ¶ 11 & Ex. B: 12/21/98 Inmate Grievance Complaint; Walker 56.1 Stmt. ¶ 26; Walker Aff. ¶ 4; Defs. 56.1 Stmt. ¶ 18.)

FN5. Walker also noted in the grievance that he had not requested the transfer in his housing or employment assignment. (Compl. Ex. B: 12/21/98 Inmate Grievance Complaint.)

On January 20, 1999, Superintendent Strack responded to this grievance by memo to Walker:

Your original grievance # 17055-98 dated 11/24/98 was filed against Officer Woodard for harassment. This grievance was unsubstantiated based upon information received during the investigation.

Due to your complaint, in order to make you feel more comfortable while at Fishkill, you were moved at the discretion of a supervisory decision where you would be under the supervision of other Officers as it appeared you had a problem with Officer Woodard. You have been interviewed by Lt. Szymanowicz concerning your grievance and will not be moved back to H.U. [Housing Unit] J at this time.

(Compl. Ex. C: 1/20/99 Strack Memo; *see* Walker Aff. ¶ 5; Defs. 56.1 Stmt. ¶ 19; Strack Aff. ¶ 4 & Ex. 1.)

On January 28, 1999, Walker wrote a letter to Superintendent Strack explaining his situation in more depth and reasserting his retaliation claim. (Compl. ¶ 12 & Ex. D: 1/28/99 Letter to Strack; Defs. 56.1 Stmt. ¶ 20; Walker Aff. ¶ 6; Steckelman Aff. Ex. 10: Walker Dep. at 63.) Walker also appealed Supt. Strack's denial of his grievance to the Central Office Review Committee ("CORC"), which held a hearing on February 23, 1999. (Compl. ¶ 13 & Ex. C; Walker Aff. ¶ 7; Defs. 56.1 Stmt. ¶ 22.) On February 24, 1999, the CORC sustained Supt. Strack's decision, finding that "there is insufficient evidence to indicate retaliation by staff related to the grievant's previous use of the grievance process." (Ercole Aff. ¶¶ 6-7 & Ex. 2: 2/24/99 CORC Report; Defs. 56.1 Stmt. ¶ 22.)

On February 25, 1999, Ada Perez, the Deputy Superintendent for Program Services, responded to Walker's letter to Supt. Strack, informing Walker that he was in his "current assignment of Barber Shop as per [his] own request" and that he would be eligible to request a change of assignment after ninety days, *i.e.,* after April 18, 1999. (Compl. ¶ 14 & Ex. E: 2/25/99 Perez Letter; *see* Walker Aff. ¶ 7; Defs. 56.1 Stmt. ¶ 21.) As noted above, Walker returned to the porter pool group leader assistant position in Building 21 on July 15, 1999. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

*Walker's Federal Lawsuit*

***4** Walker's pro se § 1983 complaint is dated April 12, 1999, was received by the Court's Pro Se Office on April 15, 1999 and filed as of June 25, 1999. (Dkt. No. 2: Compl.) On November 2, 1999, defendants moved to dismiss the complaint. (Dkt.Nos.7-9.) On December 22, 1999, Judge Scheindlin (to whom the case then was assigned) denied the motion to dismiss. (Dkt. No. 14: Opinion & Order.) *Walker v. Patero,* 99 Civ. 4607, 1999 WL 1243865 at *1-3 (S.D.N.Y. Dec. 22, 1999).

At the conclusion of discovery, defendants filed the present summary judgment motion. (Dkt.Nos.31-33, 36.)

ANALYSIS

I. *SUMMARY JUDGMENT STANDARDS IN SECTION 1983 CASES*[FN6]

FN6. For additional cases authored by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5-7 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); *Salahuddin v. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment-here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g ., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513;*see also, e.g., Chambers v. TRM,* 43 F.3d at 36;*Gallo v. Prudential,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party-here, Walker-only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Chambers v. TRM,* 43 F.3d at 37.

***5** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,*480 U.S. 932, 1907 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Walker and that "pro se parties are 'to be given "special latitude on summary judgment motions." " ' *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citing cases); *see also, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest" '). "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v.. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).

II. THE ELEVENTH AMENDMENT BARS DAMAGE CLAIMS AGAINST *DEFENDANTS IN THEIR OFFICIAL CAPACITIES*

" 'It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment ..." ' *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (quoting *Jackson v. Johnson,* 30 F.Supp.2d 613, 618 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) ( & cases cited therein). Since Walker's complaint seeks only damages, his claims against defendants in their official capacities should be dismissed.

III. *RETALIATION UNDER SECTION 1983*

A. *Legal Standard*

To prevail in a Section 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See*42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).[FN7] "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,*512 U.S. 1240, 114 S.Ct. 2749 (1994).[FN8]

FN7.*Accord, e.g., Soldal v. Cook County,* 506 U.S. 56, 60 n.6, 113 S.Ct. 538, 543 n.6 (1992); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *4 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); *Ali v. Szabo,* 81 F.Supp.2d 447, 453 (S .D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

FN8.*Accord, e.g., Espinal v. Goord,* 2001 WL 476070 at *7;*Fulmore v. Mamis,* 2001 WL 417119 at *7;*Freeman v. Strack,* 2000 WL 1459782 at *5;*Culp v. Koenigsmann,* 2000 WL 995495 at *6;*Carbonell v. Goord,* 2000 WL 760751 at *5.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. A § 1983 Claim Can Be Asserted if a Prisoner is Reassigned from a Prison *Job in Retaliation for Filing a Prison Grievance*

***6** An inmate does not have any constitutional, statutory, orregulatory right to a particular prison job. *E.g., Davis v. Artuz,* No. 96-2911, 133 F.3d 906 (table), 1998 WL 29763 at *1 (2d Cir. Jan. 28, 1998); *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) ("New York law does not give a prisoner 'any statutory, regulatory or precedental right to his prison job." ') (quoting *Cooper v. Smith,* 63 N.Y.2d 615, 616, 479 N.Y.S.2d 519, 519 (1984)); *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996).[FN9]

FN9.*See also, e.g., Muhammad v. Warithu-Deen Umar,* 98 F.Supp.2d 337, 345 (W.D.N.Y.2000); *Guillen v. Tierney,* 93 Civ. 8853, 1995 WL 479406 at *4 (S.D.N.Y. Aug. 11, 1995); *West v. Keane,* 93 Civ. 6680, 1995 WL 434306 at *2 (S.D.N.Y. July 24, 1995); *James v. Artuz,* 93 Civ.2056, 1994 WL 174005 at *8 (S.D.N.Y. May 4, 1994); *Saunders v. Coughlin,* 92 Civ. 4289, 1994 WL 88108 at *4 (S.D.N.Y. Mar. 15, 1994); *Laureano v. Vega,* 92 Civ. 6056, 1994 WL 68357 at *7 (S.D.N.Y. Feb. 25, 1994), *aff'd,*No. 94-2140, 40 F.3d 1237 (table) (2d Cir. Oct. 18, 1994).

Nevertheless, "a claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d at 194;*accord, e.g., Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights"); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983"); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Prisoners, like non-prisoners, have a right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right"); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988) (" 'An act in retaliation for the exercise of a constitutional right is actionable under [S]ection 1983 even if the act, when taken for a different reason, would have been proper." '); *Meriwether v. Coughlin,* 879 F.2d 1037, 1045-46 (2d Cir.1989) ("Although prison officials have broad discretion to transfer prisoners ... [t]hey may not, however, transfer them solely in retaliation for the exercise of constitutional rights.").[FN10]

FN10.*See also, e.g., Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 283-84, 97 S.Ct. 568, 574 (1977) (even though non-tenured teacher could have been fired for any reason, he may have a § 1983 claim if fired for exercising constitutionally protected First Amendment rights); *Higgins v. Davis,* 95 Civ. 3011, 2001 WL 262930 at *5 (S.D.N.Y Mar. 15, 2001); *Smith v. Deckelbaum,* 97 Civ. 1265, 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000); *Rivera v. Goord* 119 F.Supp.2d 327, 339-40 (S.D.N.Y.2000); *Oyague v. State,* 98 Civ. 6721, 2000 WL 1231406 at *4 (S.D.N.Y. Aug. 31, 2000), *aff'd,*2001 WL 668466, 13 Fed. Appx. 16 (2d Cir. June 12, 2001), *cert. denied,*122 S.Ct. 484 (2001); *Shabazz v. Vacco,* 97 Civ. 3761, 1998 WL 901737 at *3 (S.D.N.Y. Dec. 28, 1998); *Bey v. Eggleton,* 96 Civ. 4288, 1998 WL 118158 at *2 (S.D.N.Y. Mar. 17, 1998); *Pacheco v. Vanwyk,* No. 94-CV-456, 1997 WL 642540 at *7 (N.D.N.Y. Oct. 15, 1997) (Pooler, D.J.), *aff'd,*No. 97-2767, 164 F.3d 618 (table), 1998 WL 716572 (2d Cir. Oct. 9, 1998); *Lowrance v. Coughlin,* 862 F.Supp. 1090, 1101 (S.D.N.Y.1994).

Specifically, the Second Circuit has held that, "[w]hile a prisoner may not have a constitutional right to a specific job assignment, this Circuit has recognized that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Davis v. Artuz,* 1998 WL 29763 at *1;*accord, e.g., Davis v. Kelly,* 160 F.3d at 920 ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights, ... and [plaintiff] had a constitutionally protected right to petition the court for redress of grievances"); *Gill*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v. Mooney,* 824 F.2d at 194 (a claim for relief under § 1983 may be made if prison official's decisions to change inmate's work assignments "are made in retaliation for the exercise of constitutionally protected rights"); *Saunders v. Coughlin,* 1994 WL 88108 at *4 ("cognizable claim under § 1983 can be asserted based on an allegation that a prisoner was reassigned [from a particular prison job assignment] in retaliation for the exercise of his constitutional rights"); *Laureano v. Vega,* 1994 WL 68357 at *7 ("a claim for relief arising out of actions taken in connection with a prison job may be stated 'if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights' "); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at *4 (S.D.N.Y. Nov. 12, 1993); *Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("It is well established a claim for relief can be stated under section 1983 for job reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his legal rights ...."); *see, e.g., DeWalt v. Carter,* 224 F.3d 607, 612-13, 618-19 (7th Cir.1999) (joining the Second Circuit and holding that while "prisoners have no right to hold a particular prison job" plaintiff still can bring Section 1983 "retaliation claims arising from the loss of that job."); *see also* cases cited at pages 17-18, 36-37 below.

2. *Plaintiff's Burden of Proof For a § 1983 Retaliation Claim*

***7** The Second Circuit has clearly set forth a plaintiff's burden of proof in proving a § 1983 retaliation claim, as follows:

The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted); *see, e.g., Ebron v. CTO Huria,* No. 99-0087, 205 F.3d 1322 (table), 2000 WL 241576 at *1 (2d Cir. Feb. 1, 2000); *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *Duamutef v. Hollins,* No. 97-2692, 159 F.3d 1346 (table), 1998 WL 537838 at *1 (2d Cir. July 7, 1998); *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.), *cert. denied,*525 U.S. 907, 119 S.Ct. 246 (1998); *Davidson v. Kelly,* No. 96-2066, 131 F.3d 130 (table), 1997 WL 738109 at *3 (2d Cir. Nov. 24, 1997); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984).[FN11]

FN11. *See also, e.g., Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 2, 2001); *Williams v. Muller,* 98 Civ. 5294, 2001 WL 936297 at *3 (S.D.N.Y. Aug. 17, 2001); *Jackson v. Johnson,* 15 F.Supp.2d 341, 363-64 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Campbell v. Kuhlmann,* 91 Civ. 6766, 1998 WL 249196 at *4 (S.D.N.Y. May 15,1998).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller,* 2001 WL 936297 at *3 (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)); *see, e .g., Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002); *Gill v.. Jones,* 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y. Nov. 1, 2001); *Walker v. Keyser,* 2001 WL 1160588 at *6;*Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

"While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim. Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001) (citations omitted); *accord, e.g., Morales v. Mackalm,* 278 F.3d at 131;*Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999); *Thaddeus-X*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v. Blatter,* 175 F.3d 378, 396-98 (6th Cir.1999) (to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), *rev'd on other grounds,* 523 U.S. 574, 118 S.Ct. 1584 (1998).[FN12]

FN12. *See also, e.g., Walker v. Keyser,* 2001 WL 1160588 at *6; *Wagnoon v. Gatson,* 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at *6 (S.D.N.Y. June 25, 2001); *Rivera v. Goord,* 119 F.Supp.2d at 340.

***8** Prisoners' claims of retaliation, of course, must be examined with skepticism and particular care because they are " 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d at 79 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord, e.g., Dawes v. Walker,* 239 F.3d at 491; *Colon v. Coughlin* 58 F .3d at 872; *Jackson v. Johnson,* 15 F.Supp.2d at 364 ( & cases cited therein).

B. *Analysis of Walker's Retaliation Claim*

Walker's § 1983 action alleges that defendants transferred him out of Building 21A in retaliation for the administrative grievance he filed against C.O. Woodard.

1. *Walker's Initial Grievance Was A Protected Activity*

Defendants do not dispute that Walker's November 24, 1998 grievance against C.O. Woodard was a protected activity. (Dkt. No. 31: Defs. Br. at 8.) *See, e.g., Moore v. Gardner,* 00-CV-6076, 2002 WL 553708 at *9 (W.D.N.Y. May 12, 2002) ("filing an inmate grievance is constitutionally protected activity"); *Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 17, 2001); *Wagnoon v. Gatson,* 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at *5 (S.D.N.Y. June 25, 2001) ("A prisoner's filing of an internal [prison] grievance against a corrections officer is protected by the First Amendment, such that retaliation in response to such a grievance may form the basis for a retaliation claim.") (citing *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)).

2. Threat of a 60% Pay Cut is Substantial Enough to Deter a Reasonable *Inmate From Pursuing Prison Grievances*

The next question is whether Walker's transfer to another housing unit, costing him his prison job, constituted an adverse action sufficient to sustain a claim for retaliation, *i.e.,* whether it was substantial enough to deter a similarly situated inmate from exercising his constitutional right to file a prison grievance. (*See* cases cited on pages 15-16 above.) As a result of his transfer out of Building 21A, Walker lost a job that paid twenty-five cents an hour and was given a job that paid ten cents an hour. (Steckelman Aff. Ex. 4: Walker Dep. at 40.) This Court cannot conclude as a matter of law that the threat of such a substantial reduction in a prisoner's hourly pay rate would not discourage a reasonable inmate from exercising his constitutional right to file a prison grievance. *See Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at *4-5 (S.D.N.Y. Nov. 12, 1993) (denying defendants' summary judgment motion since plaintiff's "transfer from porter to clerk to recreational supervisor, and his corresponding decreases in pay," was sufficient to sustain a reasonable inference of retaliation); *Baker v. Zlochowon,* 741 F.Supp. 436, 439-40 (S.D.N.Y. June 29, 1990) (decision not to pay plaintiff for his absences from work and to transfer him to a lower paying job after filing an Article 78 proceeding challenging prison officials' actions could sustain reasonable inference of retaliation sufficient to defeat summary judgment); *see also* cases cited at page 18 n.14 below.[FN13]

FN13. Defendants argue that any injury was *de minimis* because Walker was able to acquire a job in the prison barbershop, paying approximately eighteen cents an hour, two weeks after the transfer. (Defs. Br. at 12; *see* page 7 above.) The fact that Walker was able to secure a new job which paid more than the job he was assigned after the alleged retaliatory transfer but less than the job he lost in Building 21A does not change the Court's analysis.

***9** Defendants argue that, since Walker filed another grievance soon after his housing and job transfer, there

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

was no "chilling effect" on his constitutional rights. (Defs. Br. at 12.) The test, however, is not whether plaintiff Walker himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by defendants to argue that the plaintiff was not chilled), but rather whether the retaliatory conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001).[FN14] The Court cannot say that a prison housing transfer that results in an inmate's loss of a higher-paying prison job and a sixty percent pay cut would not deter a similarly situated reasonable inmate from filing a prison grievance.

FN14. *See, e.g., Morales v. MacKalm,* 278 F.3d 126, 131-32 (2d Cir.2002) (at motion to dismiss stage, "the allegation that defendants transferred [plaintiff] to a psychiatric facility must be construed as describing an adverse action. [Plaintiff] should have the opportunity to develop facts that would demonstrate that the prospect of confinement in a psychiatric facility would deter a reasonable inmate from pursuing grievances."); *Davidson v. Chestnut,* 193 F.3d 144, 150-51 (2d Cir.1999) (issue of whether alleged retaliatory acts would chill reasonable inmate is "factual in nature"); *Rivera v. Goord,* 119 F.Supp.2d 327, 339-40 (S.D.N.Y.2000) (finding that assault by prison officials "would chill a person of ordinary firmness from continuing to engage in his First Amendment activity," but that verbal harassment is "*de minimis* and would not chill a person of ordinary firmness from exercising his First Amendment rights"); *Wells v. Wade,* 96 Civ. 1627, 2000 WL 1239085 at *2-4 (S.D.N.Y. Aug. 31, 2000) ("a rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing keeplock confinement would be likely to chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment: namely, pursuing a prison grievance.") (internal quotations omitted).

3. Whether Walker's Initial Grievance Was a Substantial or Motivating *Factor Cannot Be Decided on This Summary Judgment Motion*

The remaining and decisive inquiry is whether Walker's initial grievance was a "substantial or motivating factor" in the decision to transfer him out of Building 21A. While temporal proximity can raise an inference of causal connection (*see* cases cited at page 15 above), here, defendants concede that the housing move *was* caused by Walker's initial grievance, but deny any improper motive, arguing that the decision to transfer Walker was an "accommodation" to Walker's concerns as expressed in his grievance. (Dkt. No. 31: Defs. Br. at 8-9; *see also* discussion at page 4 above.) Defendants argue that Deputy Superintendent Ercole's decision to transfer Walker was motivated by the desire to resolve Walker's complaint that he felt "uncomfortable" when C.O. Woodard was on duty and to avoid a "possibly volatile situation." (Defs. Br. at 9, 11; *see also* page 4 above.)

Defendants, however, have not submitted evidence that it was a standard or even common practice to transfer inmates who had filed a complaint alleging harassment by specific correctional officers to a different housing unit. *See, e.g., Nicholas v. Mantello,* No. 96-2391, 104 F.3d 353 (table), 1996 WL 671276 at *1 (2d Cir. Oct. 20, 1996) (summary judgment for defendant reversed where defendant "has pointed to no prison regulation or other documentary evidence confirming his assertion about" reasons he took action which plaintiff claimed was retaliatory); *cf. Moore v. Gardner,* No. 00-CV-6076, 2002 WL 553708 at *9-11 (W.D.N.Y. Mar. 12, 2002) (summary judgment in favor of prison officials is appropriate where adherence to DOCS "policy and procedure" refutes retaliatory motive).

Moreover, Walker asserts that when a corrections officer informed Lt. Pataro that Walker would lose his job if transferred, Lt. Pataro responded that Walker was "going to have to get another job." (Dkt. No. 2: Compl. ¶ 9; Walker Aff. ¶ 3.) Defendants do not address this alleged statement in their papers. While Lt. Pataro's statement may be interpreted in more than one way, at least one possible interpretation is that Lt. Pataro intended to deprive Walker of his higher-paying job in retaliation for his grievance.

***10** Finally, perhaps the most persuasive circumstantial evidence of defendants' intent is the way they handled

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Walker's second grievance. Defendants claim that they transferred Walker to a different building to make him more "comfortable," *i.e.,* for his benefit. But within three days of the transfer, Walker filed a second grievance, requesting that he be reinstated to his original housing and job assignments. (*See* pages 5-6 above.) Rather than transferring Walker back when defendants learned that the supposedly beneficial transfer was not what Walker wanted, defendants denied his second grievance. (*See* pages 6-7 above.) A reasonable jury could infer from this that defendants did not transfer Walker to another housing unit to make him "comfortable," but rather in retaliation for his original grievance against a corrections officer.

Based on all these factors, the issue of whether, in admitted response to Walker's initial grievance, defendants' transfer of Walker to another housing unit, causing him to lose a higher-paying job, was for Walker's benefit or in retaliation for the grievance, "runs to matters of credibility and weight of the evidence, which are matters for the jury and should not be decided on summary judgment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

IV. *PERSONAL INVOLVEMENT UNDER SECTION 1983*

A. *Legal Standard*

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions .").[FN15]

FN15. *See also, e.g., Brown v. Peters,* No. 97-2725, 175 F.3d 1007 (table), 1999 WL 106214 at *1 (2d Cir. Feb. 26, 1999); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr. 3, 2001) (Peck, M.J.) ( & cases cited therein); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *6 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Ali v. Szabo,* 81 F.Supp.2d 447, 462 (S.D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) *the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,* (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d at 873 (emphasis added).[FN16]

FN16. *Accord, e.g., Wright v. Smith,* 21 F.3d at 501; *Espinal v.. Goord,* 2001 WL 476070 at *10; *Fulmore v. Mamis,* 2001 WL 417119 at *8 ( & cases cited therein); *Freeman v. Strack,* 2000 WL 1459782 at *7; *Carbonell v. Goord,* 2000 WL 760751 at*7; *Zamakshari v. Dvoskin,* 899 F.Supp. at 1109; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

B. Defendants Lowry and Perez are Entitled to Summary Judgment for Lack of Personal Involvement, But Defendants Ercole and Strack Were Personally *Involved*

***11** Defendants argue that defendants Captain Lowry, Deputy Superintendent Perez, Deputy Superintendent Ercole and Superintendent Strack are entitled to summary judgment for lack of personal involvement in Walker's

alleged retaliatory transfer. (Dkt. No. 31: Defs. Br. at 13-17.) FN17

FN17. Defendants have not moved for summary judgment for lack of personal involvement with respect to defendants Lt. Pataro and Capt. Thacker.

1. *Deputy Superintendent Ercole*

Defendants contend that summary judgment should be granted for Deputy Superintendent Ercole because he had no involvement in the decision to transfer Walker. (Dkt. No. 31: Defs. Br. at 14-15; Dkt. No. 36: Defs. Reply Br. at 4-5.) Deputy Supt. Ercole stated in his affidavit that while he oversees general prison security, his duties "do not include assigning inmates to specific housing units within the facility or assigning inmates to [job] programs." (Dkt. No. 32: Ercole Aff. ¶¶ 2-3.) However, Deputy Supt. Ercole wrote a memo responding to Walker's initial grievance against C.O. Woodard, in which he informed Walker that to make him "more comfortable while at Fishkill," Deputy Supt. Ercole "will have you moved" to another housing unit where Walker would be under the supervision of other officers. (Compl. Ex. A: 12/18/98 Ercole Memo; Defs. 56.1 Stmt. ¶ 10; Ercole Aff. ¶ 5; Walker 56.1 Stmt. ¶ 9; Walker Aff. ¶ 4.) Thus, it is crystal clear that Deputy Supt. Ercole was personally and directly involved in the decision to transfer Walker to another housing unit-he ordered it.FN18 Defendant's motion on his behalf on this issue is frivolous and borders on sanctionable conduct. Summary judgment therefore should be denied as to Supt. Ercole's personal involvement.

FN18. Deputy Supt. Ercole's statement that he is involved in prison security and not housing or job assignments is circumstantial evidence that Walker's transfer was not to make Walker more "comfortable" but may have been done to prevent Walker from fighting with C.O. Woodard. (*See also* Walker Aff. Ex. 1: 11/22/98 Grievance, where Walker stated that "this is the final time I request" that something be done about C.O. Woodard "or I will take the necessary steps to ensure I'm no longer harassed [and] verbally abused by this officer.")

2. *Superintendent Strack*

Walker alleges that Superintendent Strack was personally involved in the alleged retaliation against him and points to the following evidence: (1) Walker's December 21, 1998 prison grievance to Supt. Strack claiming that his transfer was made in retaliation for his prior grievance against C.O. Woodard; (2) Supt. Strack's January 20, 1999 memo to Walker in response to the second grievance, justifying the transfer decision and denying relief; and (3) Walker's January 28, 1999 response to Supt. Strack reiterating his retaliation claim. (*See* pages 5-6 above.)

As noted above, the Second Circuit holds that: "The personal involvement of a supervisory defendant may be shown by evidence that: ... (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong ... or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986))); *accord, e.g., Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997).FN19

FN19. In *Colon v. Coughlin,* the Second Circuit affirmed summary judgment for Commissioner Coughlin and Supt. Senkowski on the ground, *inter alia,* that the contents of the inmate's letters to them was not in the record and "we do not know, therefore, whether the letter was one that reasonably should have prompted [defendants] to investigate." *Colon v. Coughlin,* 58 F.3d at 873, 874 n.8.

In *Wright v. Smith,* the Second Circuit affirmed summary judgment for Commissioner Coughlin where plaintiff's letter to him was not specific, but found personal involvement by Supt. Smith because he received detailed notice, through a habeas petition, that plaintiff had not received a meaningful hearing before being placed in administrative confinement.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Wright v. Smith,* 21 F.3d at 501-02.

In *Williams v. Smith,* the Second Circuit found Supt. Smith personally involved where he affirmed plaintiff's disciplinary punishment on appeal. *Williams v. Smith,* 781 F.2d at 324.

In *Sealy v. Giltner,* the Second Circuit affirmed summary judgment for Commissioner Coughlin where he referred plaintiff's appeal letter to the prison superintendent. *Sealy v. Giltner,* 116 F.3d at 51.

***12** On the other hand, district court decisions in this Circuit have held that " 'it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." ' *Higgins v. Artuz,* 94 Civ. 4810, 1997 WL 466505 at *7 (S.D.N.Y. Aug. 14, 1997) (Sotomayor, D.J.) (quoting *Greenwaldt v. Coughlin,* 93 Civ. 6551, 1995 WL 232736 at *4 (S.D.N.Y. Apr. 19, 1995)); *accord, e.g., Ramos v. Artuz,* 00 Civ. 0149, 2001 WL 840131 at *7 (S.D.N.Y. July 25, 2001) (Swain, D.J. & Pitman, M.J.) ("Notwithstanding the fact that a supervisory official may be held liable for failing to remedy a constitutional violation after learning of the violation through a report or appeal, inaction following receipt of letters from a prisoner regarding alleged violations does not automatically render an official personally liable under Section 1983.... District courts have generally been reluctant to find personal liability where a prison official's involvement is limited to the receipt of a prisoner's letters or complaints."). *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.").[FN20]

FN20. *See also, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (Defendant "merely asserts that he wrote to these [supervisory] defendants [including the Commissioner and Supt.] complaining about the conduct of various Medical and Correctional Defendants and that his complaints were ignored. These allegations are insufficient to hold these Official/Supervisory Defendants liable under § 1983."); *Woods v. Goord,* 97 Civ. 5143, 1998 WL 740782 at *6 (S.D.N.Y. Oct. 23, 1998) ("Receiving letters or complaints, however, does not render [Supt.] Artuz personally liable under § 1983."); *Cox v. Cosgrove,* 94 Civ. 6361, 1998 WL 148424 at *9 (S.D.N.Y. Mar. 27, 1998) (" 'It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations ." ') (quoting *Higgins v. Artuz,* cited above).

Thus, where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable (*see* cases cited at pages 26-27 below). At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them. *See, e.g., Amaker v. Goord,* 98 Civ. 3634, 2002 WL 523371 at *16 (S.D.N.Y. Mar. 29, 2002) (Commissioner "Goord has testified that he receives thousands of letters each year as the Commissioner and Chief Executive Officer of DOCS, and that his office generally forwarded the letters to the appropriate personnel to handle the problems in question."); *Ramos v. Artuz,* 2001 WL 840131 at *8 (no personal involvement by Supt. Artuz where he forwarded inmate's complaint letters to appropriate subordinates); *Higgins v. Artuz,* 1997 WL 466505 at *6 ("In an affidavit, defendant [Supt.] Artuz responded that all complaints filed with him by inmates are referred to 'the appropriate deputy superintendent to investigate and take corrective action if warranted." '); *Watson v. McGinnis,* 964 F.Supp. at 130 ("as soon as Supt. McGinnis received the letter he forwarded it to Capt. Many who immediately informed [plaintiff] that the matter would be investigated"). Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely

for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability. (*See* cases cited on page 21 above.) [FN21]

FN21. It would appear to this Court that implicit (but not articulated as such) in the decisional law in this Circuit is that the more senior the defendant DOCS official, more will be needed in order to find personal involvement. This Court also believes that officials are more likely to be held personally involved where the inmate's complaint is about an ongoing problem that the official's action could eliminate (*e.g.,* prison housing assignments) than about a concluded action (*e.g.,* a corrections officer's use of excessive force), although again this distinction is not clearly articulated in the case law.

***13** On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon v. Coughlin,* 58 F.3d at 873;*see, e.g., Ramos v. Artuz,* 2001 WL 840131 at *8-10 (no personal involvement by Supt. who forwarded letters to others to respond, but personal involvement found for prison Health Services Administrator Zwillinger whose "involvement extends beyond the mere receipt of letters. Zwillinger sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff in his letter to defendant [Supt.] Artuz."); *Booker v. Strack,* 97 Civ. 2418, 1999 WL 983878 at *5-6 (S.D.N.Y. Oct. 29, 1999) (grievances sent to Superintendent may show personal involvement); *James v. Artuz,* 93 Civ.2056, 1994 WL 174005 at *7 (S.D.N.Y.May4, 1994) (personal involvement where Supt. Artuz "conducted a *de novo* review" of prison disciplinary hearing); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at *6 (S.D.N.Y. Nov. 12, 1993) (Superintendent found to have personal involvement where he reviewed plaintiff's grievances and also plaintiff wrote to Superintendent about correction officer's alleged threats, yet Superintendent "consistently denied plaintiff's subsequent complaints of retaliation."). [FN22]

FN22. The Court notes that there are some district court decisions that hold that affirming denial of a grievance is not enough to constitute personal involvement, *e.g., Joyner v. Greiner,* 01 Civ. 7399, 2002 WL 550092 at *5 (S.D.N.Y. Mar. 28, 2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement...."), while conversely other decisions hold that informing a supervisory official of a problem by letter can be enough for personal involvement, *e.g., Saar v. United States Dep't of Justice,* 705 F.Supp. 999, 1006 (S.D.N.Y. Feb. 7, 1989) (personal involvement by warden where plaintiff informed warden by letter and orally of the alleged deprivations). The Court declines to follow such decisions that appear to deviate from the mainstream of decisions within the Circuit.

With this background, the Court turns to the facts concerning Supt. Strack's involvement here. Supt. Strack did not simply receive complaints from Walker about concluded conduct; rather, he evaluated Walker's second grievance and defended the transfer decision at a time when he could have righted the alleged wrong by ordering Walker reinstated to his old housing unit and old job.

Walker alleged in his December 21, 1998 grievance to Supt. Strack, that:

On 12/18/98, I was removed from my program assignment (B/21A PP Group lead. Asst). This removal only occurred because I exercised my constitutional protected rights. Which was the grievance complaint I filed [against] C.O. Woodard dated 11/23/98. In that complaint I requested that no retaliation action be taken for filing such grievance complaint. Now by my exercising my 1st Amendment Right, I am subjected to have my 5th and 14th Amendment Rights violated.

(Compl. ¶ 11 & Ex. B: 12/21/98 Inmate Grievance Complaint; *see* Walker 56.1 Stmt. ¶ 26; Walker Aff. ¶ 4; Defs. 56.1 Stmt. ¶ 18.) Supt. Strack responded to Walker's grievance as follows:

Your original grievance # 17055-98 dated 11/24/98 was filed against Officer Woodard for harassment. This grievance was unsubstantiated based upon information received during investigation.

Due to your complaint, in order to make you feel more comfortable while at Fishkill, you were moved at the discretion of a supervisory decision where you would be under the supervision of other Officers as it appeared you had a problem with Officer Woodard. You have been interviewed by Lt. Szymanowicz concerning your grievance and will not be moved back to H.U.J. at this time.

***14** (Compl. Ex. C: 1/20/99 Strack Memo; *see* Walker Aff. ¶ 5; Defs. 56.1 Stmt. ¶ 19; Strack Aff. ¶ 4 & Ex. 1.)

Responses to grievances (or other inmate complaints) which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement. *See* cases cited at pages 26-27 above. This Court, therefore, cannot conclude as a matter of law on this summary judgment motion that Supt. Strack was not personally involved in the alleged violation. Accordingly, summary judgment should be denied as to Supt. Strack's personal involvement.

3. *Deputy Superintendent Perez*

Walker alleges that Deputy Superintendent Ada Perez was personally involved in retaliation against him because Deputy Supt. Perez knew he had lost his job as a result of his grievance against C.O. Woodard and should have "stopped this from occurring, at least until the matter could have properly been resolved." (Steckelman Aff. ¶ 10 & Ex. 9: Walker Dep. at 57.)

Deputy Supt. Perez testified that she did not know why Walker had been moved out of Building 21A, had no knowledge of Walker's original grievance against C.O. Woodard until the filing of this lawsuit, and has no involvement in inmate housing transfers at Fishkill. (Dkt. No. 32: Perez Aff. ¶¶ 7-9.) In response to Walker's January 28, 1999 letter to Supt. Strack explaining his retaliation claim, Deputy Supt. Perez wrote a February 25, 1999 memo to Walker informing him that he was "in [his] current assignment of Barber Shop as per [his] own request" and would be eligible for "a change of assignment after 90 days, on 4/18/99." (Compl. ¶ 14 & Ex. E: 2/25/99 Perez Letter; *see* Walker Aff. ¶ 7; Defs. 56.1 Stmt. ¶ 21.)

As noted above, a response to an inmate's letter which does little more than provide information does not establish personal involvement. *E.g., Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (defendant not personally involved where he responded to inmate's status inquiry by informing inmate that a decision had been reached regarding his grievance); *Amaker v. Goord,* 98 Civ. 3774, 2002 WL 523371 at *16 (S.D.N.Y. Mar. 29, 2002) (response letter from Commissioner that indicated matter would be handled by someone else not sufficient for personal involvement). Moreover, Deputy Supt. Perez's duties did not include the assignment of inmates to housing units within the facility (Perez Aff. ¶ 4), and there is no evidence that she participated in the initial decision to change Walker's housing unit or that she could have caused him to be returned to Building 21A in February 1999 when she learned of Walker's second grievance. *See, e.g., Saar v. United States Dep't of Justice,* 705 F.Supp. 999, 1006 (S.D.N.Y.1989) (where supervisor was informed of plaintiff's complaint but "had no control over plaintiff's segregation, he cannot be held personally liable for any due process violations arising out of that segregation.").

***15** Deputy Superintendent Perez should be granted summary judgment for lack of her personal involvement in Walker's housing unit transfer.

4. *Captain Lowry*

Captain Lowry asserts that he was not personally involved in Walker's housing or job assignments and that he was unaware of Walker's original grievance against C.O. Woodard until the filing of this lawsuit. (Dkt. No. 32: Lowry Aff. ¶¶ 5-6.) Walker does not dispute Lowry's position. In fact, Walker conceded at his deposition that Lowry "does not have any say over supervisory decisions." (Steckelman Aff. ¶ 8 & Ex. 7: Walker Dep. at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56.) Walker's own statements, therefore, support the grant of summary judgment to Capt. Lowry for lack of personal involvement. *See, e.g., Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1988) (§ 1983 claim based on alleged denial of access to counsel fails where plaintiff "by his own admission was allowed to contact his attorney by telephone").[FN23]

FN23. *See also, e.g., Williams v. NYC Dep't of Sanitation,* 00 Civ. 7371, 2001 WL 1154627 at *17 (S.D.N.Y. Sept. 28, 2001) (Peck, M .J.); *Gonzalez v. New York City Transit Authority,* 00 Civ. 4293, 2001 WL 492448 at *14 (S.D.N.Y. May 9, 2001) (Peck, M.J.); *Wheeler v. Corporation Counsel of N.Y.C.,* 93 Civ. 5184, 2000 WL 1760947 at *9 (S.D.N.Y. Nov. 30, 2000), *aff'd* 2002 WL 136088, 28 Fed. Appx. 90 (2d Cir. Jan. 29, 2002).

In any event, Walker has not submitted any evidence to contradict Capt. Lowry's claim that he was not involved in Walker's transfer. (*See* Dkt. No. 36: Defs. Reply Br. at 4.) After "discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case." *Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998); *see also, e.g., Neitzke v. Williams,* 490 U.S. 319, 324 n.2, 109 S.Ct. 1827, 1831 n.2 (1989) (affirming Court of Appeals' finding that plaintiff in a § 1983 action "alleged no personal involvement on the part of three ... defendants ... and that these defendants' prison jobs did not justify an 'inference of personal involvement ...' "); *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (defendant "documented his assertion of no personal involvement [and plaintiff] offers no concrete evidence to the contrary"); *Saar v. United States Dep't of Justice,* 705 F.Supp. 999, 1006 (S.D.N.Y.1989) (where "Plaintiff has not contradicted defendant" supervisor's assertion that "he had no power to act to remedy the violation," § 1983 claim against that defendant dismissed). Summary judgment therefore should be granted to Capt. Lowry for lack of personal involvement.

V. *QUALIFIED IMMUNITY*

A. *Legal Standard*

"Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002); *see also, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). Qualified immunity is " 'an entitlement not to stand trial or face the other burdens of litigation." ' *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 2156 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815 (1985)).

As the Second Circuit has explained, government actors are entitled to qualified immunity from liability for civil damages when they perform discretionary functions "if either (1) their conduct 'did not violate clearly established rights of which a reasonable person would have known,' or (2) 'it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." ' *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998); *accord, e.g., Poe v. Leonard,* 282 F.3d at 132-33; *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001); *Martinez v. Simonetti,* 202 F.3d 625, 633-34 (2d Cir.2000); *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998).[FN24] "The availability of the defense depends on whether a reasonable [official] could have believed his action to be lawful, in light of clearly established law and the information [he] possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996).[FN25]

FN24. *See also, e.g., Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *11 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) ( & cases cited therein); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *8 (S.D.N.Y. July 19, 2000) (Peck, M .J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *7 & n. 16 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Salahuddin v. Coughlin,* 999F.Supp. 526, 536-37 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.).

FN25. *See also, e.g., Hunter v. Bryant,* 502 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

224, 227, 112 S.Ct. 534, 536 (1991); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040 (1987); *Martinez v. Simonetti,* 202 F.3d at 634;*Freeman v. Strack,* 2000 WL 1459782 at *7;*Culp v. Koenigsmann,* 2000 WL 995495 at *8;*Carbonell v. Goord,* 2000 WL 760751 at *7.

***16** "In a suit against [a government official] for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." *Saucier v. Katz,* 533 U.S. at 200, 121 S.Ct. at 2155;*accord, e.g., Poe v. Leonard,* 282 F.3d at 133;*Smith v. Menifee,* 00 Civ. 2521, 2002 WL 461514 at *4 (S.D.N.Y. Mar 26, 2002).

"A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156 (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793 (1991)); *accord, e.g., Poe v. Leonard,* 282 F.3d at 132;*Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 251 (2d Cir.2001); *Smith v. Menifee,* 00 Civ. 2521, 2002 WL 461514 at *4 (S.D.N.Y. Mar. 26, 2002). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156;*accord, e.g., Poe v. Leonard,* 282 F.3d at 132;*Smith v. Menifee,* 2002 WL 461514 at *4.

The "right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 1700 (1999); *accord, e.g., Smith v. Menifee,* 2002 WL 461514 at *4-5. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156;*accord, e.g., Poe v. Leonard,* 282 F.3d at 135;*Smith v. Menifee,* 2002 WL 461514 at *4-5. " '[T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' *Saucier v.. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987)); *see also, e.g., Wilson v. Wayne,* 526 U.S. at 614-15, 119 S.Ct. at 1699;*Smith v. Menifee,* 2002 WL 461514 at *5. Therefore, to determine whether a right is clearly established, the Court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156;*see also, e.g., Anderson v. Leighton,* 487 U.S. at 640, 107 S.Ct. at 3029; *Smith v. Menifee,* 2002 WL 461514 at *5.

***17** "In determining whether a particular legal principle was 'clearly established' for purposes of qualified immunity, [the Second Circuit] has considered three factors: 'whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." ' *Powell v. Schriver,* 175 F.3d 107, 113 (2d Cir.1999) (internal quotes omitted); *accord, e.g., Cerrone v. Brown,* 246 F.3d at 199;*Mollica v. Volker,* 229 F.3d 366, 371 (2d Cir.2000); *Powell v. Schriver,* 175 F.3d 107, 113 (2d Cir.1999); *Cahill v.. O'Donnell,* 75 F.Supp.2d 264, 277 (S.D.N.Y. Dec. 7, 1999) (B.D.Parker, D.J.).

Moreover, where the qualified immunity issue is raised in connection with a supervisor's liability, "both the subordinate's and the supervisor's actions (or lack thereof) are relevant." *Poe v. Leonard,* 282 F.3d at 134. A plaintiff "must show that both laws were clearly established to lay the predicate for demonstrating that [the supervisor] lacked qualified immunity: the law violated by [the subordinate official] and the supervisory liability doctrine under which [plaintiff] wishes to hold [the supervisor] liable." *Poe v. Leonard,* 282 F.3d at 134.

Finally, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to a factual situation

the officer confronts.... If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier v. Katz,* 533 U.S. at 205, 121 S.Ct. at 2158;*accord, e.g., Poe v. Leonard,* 282 F.3d at 133. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156-57. "[E]ven if the plaintiff's federal rights were clearly established at the time of the alleged violation, the defendants may nevertheless enjoy qualified immunity if it was objectively reasonable for them to believe that their actions did not violate those rights." *Lennon v. Miller,* 66 F.3d at 423. " 'Thus, if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances,' qualified immunity applies." *Poe v. Leonard,* 282 F.3d at 133 (quoting *Lennon v. Miller,* 66 F.3d at 421). " 'A defendant is therefore entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." ' *Poe v. Leonard,* 282 F.3d at 146 (quoting *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001)); *see also, e.g., Tierney v. Davidson,* 133 F.3d at 196.

B. Defendants are Not Entitled to Summary Judgment on Qualified Immunity *Grounds*

***18** The first question is whether Walker has alleged a constitutional violation. Walker alleges that he was transferred in retaliation for an administrative grievance he filed against C.O. Woodard. (Dkt. No. 2: Compl.) The law is clear that prison officials may not retaliate against an inmate for exercising his constitutional rights, including the right to file a prison grievance. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ( "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983"); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Prisoners, like non-prisoners have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see also* cases cited at pages 12-13 & n.10 above. Thus, Walker's claim that he was transferred in retaliation for filing a grievance, if proved, clearly would demonstrate violation of a constitutional right.

The next inquiry is whether Walker's particular right in this case was "clearly established," *see. e.g., Saucier v. Katz,* 533 U.S. at 194, 201, 121 S.Ct. at 2151, 2156;*Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002), that is, whether it would have been clear to a reasonable prison official that it was impermissible to transfer Walker in retaliation for his grievance. Retaliatory transfer of a prisoner's housing and/or job assignment has long been prohibited in this Circuit. *See, e.g., Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights"); *Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989) ("Retaliatory transfers were clearly illegal in 1980."); *Hohman v. Hogan,* 597 F.2d 490, 493 (2d Cir.1979) (retaliatory transfer to another prison and segregated confinement would be impermissible); *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976) (impermissible to transfer inmate in retaliation for exercise of constitutional rights), *cert. denied,*431 U.S. 967, 97 S.Ct. 2925 (1977); *Bennet v. Tucker,* 95 Civ. 8029, 1996 WL 288202 at *4 (S.D.N.Y. May 30, 1996) (qualified immunity defense denied for alleged retaliatory prison transfer; "This court has held that the doctrine of qualified immunity does not shield officials from § 1983 liability for engaging in retaliatory conduct in response to an inmate's exercise of rights."); *Lowrance v. Coughlin,* 862 F.Supp. 1090, 1098 (S.D.N.Y.1994) (retaliatory transfers held to be constitutionally impermissible); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at *7 (S.D.N.Y. Nov. 12, 1993) ("Qualified immunity will not save these defendants from suit because retaliatory job assignments, and retaliatory transfers, have both been held in this Circuit to violate constitutional rights, and were so held throughout the relevant period.") (citations omitted); *Baker v. Zlochowon,* 741 F.Supp. 436, 440 (1990) ("Defendants ['] contention that they have qualified immunity from suit for damages does not warrant granting their summary judgment motion.... The Second Circuit has held that at least with respect to transfers in retaliation for exercise of constitutional rights, 'a reasonable jury could find that a reasonable commissioner of corrections would be aware of [the illegality of his actions],' and thus might not be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

able to establish the defense of qualified immunity. We believe that the same can be said with respect to retaliatory job reassignments.") (citations omitted; bracketed material in original); *see also* cases cited at pages 13-14 above. Given this abundance of case law, a reasonable prison official should have been aware that transferring Walker's housing and/or job assignment in retaliation for filing a grievance was unlawful.

***19** Since Walker's right not to be transferred in retaliation for his grievance was "clearly established" long before December 1998, the final question is whether it should have been clear to defendants that their conduct was unlawful in the situation they confronted. *E.g., Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156. The relevant question is whether a reasonable jury would conclude that "officers of reasonable competence could disagree" on the legality of defendants' actions under the circumstances. *Poe v. Leonard,* 282 F.3d at 146.

Defendants Strack, Ercole, Thacker and Pataro concede in their affidavits that they were aware of Walker's grievance against C.O. Woodard and indeed that Walker's grievance was the reason for his transfer out of Building 21A. (Dkt. No. 32: Strack Aff. ¶ 4; Ercole Aff. ¶¶ 4-5; Thacker Aff. ¶¶ 4-5; Pataro Aff. ¶ 3.) Defendants argue, however, that their transfer of Walker out of Building 21A was a reasonable response to Walker's grievance that he was "uncomfortable" around C.O. Woodard. (*See* Defs. Br. at 19; *see also* discussion at page 19 above.) [FN26] While defendants contend that Walker's December 18, 1998 transfer was undertaken to accommodate Walker's interests, Walker immediately informed prison officials that he would lose his job as a result of the move and that he needed and wanted to stay in Building 21A or 21. (Walker Aff. ¶ 3; *see also* pages 4-5 above).[FN27] Walker also filed a formal grievance three days later, on December 21, 1998, informing prison officials that he had lost his job as a result of the housing transfer and that he wished to be moved back to his original housing unit. (*See* pages 5-6 above.) Finally, after his second grievance was denied, Walker wrote to Superintendent Strack reiterating his desire to be moved back to Building 21A. (*See* page 6 above.) Taken together, these grievances should have put prison officials on notice that their transfer of Walker had a negative impact on Walker and as a result did not serve to make him "more comfortable." Causation here is conceded; the only issue is whether defendants moved Walker for his benefit or in retaliation for his initial grievance. The Court cannot say that the only conclusion a reasonable jury could reach, viewing the evidence in the light most favorable to Walker, is that reasonable prison officials could disagree about the legality of defendants' actions if they changed his prison housing assignment to retaliate for his grievance.

FN26. As noted above, where the qualified immunity issue is raised as to a supervisor's liability "both the subordinate's and the supervisor's actions (or lack thereof) are relevant." *Poe v. Leonard,* 282 F.3d at 134; *see* page 34 above. Here, however, defendants' brief spent only two pages on the qualified immunity argument and treated all defendants together. (*See* Dkt. No. 31: Defs. Br. at 17-19; *see also* Dkt. No. 36: Defs. Reply Br. at 6-7 .) The Court accordingly will also consider the qualified immunity issue as to all defendants as a group.

FN27. Walker stated that he "explained to C.O. Sylvester that his job required him to live in B/21 or B/21A. C.O. Sylvester informed Lt. Patero, the official in charge of movement at [Fishkill], of plaintiff's relocation problem." (Walker Aff. ¶ 3.)

Summary judgment for the remaining defendants on qualified immunity grounds should be denied.

## CONCLUSION

For the reasons set forth above, defendants' summary judgment motion should be: (1) GRANTED as to defendants in their official capacities because the Eleventh Amendment bars such damage claims; (2) GRANTED as to defendants Lowry and Perez for lack of personal involvement; and (3) DENIED in all other respects.

Pursuant to the Court's prior scheduling order, the parties are to submit a joint proposed Pretrial Order by May 31, 2002.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

***20** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also*Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 40 Centre Street, Room 410, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,*513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,*506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2002.
Walker v. Pataro
Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Blake WINGATE, Plaintiff,
v.
Correction Officer GIVES, et al., Defendant.
**No. 05 Civ. 1872(LAK).**

April 13, 2008.

West KeySummary
**Civil Rights 78 1352(4)**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
78k1352(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
New York inmate stated a viable claim of municipal liability under § 1983 against the city for having caused or encouraged deliberate indifference to the inmate's medical needs through an unconstitutional policy or practice. Prison employees had allegedly been deliberately indifferent to the inmate's medical needs by refusing to provide him his medically prescribed diet which resulted in a variety of medical problems. The inmate had alleged that he was not the only inmate who complained about not receiving a special diet, and that other inmates who faced similar difficulties had medical problems that were worse than his. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**ORDER**

LEWIS A. KAPLAN, District Judge.

***1** In a report and recommendation dated March 17, 2008 (the "R & R"), Magistrate Judge Debra Freeman recommended that the Court:

• grant the motion of New York State Commissioner of Corrections Alan J. Croce to dismiss the complaint against him (docket item 44)

• grant the motion of the City defendants to dismiss the complaint (docket item 52) insofar as it seeks dismissal of (a) the false arrest claim against defendants Rachel Alvarez and Asman, and (b) the *Monell* claim against the City only with respect to the alleged policy of transferring inmates to different prisons to thwart their ability to pursue the grievance process and deny the motion in all other respects

• deny without prejudice plaintiff's motion for an injunction and declaratory reliefr (docket item 72) and direct plaintiff to serve and file a motion to supplement his pleading and, if he wishes to pursue preliminary injunctive relief, to file a properly supported motion

• deny plaintiff's motion for an order of protection (docket item 79).

The City defendants and plaintiff object to different aspects of the R & R.

*The City Defendants' Objections*

1. The City's contention that plaintiff's claim for equitable relief is moot in light of his transfer to a state facility and subsequent release. While plaintiff has been rearrested, again is in City custody, and again is making much the same complaints, it stands on the ceremony of the fact that the rearrest and subsequent events postdate the complaint.

The City is right that the claim for equitable relief as stated in the amended complaint is moot. The practical significance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of this fact, given that plaintiff will be allowed to supplement his complaint, is doubtful.

2. The City argues that the R & R's conclusion that the amended complaint adequately states a claim against the City under *Monell* with respect to plaintiff's diet is incorrect. Given the liberality with which we are obliged to view *pro se* pleadings, the Court disagrees.

3. Finally, the City defendants argue that the Magistrate Judge incorrectly sustained the sufficiency of the malicious prosecution claim against Police Officer Rachel Alvarez because she was not served in this action. The docket sheet, however, reflects proof of service upon her. (Docket item 13)

*Plaintiff's Objections*

Plaintiff has filed two documents, one entitled Plaintiff's Objections to Report and Recommendations and the other Rebuttal to Report and Recommendations, in view of plaintiff's *pro se* status, the Court considers both to the extent they are comprehensible.

The only point of any significance pertains to the R & R's recommendation that plaintiff's claim that he was falsely arrested on April 9, 2003 by Officers Rachel Alvarez and Asman be dismissed because plaintiffs subsequent conviction of some of the charges on which he was arrested sufficed to establish probable cause. (R & R 13-15) Plaintiff appears to argue that this was error as to Officer Asman because hers was a separate arrest, and those charges against plaintiff were dismissed. (Rebuttal 5 and rap sheet)

***2** The portion of a rap sheet attached to plaintiff's papers reflects the April 9, 2003 arrest, which plaintiff has labeled by hand "Alvarez case," and another arrest on October 19, 2004, which plaintiff has labeled "Asman case." The disposition column for the latter arrest, as plaintiff suggests, indicates that the charge arising out of that incident was dismissed. It is impossible to tell from the amended complaint, however, whether the false arrest claim against Officer Asman arises from the April 9, 2003 arrested or the October 19,2004 arrest. Accordingly, that issue cannot now be disposed of.

The Court has considered plaintiff's other arguments and concluded that they lack merit.

*Conclusion*

Accordingly, the motions arc disposed of as follows:

1. The motion of defendant Croce to dismiss the complaint with prejudice as to him (docket item 44) is granted in all respects.

2. The motion of the City Defendants to dismiss the complaint with prejudice as to them (docket item 52) is granted to the extent that:

(a) Plaintiffs false arrest claim against defendants Rachel Alvarez and Asman with respect to the April 9, 2003 arrest is dismissed,

(b) Plaintiff's *Monell* claim against the City, to the extent it is based on the City's alleged policy of transferring inmates to thwart the grievance process, is dismissed, and

(c) Plaintiff's claim for injunctive and declaratory relief is dismissed.

It is denied in all other respects.

3. Plaintiff's motion for an injunction and declaratory relief (docket item 72) is denied without prejudice to a motion by plaintiff, pursuant to Fed.R.Civ.P. 15(d), for leave to file a supplemental complaint with respect to the claim that he currently is, and since his return to City custody has been, denied a proper diet and, if leave is granted, to file a properly supported motion for a preliminary injunction.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

4. Plaintiff's motion for an order of protection (docket item 79) is denied.

SO ORDERED.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge.

In this action, brought pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Blake Wingate ("Plaintiff") alleges that his rights were violated by the City of New York, the New York City Board of Corrections, three New York City police officers, a Queens County assistant district attorney, an employee of the Civilian Complaint Review Board, the Commissioner of the New York State Commission of Corrections, the Commissioner of the New York State Department of Correctional Services, and 23 employees of the New York City Department of Correction. Specifically, Plaintiff claims that he was falsely arrested in April 2003, that he was maliciously prosecuted, and that, while he was detained at Rikers Island from October 2004 through February 2005, his medical need for a specific diet was treated with deliberate indifference.

Currently pending before the Court are four motions: First, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Alan J. Croce, Commissioner of the New York State Commission of Corrections ("Croce" or the "State Defendant") [FN1] has moved to dismiss the Amended Complaint on the principal ground that it does not adequately allege that he was personally involved in the alleged deprivation of Plaintiff's constitutional rights. (Dkt.44.)

FN1. According to the New York State Attorney General's Office, Commissioner Croce is the only State defendant who has been personally served or has requested representation from the Attorney General's Office. (Defendant's Memorandum of Law In Support of Motion to Dismiss the Complaint, dated Sept. 23, 2005 ("State Mem.") (Dkt.45) at 1 n.1.) As Croce is the only State defendant named on the motion, the exhaustive list of defendants listed on the Court's docket as having filed the motion appears to be a docketing error. (*See id.; see also* Notice of Motion, dated Sept. 23, 2005 (Dkt.44).)

***3** Second, also pursuant to Rule 12(b)(6), defendant the City of New York and certain other defendants identified either as New York City Police Officers (Rachel Alvarez and Rebecca Asman) or as employees of the New York City Department of Correction (Commissioner Martin Horn, Corrections Officers D. Givens and P. Danza, Wardens Walsh and Thompson, Food Service Manager R. Haberman, Dietician C. Talusan, and Grievance Coordinator P. Mimms) (collectively, the "City Defendants") [FN2] have moved to dismiss the Amended Complaint against them on a number of grounds. (Dkt. 52 .)

FN2. According to the New York City Office of the Corporation Counsel, these are the only named City defendants who have been served. (Memorandum of Law In Support of City Defendants' Motion to Dismiss, dated Dec. 16, 2005 ("City Mem.") (Dkt.54) at 1 n.1.) As only the City and the individual defendants who have been served are presently moving to dismiss (*see id.*), the other defendants listed on the Court's docket as having filed the present motion appear to have been listed in error. Further, Plaintiff spells the name of one defendant as "Gives," but, according to the City Defendants' motion papers, it is properly spelled "D. Givens." (*See id.*)

Third, Plaintiff has filed a motion for "an injunctive or declaratory judgment," contending that, when he returned to Rikers Island in 2007 (after having left City custody for a period of time), he was again denied a special diet, and requesting that the Court issue an immediate order requiring that he be given food appropriate to meet his medical needs. (Dkt.72.)

Finally, Plaintiff has moved for an order of protection against certain New York City police officers, one of whom (Sergeant Fields) has been named as a defendant in this case, arguing that, during a period in 2007 after Plaintiff had been released from custody and before he was re-incarcerated, he was attacked by these officers. (Dkt.79.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

For the reasons set forth below, I respectfully recommend that the State Defendant's motion to dismiss be granted in its entirety, and that the City Defendants' motion to dismiss be granted in part and denied in part. As for Plaintiffs' motions, I recommend that Plaintiff's motion for immediate injunctive and declaratory relief be denied without prejudice to renew upon a properly supported submission, and that Plaintiff's motion for an order of protection be denied.

***BACKGROUND***

**A. *Factual Background*** [FN3]

FN3. While Plaintiff makes a variety of allegations against 32 defendants, this recitation of the facts focuses on Plaintiff's allegations against the defendants who have moved to dismiss the Amended Complaint.

**1. *Alleged False Arrest and Malicious Prosecution***

On April 9, 2003, Plaintiff was arrested for Grand Larceny in the Fourth Degree, Criminal Possession of Stolen Property, Criminal Possession of a Controlled Substance and Resisting Arrest.[FN4] (*See* Amended Complaint, dated Mar. 23, 2005 ("Am.Compl.") (Dkt.5) at 32 [FN5]; Plaintiff's Response to City Defendants' Request for Dismissal, filed Jan. 12, 2006 ("Pl.Resp.") (Dkt.57), at Ex. 10 (New York State Criminal History; *see also* Declaration of John Hewson, dated Dec. 16, 2005 ("Hewson Decl."), at Ex. A (Certificate of Disposition of Indictment).) Plaintiff alleges that the arrest was based upon "false accusations" by defendants Rachael Alvarez ("Alvarez") and Rebecca Asman ("Asman"), police officers from the 113th Precinct in Queens. (Am. Compl. at 32.) According to Plaintiff, the police submitted false reports to the District Attorney [FN6] (*id.* at 34), and the assistant district attorney prosecuted Plaintiff based upon these false accusations (*id.* at 32).

FN4. While Plaintiff alleges that he was also charged with "joy riding" (Am. Comp. at 32), his New York State Criminal History does not confirm this (*see* Pl. Resp., Ex. 10).

FN5. As the Amended Complaint does not contain numbered paragraphs, all references to that pleading are to page numbers.

FN6. As examples of the falsity, Plaintiff alleges that, while Asman stated that she arrested Plaintiff "on" 147 and Rockaway Boulevard, he was actually arrested "in the house" at 146-18 Rockaway Boulevard. (Am. Compl. at 33.) Further, Plaintiff alleges that he was arrested "by 3 men and not at all by a woman," and that, although he was charged with possession of cocaine, he actually had only "residue." (*Id.*)

In the Amended Complaint, Plaintiff appears to allege that the grand jury did not return an indictment on the charge that he resisted arrest (or, according to Plaintiff, on the joy riding charge (*see* n.4, *infra* )), and the District Attorney's Office voluntarily dismissed the grand larceny charge (Am. Compl. at 32). Plaintiff was tried by a jury on the remaining charges of Criminal Possession of Stolen Property and Criminal Possession of a Controlled Substance, and, on July 5, 2005, he was apparently convicted of those charges. (*See id.; see also* Pl. Resp. Ex. 8; Hewson Decl. Ex. A.) [FN7]

FN7. While the Amended Complaint was filed prior to the date when Plaintiff was convicted, Plaintiff does not challenge the fact of his conviction in his subsequent submissions. (*See, e.g.,* Pl. Resp. 6 (stating that Plaintiff's conviction is under appeal).) In addition, the Court may take judicial notice of Plaintiff's conviction. *See, e.g., Schwartz v. Capital Liquidators, Inc.,* 984 F.2d 53, 54 (2d Cir.1993) (taking judicial notice of plaintiff's criminal conviction); *Gibson v. City of New York,* No. 96 CV 4958, 1998 U.S. Dist. LEXIS 21653, at *7-8 (E.D.N.Y. Dec.9, 1998) (taking judicial notice of plaintiff's criminal conviction anddismissing claim of false arrest).

**2. *Alleged Deliberate Indifference to Medical Needs***

***4** Between Plaintiff's arrest and the time he filed this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

lawsuit, he was incarcerated at four different facilities on Rikers Island: the Vernon C. Bain Center ("VCBC"), the George Motchan Detention Center ("GMDC"), the Anna M. Kross Center ("AMKC"), and the Otis Bantum Correctional Center ("OBCC"). The exact time periods of Plaintiff's incarceration at the different facilities are not clear.

**a. *VCBC***

On October 22, 2004, Plaintiff was incarcerated at VCBC. On that date, he received a "diet sheet" from the medical department at VCBC that indicated that he was supposed to receive a special diet based upon his medical needs. (Am. Compl. at 15.) According to Plaintiff, he was supposed to receive a "bland diet" (*id.* at 14), providing low sodium, low fat, low cholesterol, low fiber, and no tomato products, fruits or salads. (*Id.* at 28.) Plaintiff describes the "bland diet" as follows: "It is the most simple diet there is. Just clean the food and cook it in the steamer. That[']s it[.] No seasoning. No corn or non-digestible foods. Nor any kind of oats, beans, peas, fibrous meats, nuts [,] berries or seasoned food. [N]o fruit with pulp, nor vegetable pulp." (*Id.* at 14; *see also id.* at 24 (describing Plaintiff's bland diet as "[t]he most easiest diet there is. No processed foods, just chicken, or fish or fresh ground meat. No seasoning. White rice, spaghetti or pasta, no seasoning or colors, vegetable green, no seeded foods, tomato products or high fiber (processed meats potatoes etc ... ) no milk, or hot cereals. Canned fruit or bananas.").)

Plaintiff alleges that defendant R. Haberman ("Haberman"), the Food Service Manager for GMDC, was responsible for sending the prescribed diet to him in VCBC, yet failed to do so. (*Id.* at 16 .) Plaintiff alleges that, when he did not receive his diet meals, he "filed a complaint" with a number of individuals, including defendant Croce (Commissioner of the New York State Commission of Corrections), and defendant Horn (Commissioner of the New York City Department of Correction). (*Id.*) [FN8] In addition, although the City Defendants assert that the Department of Correction has no record showing that Plaintiff filed any grievances while at VCBC (Hewson Decl. Ex. B), Plaintiff claims that he filed four grievances at that facility, including one grievance complaining about not receiving his special diet (Am. Compl. at 17). According to Plaintiff, "[t]he VCBC Grievance Coordinator ... did not respond for over a week[,][a]fter which [Plaintiff] was transferred to [a different] Facility." (*Id.* at 15; *see also id.* at 17 (alleging that, after filing complaints at VCBC, Plaintiff was transferred to GMDC, another jail on Rikers Island).)

FN8. Plaintiff later received letters dated December 31, 2004 and January 7, 2005, informing him that the State Commission of Correction would investigate his complaint, and February 7, 2005, advising him to exhaust all remedies with the New York City Department of Correction before writing to the Commission. (*See* Am. Compl. (attached letters).)

**b. *GMDC***

Plaintiff alleges that, upon being transferred to GMDC, he "still" did not receive his prescribed diet. (*Id.* at 17.) Plaintiff thus attempted to follow up on the grievances he had filed at VCBC, but defendant P. Mimms ("Mimms"), the Grievance Coordinator at GMDC, allegedly told him that his previous grievances were "no good in her facility." (*Id.*) Plaintiff alleges that he then proceeded to file new grievances at GMDC. (*Id.*) Although Mimms purportedly arranged for Plaintiff to receive "his diet card," Plaintiff "did not accept [that] resolution and requested a hearing." (*Id.*) When his request for a hearing was refused by Mimms, Plaintiff then wrote to Governor Pataki and Mayor Bloomberg to complain, but received no response. (*Id.*) Plaintiff also alleges that he complained to defendant Walsh ("Walsh"), the warden of GMDC, to no avail. (*Id.* at 18.)

**c. *AMKC***

***5** On December 18, 2004, Plaintiff was transferred from GMDC to a mental health housing area at AMKC. (Am. Compl. at 18.) [FN9] Plaintiff seems to allege that, at AMKC, he received his medical diet on certain occasions, but not on others, depending upon which staff members were working at the time. For example, he states that Officers Ware and Gibson "made sure that [Plaintiff] received his medical diet whenever they could," but, according to Plaintiff, "[t]he problem was, [he] couldn't receive [his] therapeutic diet when they were not [working]." (*Id.* at 20.) Further, Plaintiff alleges that defendant D. Givens ("Givens"), a corrections officer stationed in Plaintiff's housing area, "refused on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

various occasions to call the kitchen to assure [that Plaintiff would] receive his medical diet." FN10 (*Id.*)

FN9. Plaintiff appears to allege that he was transferred as the result of an incident involving a confrontation with a psychiatrist at GMDC. (Am. Compl. at 19.)

FN10. Plaintiff also alleges that Givens "refused to place a work order" when he complained about a lack of running water in his cell (Am. Compl. at 19) and opened his mail and kept it at her station while he was at the law library (*id.* at 22). To the extent that these allegations form the basis of any independent claims by Plaintiff, such claims would be subject to dismissal on the ground that the challenged conduct would not, as an objective matter, be sufficiently serious to implicate the Eighth Amendment. *See* *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (conditions must result "in unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities"); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (requiring conditions that are "repugnant to the conscience of mankind").

At an Inmate Counsel Meeting in December 2004, Plaintiff complained about his diet to Deputy Bailey of Security, who "immediately called the Food Service Manager Haberman to ... meet." (*Id.* at 20.) Plaintiff explained his complaint to Haberman, who determined that Plaintiff had not received his meals due an oversight and promised to fix the problem. (*Id.* at 21.) Yet, according to Plaintiff, "it didn't happen." (*Id.*) Haberman was then called back to another meeting by Deputy Bailey. This time, Haberman indicated that the problem had not been fixed because the dietician, defendant C. Talusan ("Talusan"), was on vacation and "her stand[-]in was sick." (*Id.*)

Plaintiff does not question that, when Talusan returned from her vacation, she ordered him the correct diet. According to Plaintiff, however, "it would only come at night whenever Ms. Gibson was on her 3-11 shift" (*id.*); Plaintiff alleges that his "diet never came when Ms. Give[n]s was on her 7-3 shift." (*Id.*) When Plaintiff complained to Givens, she told him, "If you didn't come to jail you wouldn't have this problem. This is not Mc Donald's or Burger King [;] you are too needy, [and] you need to go home." (*Id.*) In addition, defendant P. Danza ("Danza"), a corrections officer in Plaintiff's housing area, allegedly never called the kitchen to notify them when Plaintiff's breakfast did not arrive. (*Id.* at 22.) At this point, according to Plaintiff, he was "receiving an average of five [diet] meals a week." (*Id.* at 23.)

In mid-January 2005, Plaintiff filed two grievances with the Grievance Coordinator at AMKC, whom he identifies as "Robinson." (*See id.*) According to Plaintiff, Robinson officially filed the grievances on February 3, 2005. (*Id.* at 24.) Plaintiff alleges that he was interviewed by a captain regarding the grievances (*id.*), but that, the following day (February 4, 2005), he was removed from his cell, and the day after that (February 5, 2005), he was transferred to OBCC Mental Health Housing (*id.* at 25).

**d. *OBCC***

At some point after his transfer to OBCC, Plaintiff's diet meals allegedly "stopped coming on a regular basis," FN11 and Plaintiff learned that this was because the meals were still being sent to his old facility, AMKC. (*Id.*) Plaintiff therefore wrote to Haberman to try to rectify the situation. (*Id.*) In addition, Plaintiff wrote to defendant Thompson, the warden of OBCC, on two occasions, to notify him of the problem. (*Id.* at 26.) Further, Plaintiff contacted the Board of Corrections Inspector General ("IG"), who sent officers to interview Plaintiff. (*Id.*) According to Plaintiff, his complaint to the IG was initially "declared ... unsubstantiated" (*id.*), but, after Plaintiff submitted additional documentation, the deputy warden "declared the appeal granted" (*id.* at 27). Plaintiff does not specify what, if anything, resulted from the granting of the appeal.

FN11. Plaintiff estimates that, out of a total of 150 meals he received at OBCC, only five to seven were his proper diet meals. (Am.Compl.25.)

***6** Plaintiff alleges that he also attempted to file a grievance at OBCC, but the grievance coordinator "dismissed the grievance because [Plaintiff had already] contacted the

inspector general." FN12 (*Id.* at 26.) Plaintiff states that he then "filed appeals to all of the grievances [that he had initially filed at AMKC with] Mr. Robinson on all levels." (*Id.*) According to Plaintiff, the Department of Correction responded by "closing out [Plaintiff's] grievances because he was transferred [to a new facility] and saying file another grievance." (*Id.*)

FN12. Plaintiff attaches to his Amended Complaint a letter from the Inmate Grievance Resolution Program ("IGRP"), stating that Plaintiff's previous grievances were "now closed" because they originated from a "previous facility." (Am. Compl. (attached letter to Plaintiff from C.O. Penceal, Field Operations Officer IGRP, dated Feb. 15, 2005).) That letter instructed Plaintiff to "[i]n the future go to your Grievance Coordinator in your current facility." (*Id.*) In addition, another letter from the Inmate Grievance Resolution Committee ("IGRC"), indicated that Plaintiff's complaint about his diet was "non-grievable" because he had already filed complaints with the IG. (*See* Am. Compl. (attached letter to Plaintiff from S. King, Grievance Coordinator, OBCC, dated Mar. 4, 2005).)

**3. *The Amended Complaint***

On January 25, 2005, Plaintiff filed his original Complaint in this action with the Court's *Pro Se* Office. (*See* Complaint, dated Dec. 28, 2004 (Dkt.2).) On February 4, 2005, the Court (Mukasey, C.J.) issued an Order, staying all proceedings in the action for 60 days and instructing Plaintiff to amend his Complaint to name individuals personally responsible for the alleged violation of his rights and to state a proper claim against the City of New York. (*See* Order, dated Feb. 4, 2005 (Dkt.3).) On March 29, 2005, Plaintiff filed his Amended Complaint (Dkt.5), claiming that he was falsely arrested and maliciously prosecuted by defendants Asman and Alvarez, and that the other defendants refused to provide him with his medically prescribed diet, in violation of the Eighth Amendment.FN13 (*See* Am. Compl. at 31.)

FN13. In his Amended Complaint, Plaintiff partially blames the cooks (Danny Rapalero, Anderson Roach and senior cook Henry) for not providing his diet. Plaintiff alleges that "none of these cooks have [*sic* ] delivered [Plaintiff] his medically prescribed diet.... For some reason the cooks do not want to follow the diet schedule for a bland diet." (Am. Compl. at 29.) According to Plaintiff, "the cooks are following their own laziness ... instead [of] the medically prescribed diet as the law of medicine requires." (*Id.*) These allegations are not addressed herein because they are not asserted against any of the moving defendants.

Without specifying when, Plaintiff alleges that, as a result of his incorrect diet, he "has suffered hunger, stomach pains[, pains] to his feet, [diarrhea,] acid reflux, [b]loody stool, obesity.... He has gained 50 pounds [,] ... [and suffers from] bloat ... [and] heart and stomach pain." FN14 (*Id.* at 28.) Furthermore, Plaintiff alleges that he suffered a "loss of liberty" because of the purported false arrest and malicious prosecution by Police Officers Asman and Alvarez. (*Id.* at 34.) As a result of these alleged violations, Plaintiff requests: (1) injunctive relief, specifically that the Department of Correction improve its polices and procedures for providing special diets to inmates (*id.* at 36), and that he be transferred to a different facility where he can get the meals he was prescribed (*id.* at 37); (2) $600 million in compensatory damages for defendants' failure to give him his diet meals (*id.* at 37); and (3) unspecified damages for false arrest and malicious prosecution.FN15

FN14. In addition, Plaintiff alleges that "kidneys produce less fluids, liver and intestine problems, blood pressure drops, heart beats less from less oxygen & [b]lood flow dizzyness [*sic* ]." (Am. Compl. at 31.)

FN15. Plaintiff also seeks unspecified damages for an alleged failure to properly pay him for working in the mess hall. Any claim based on such allegations is not addressed in this Report and Recommendation, as it is not pleaded against any of the State or City Defendants who are presently moving to dismiss.

***DISCUSSION***

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**I. *DEFENDANTS' MOTIONS***

On September 23, 2005, the State Defendant (Croce), moved to dismiss the Amended Complaint on the grounds that he was not personally involved in the alleged constitutional deprivation, that he is entitled to qualified immunity, and that the Court lacks jurisdiction over him pursuant to the 11th Amendment. (*See* State Mem. at i.) In response to that motion, Plaintiff argues that defendant Croce is liable because Plaintiff wrote to him "on over 8 separate and different occasions ... [and he] failed to investigate properly and assure [that Plaintiff] receive[d] his medical diet." (Plaintiff's "Addendum" opposing Defendant Croce's motion, dated Dec. 19, 2005 (Dkt.55), at 2.)

***7** On December 19, 2005, the City Defendants filed their motion to dismiss the Amended Complaint on the grounds that: the Amended Complaint fails to state a claim for false arrest and malicious prosecution; Plaintiff's claim for equitable relief is moot; Plaintiff failed to exhaust administrative remedies; all individual defendants are entitled to immunity; and Plaintiff fails to state a claim of municipal liability against New York City. (*See generally* City Mem.) In response to the City's motion, Plaintiff argues that his conviction of possession of stolen property and possession of a controlled substance did not establish probable cause for his arrest and prosecution for larceny and resisting arrest; that his claim for equitable relief is not moot; that he did not fail to exhaust his claims; that defendants are not entitled to qualified immunity; and that New York City should be held liable because its Department of Correction has an unconstitutional policy of transferring inmates after they file grievances and an unconstitutional policy of denying inmates at Rikers Island their medical diets. (*See* Pl. Resp. at 8-28.)

**A. *Rule 12(b)(6) Standards***

A motion under Rule 12(b)(6) requires the Court to "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citation omitted); *accord Jaghory v. New York State Dep't of Ed.,* 131 F.3d 326, 329 (2d Cir.1997). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire,* LLP, 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). Rather, in order to withstand a motion to dismiss, a complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); *see also Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."); *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ( [A] pleader is obliged "to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.").

Where, as here, a plaintiff is proceeding *pro se,* the Court must construe the pleadings liberally, *Branham v. Meachum,* 77 F.3d 626, 628-29 (2d Cir.1996), and "interpret them to raise the strongest arguments that they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers).

**B. *False Arrest and Malicious Prosecution Claims***

***8** Plaintiff alleges that he was falsely arrested and maliciously prosecuted by Police Officers Alvarez and Asman. (Am. Compl. at 32, 34). The City Defendants argue that these claims must be dismissed because Plaintiff was "subsequently convicted of the offense for which he was arrested." (City Mem. at 5.) Plaintiff does not take issue with the City Defendants' representation that he was eventually convicted of two crimes (possession of stolen property and of a controlled substance), but he pleads that he was originally charged with additional offenses (at a minimum, grand larceny and resisting arrest), and that those additional charges were dropped prior to his trial. (*See* Pl. Resp. Ex. 8; *see also* Hewson Decl. Ex. A.) The question is whether this allegation renders his false arrest and malicious prosecution claims viable.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**1. *False Arrest***

Plaintiff's claim of false arrest is insufficient as a matter of law. Under New York law, the elements of false arrest are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest whether that action is brought under state law or under § 1983." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (internal citation and quotation marks omitted). Moreover, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and ... it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006).

"[A] conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause." *Cameron v. Fogarty,* 806 F.2d 380, 387, 388-89 (2d Cir.1986) ("[W]here law enforcement officers have made an arrest, the resulting conviction is a defense to a § 1983 action asserting that the arrest was made without probable cause."). It makes no difference whether a plaintiff is convicted of all the crimes for which he was arrested; a conviction as to any one of the charges legitimizes the seizure and subsequent detention. *See Ostroski v. Town of Southold,* 443 F.Supp.2d 325, 335 (E.D.N.Y.2006) (citing *Jaegly,* 439 F.3d at 154).

In this case, Plaintiff's apparent conviction at trial of even certain crimes for which he was arrested on April 9, 2003 establishes the existence of probable cause for his arrest. The allegation that other charges initially brought against Plaintiff were dropped is inconsequential. Similarly, Plaintiff cannot save his false arrest claim merely by pleading that he appealed his conviction and that the appeal remains pending (Pl. Resp. at 6). *See Henry v. Purvis,* 111 Fed. Appx. 622, 624 (2d Cir.2004) (allegation that an appeal is pending is not sufficient to render a false arrest claim cognizable under Section 1983). Accordingly, I recommend that Plaintiff's claim of false arrest against defendants Alvarez and Asman be dismissed.

**2. *Malicious Prosecution***

***9** On the other hand, Plaintiff has sufficiently alleged a claim of malicious prosecution against Alvarez and Asman. Plaintiff correctly argues that his convictions of possession of stolen property and possession of a controlled substance do not preclude him from claiming that he was maliciously prosecuted for the separate crimes of larceny and resisting arrest.

"To make out a § 1983 malicious prosecution claim, a plaintiff must allege facts demonstrating: (1) the initiation or continuation of a criminal proceeding against him or her; (2) that the proceeding terminated in his or her favor; (3) that there was a lack of probable cause for commencing the proceeding; and, (4) that actual malice is the motivation for defendant's conduct." *McCray v. City of New York,* Nos. 03 Civ. 9685(DAB), 03 Civ. 9974(DAB), 03 Civ. 10080(DAB), 2007 U.S. Dist. LEXIS 90875, at *76 n. 5 (S.D.N.Y. Dec. 11, 2007) (citing *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir.2003)). Thus, as an initial matter, "[a] plaintiff alleging the constitutional tort of malicious prosecution in an action pursuant to § 1983 must establish termination of the prosecution in his favor in accordance with applicable state law." *Hygh v. Jacobs,* 961 F.2d 359, 367 (2d Cir.1992) (citing *Singleton v. City of New York,* 632 F.2d 185, 195 (2d Cir.1980)); *see also Belot v. Wieshaupt,* No. 96 Civ. 3005(SS), 1997 U.S. Dist. LEXIS 5772, at *10 (S.D.N.Y. Apr. 29, 1997) ("[P]laintiff's claim for malicious prosecution based on the charge of criminal possession of a weapon in the third degree must be dismissed because ... [i]t is undisputed that plaintiff was convicted and sentenced for this charge.").

A plaintiff's conviction on one criminal charge, however, does not necessarily absolve a defendant of liability for malicious prosecution as to other criminal charges, if those other charges were resolved favorably to plaintiff. *See Janetka v. Dabe,* 892 F.2d 187, 190 (2d Cir.1989). Rather, "[w]here ... the criminal prosecution has resulted in acquittal on some, but not all charges, it must be determined whether the charges are sufficiently distinct to allow a malicious prosecution claim to proceed on the charge for which there

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

was an acquittal." *Reid v. City of New York,* No. 00 Civ. 5164(RCC)(JCF), 2004 U.S. Dist. LEXIS 5030, at *18 (S.D.N.Y. Mar. 29, 2004) (citation omitted); *compare* *Janetka,* 892 F.2d at 190 (claim of malicious prosecution on charge of resisting arrest, of which plaintiff was acquitted, was not barred by his conviction of disorderly conduct), *with* *DiBlasio v. City of New York,* 102 F.3d 654, 659 (2d Cir.1996) (claim of malicious prosecution on charges of sale of cocaine, of which plaintiff was ultimately acquitted, was barred by his conviction of possession of cocaine); *cf.* *Posr v. Doherty,* 944 F.2d 91, 100 (2d Cir.1991) ( [I]n considering a defendant's malicious prosecution claim, a court must "separately analyze the charges claimed to have been maliciously prosecuted.").

***10** Here, Plaintiff alleges that the grand larceny and resisting arrest charges initially brought against him were resolved favorably to him, not because he was tried and acquitted of those charges, but rather because the charges were dropped. This is sufficient to plead a "favorable resolution" of the charges, as Plaintiff's conviction of possession of drugs and a stolen vehicle is not inconsistent with his innocence as to the dropped charges. *See* *Rothstein v. Carriere,* 373 F.3d 275, 286 (2d Cir.2004) ("New York law does not require a malicious prosecution plaintiff to prove [his] innocence, or even that the termination of the criminal proceeding was indicative of innocence. Rather, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence." (citing *Smith-Hunter v. Harvey,* 95 N.Y.2d 191, 198-99, 712 N.Y.S.2d 438, 734 N.E.2d 750 (N.Y.2000))); *see also* *Cantolino v. Danner,* 96 N.Y.2d 391, 395, 729 N.Y.S.2d 405, 754 N.E.2d 164 (N.Y.2001) ("[A]ny termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are not inconsistent with the innocence of the accused."). Further, Plaintiff has plausibly alleged that the charges of which he was convicted were distinct from the charges which were resolved in his favor. For these reasons, I recommend that Plaintiff be permitted to proceed on his claim against Alvarez and Asman that he was maliciously prosecuted for grand larceny and resisting arrest. [FN16]

FN16. Plaintiff also appears to claim that the charges of which he was convicted should have been dismissed because (1) he did not consent to his attorney's purported waiver on his behalf of his right to a speedy trial under New York Criminal Procedure Law § 30.30, and (2) his prosecution on those charges violated his rights under the Double Jeopardy Clause of the Fifth Amendment. (Am. Compl. at 32.) The first of these claims is subject to dismissal, as it is grounded in state, not federal law, and, in any event, the claim is without merit on its face, as a defendant's statutory right to a speedy trial under CPL 30.30 "does not involve such a fundamental decision that it cannot be made by counsel." *People v. Trepasso,* 197 A.D.2d 891, 891, 602 N.Y.S.2d 291 (4th Dep't 1992); *see also* *People v. Crogan,* 237 A.D.2d 745, 745, 655 N.Y.S.2d 163 (3rd Dep't 1997) (The defendant's "[a]cquiescence in the delay may be inferred from defense counsel's consent to the delay on behalf of the defendant."). As to the second of these claims, Plaintiff relies on the inapposite case of *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (holding that it was a violation of the Double Jeopardy Clause to charge the defendant with theft of a car after he had already pleaded guilty to joy riding). Plaintiff's situation, as he presents it, is simply not analogous, as nothing in the Double Jeopardy Clause would have required the State to have dropped the possession charge against Plaintiff merely because it dropped the separate larceny charge. *See* *United States v. Dionisio,* 503 F.3d 78, 79 (2d Cir.2007) ("[T]he Double Jeopardy Clause protects criminal defendants against 'a second prosecution for the same offense after acquittal,' 'a second prosecution for the same offense after conviction' and 'multiple punishments for the same offense.' " (quoting *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969))).

**C. *Deliberate Indifference***

As set forth above, Plaintiff complains that certain defendants refused to provide him with his medically prescribed diet, and that such refusal constituted cruel and unusual punishment under the Eighth Amendment. More specifically, construing Plaintiff's complaint liberally, it alleges that City Defendants Givens, Danza, Haberman, Talusan, Mimms, Horn, Walsh, Thompson and State Defendant Croce knew that Plaintiff had been prescribed a special medical diet and intentionally failed to give him this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

diet for a prolonged period, resulting in Plaintiff's suffering a variety of medical problems, including pain, diarrhea, bloody stools, obesity, and degenerative conditions. (Am. Compl. at 28, 31.) Barring any other legal insufficiencies, which will be discussed below, these allegations state a viable Eighth Amendment claim.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to an inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To make out a claim for deliberate indifference, a plaintiff must allege that he suffered from a medical condition that, objectively, was sufficiently serious, *see* *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), and that, subjectively, the defendants knew of and disregarded an excessive risk to the inmate's health or safety, *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Allegations that a defendant knowingly and deliberately failed to provide an inmate with a medically prescribed diet will satisfy these pleading requirements. *See* *Singh v. Fuller,* No. 93 Civ. 5937(CSH), 1999 U.S. Dist. LEXIS 15269, at *5-7 (S.D.N.Y. Sept. 30, 1999) (analyzing under the deliberate indifference standard of the Eighth Amendment a complaint that prison officials failed to provide an inmate with a medically prescribed bland diet).

**1. *Exhaustion of Administrative Remedies***

***11** The City Defendants argue that, with respect to his deliberate indifference claim, Plaintiff failed to exhaust his administrative remedies prior to filing suit in federal court. (*See* Def. Mem. at 6-8.) Plaintiff, however, states that he "appealed every avenue of appeal and was notified by the corrections department that they don't handle appeals." (Pl. Resp. at 8.) While Plaintiff's allegations concerning his various efforts to file and appeal grievances are not always clear, they are sufficient to allege plausibly that he exhausted his administrative remedies or, in the alternative, that his failure to exhaust was justified.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). The PLRA is intended to eliminate unwarranted federal court interference with the administration of prisons, reduce the quantity and improve the quality of prisoner suits and afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. *Ruggiero v. County of Orange,* 467 F.3d 170, 174 (2d Cir.2006) (citations omitted). The Supreme Court has held that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *See* *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Accordingly, an inmate is required to exhaust a claim of deliberate indifference to medical needs. *See, e.g.,* *Abney v. McGinnis,* 380 F.3d 663, 665 (2d Cir.2004).

The New York City Department of Correction has a five-step administrative Inmate Grievance Resolution Program ("IGRP"). *See Jennings v. Horn,* No. 05 Civ. 9435(SAS), 2007 U.S. Dist. LEXIS 57941, at *5-6 (S.D.N.Y. Aug. 7, 2007); *Ingram v. Thomas,* No. 04 Civ. 5918(DLC), 2007 U.S. Dist. LEXIS 88336, at *7 (S.D.N.Y. Dec. 3, 2007).[FN17] The process requires an inmate to: (1) file a grievance with the IGRC; (2) request a formal hearing where witnesses may be called; (3) appeal the IGRC's formal recommendation to the Warden; (4) appeal the Warden's decision to the Central Office Review Committee ("CORC"); and (5) appeal the CORC's decision to the Board of Corrections. *Id.* The exhaustion requirement is not satisfied by an untimely or otherwise procedurally defective grievance or appeal. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *see also* *Ruggiero,* 467 F.3d at 175-76 ("[T]he PLRA requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).' " (quoting *Woodford,* 126 S.Ct. at 2385)).

FN17. *See also* Hewson Decl. Ex. I (Department of Correction Directive on Inmate Grievance Resolution Program).

While the PLRA's exhaustion requirement is "mandatory," *Porter,* 534 U.S. at 524, the Second Circuit uses "a three-part inquiry ... in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

remedies as required by the PLRA." *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). In such cases, the Court should first ask whether administrative remedies were, in fact, available to the plaintiff. *Id.* (noting that "[t]o the extent that the plaintiff lacked 'available' administrative remedies, the PLRA's exhaustion requirement is inapplicable"); *see also Abney v. McGinnis,* 380 F.3d 663 (2004). Second, the Court should "inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, ... or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). Finally, the Court should "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* (quoting *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004)).

***12** In this case, within the 32-page narrative section of the Amended Complaint, Plaintiff has alleged, at least generally, that he filed grievances regarding his diet at every facility in question and that he appealed from the denial of those grievances. (*See* summary of Plaintiff's allegations *supra* at 5-10.) While Plaintiff does not specifically refer to every step of the grievance process, he broadly alleges that he "filed appeals to all of the grievances ... on all levels." (Am. Compl. at 26.) This, in itself, is sufficient for the Amended Complaint to survive at the pleading stage. *See Jones v. Bock,* 127 S.Ct. at 921 ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."); *see also Schwartz v. Dennison,* 518 F.Supp.2d 560, 569 (S.D.N.Y.2007) (denying motion to dismiss on exhaustion grounds where "the Complaint merely omits any reference of grievances, it does not state that none were filed and appealed").

Further, while the City Defendants have submitted, in connection with their motion, certain documentary evidence regarding the issue of exhaustion (*see* Hewson Decl., Exs. B-G), they do not advance any argument as to how this evidence (which includes, *inter alia,* copies of grievances filed by Plaintiff at three of the facilities at issue) demonstrates an actual failure by Plaintiff to exhaust his claims.

Finally, construing the Amended Complaint liberally, it alleges that Plaintiff was justified in any failure to exhaust his administrative remedies fully because of the particular circumstances of this case. In particular, Plaintiff appears to allege that, on several occasions, he was transferred to a new facility shortly after filing a grievance and that, because of the transfers, he was forced to start the grievance process anew each time. (*See* Am. Compl. at 15, 24, 26; *see also* City Mem. at 8 (acknowledging allegations by Plaintiff that "he was transferred before his grievance was heard").) To support his contention that his transfers made it impossible for him to complete the grievance process, Plaintiff has attached to the Amended Complaint a letter from the Inmate Grievance Resolution Program (IGRP), dated February 15, 2005, stating that Plaintiff's previous grievances were "now closed" because they originated from a "previous facility" and advising him, "[i]n the future go to your Grievance Coordinator in your current facility." (*See* Am. Compl. (attached Letter to Plaintiff from the IGRP, dated Feb. 15, 2005).) In addition, Plaintiff alleges that, when he attempted to file a grievance at GMDC, it was "dismissed" by the Grievance Coordinator because he had already contacted the IG about the incident. (Am. Compl. at 26.) In support of this allegation, Plaintiff has attached another letter to his pleading that appears to confirm that the Grievance Committee rejected his complaint as "non-grievable" once he had contacted the IG. (*See id.* (attached Letter to Plaintiff from the IGRC, dated Mar. 4, 2005); *see also* City Mem. at 8 (arguing that the IGRC "properly dismissed" Plaintiff's grievance as he "had chosen an alternative, albeit improper, remedy").)

***13** If Plaintiff was not permitted to appeal prior grievances upon his transfer to different facilities at Rikers Island, or if he was denied the opportunity to pursue grievances after he contacted the IG as he alleges, then the grievance procedure may have been no longer "available" to him, as required for purposes of exhaustion. Moreover, if each time Plaintiff filed a grievance, he was transferred to a new facility and told to start the grievance process over again, this may be sufficient to estop the City Defendants from asserting Plaintiff's supposed failure to exhaust as a defense, as defendants' own actions may have inhibited Plaintiff's efforts to exhaust his claims. Accordingly, at this stage of the litigation, Plaintiff's Eighth Amendment claim should not be dismissed for failure to exhaust administrative remedies.

**2. *Personal Involvement***

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

State Defendant Croce argues that the claims against him should be dismissed because he had no personal involvement in the alleged violation of Plaintiff's rights.[FN18] (State Mem. at 3.) "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). The doctrine of respondeat superior may not be used in a Section 1983 action to impose liability on a supervisory official for a constitutional violation committed by subordinates. *See Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Where a plaintiff names a prison supervisory official as a defendant in a Section 1983 action, the requisite personal involvement of that defendant may be established by showing that he: (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (*citing Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)); *accord Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007).

FN18. None of the City Defendants raise the defense of lack of personal involvement.

"Generally, the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983." *Candelaria v. Higley,* No. 04-CV-277A, 2008 U.S. Dist. LEXIS 11976, at *6 (W.D.N.Y. Feb.19, 2008) (collecting cases and granting supervisory defendants' motion to dismiss); *Atkins et al. v. County of Orange,* 251 F.Supp.2d 1225, 1234 (S.D.N.Y.2003) ("if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability." (citation omitted)); *see also Walker v. Pataro,* No. 99 Civ. 4607, 2002 U.S. Dist. LEXIS 7067, at *42 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable.").

***14** On the other hand, "where a supervisory official receives and acts on a prisoner's grievance (or substantially reviews and responds to some other form of inmate complaint), personal involvement will be found under the second prong of the test set forth in *Colon:* that " 'the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong .' " *Islam v. Fischer,* 2008 U.S. Dist. LEXIS 1464, at *7 (S.D.N .Y. Jan. 9, 2008) (quoting *Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 U.S. Dist. LEXIS 16442, at *31 (S.D.N.Y. Sept. 18, 2003)); *see Colon,* 58 F.3d at 873.

In this case, Plaintiff alleges that, when did not receive his diet meals at VCBC, he "filed a complaint" with a number of individuals, including Commissioner Croce. (Am. Compl. at 16.) Plaintiff further asserts in his opposition papers that he wrote to Croce "on over 8 separate and different occasions." (Plaintiff's "Addendum" at 2.) Yet, although Plaintiff has alleged that he "complained" or sent letters to Croce, he does not allege that Croce personally reviewed, responded to, or took any other action with respect to his complaints.[FN19] Accordingly, I recommend that Plaintiff's claims against Croce be dismissed for lack of personal involvement.

FN19. While Plaintiff attaches to his Amended Complaint letters that he apparently received from the State Commission of Corrections in response to his letter(s), informing him that the Commission would investigate his complaint (*see* Letters to Plaintiff from Paul D. Annetts ("Annetts"), Supervisor, Metro Region, State Commission of Correction, dated Dec. 31, 2004 and Jan. 7, 2005), and subsequently advising him to exhaust all remedies with the New York City Department of Correction before writing to the Commission (*see* Letter to Plaintiff from Annetts, dated Feb. 7, 2005), this is not sufficient to allege personal involvement on the part of Croce.

**3. *Qualified Immunity***

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

All of the moving defendants argue that they are entitled to qualified immunity. (*See* State Mem. at 5; City Mem. at 8.) "As with public officers generally, prison officials performing tasks entrusted to their discretion typically 'are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A defendant will be deemed immune from liability if he can show either: (1) that his conduct did not violate the plaintiff's "clearly established rights" or (2) that a reasonable person in the defendant's position could have believed, in view of all of the pertinent circumstances, that his conduct did not violate such a right. *See Kerman v. City of New York,* 374 F.3d 93, 108-09 (2d Cir.2004).

An inmate has a clearly established right to be free from deliberate indifference to his serious medical needs. *See Estelle,* 429 U.S. at 104;*see also LaBounty v. Gomez,* No. 94 CIV. 3360(DLC), 1998 U.S. Dist. LEXIS 6281, at *6 (S.D.N.Y. May 1, 1998) ("Failure to provide a medically prescribed diet can state a claim for relief under Section 1983." (citing *Johnson v. Harris,* 479 F.Supp. 333, 336-37 (S.D.N.Y.1979))). In light of this clearly established law, and taking the facts alleged in the Amended Complaint as true for purposes of this motion, no reasonable person in the position of Defendants Horn, Thompson, Walsh, Mimms, Givens, Haberman, Talusan or Danza could have believed that their conduct did not violate Plaintiff's rights.[FN20]

FN20. Because the Court recommends dismissal of the claim against defendant Croce for lack of personal involvement, it is not necessary to determine if he is entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

***15** As to defendants Alvarez and Asman, taking as true Plaintiff's allegations regarding the circumstances of his prosecution, these defendants are also not entitled to qualified immunity because "[f]reedom from malicious prosecution is a constitutional right that has long been clearly established." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003) (citing *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)).

**4. *Municipal Liability***

Defendant the City of New York argues that Plaintiff fails to state a claim of municipal liability against it. (City Mem. at 9.) Plaintiff's Amended Complaint, liberally construed, may be read to allege that the City has two unconstitutional policies: (1) a policy of denying inmates their medically prescribed diets; and (2) a policy of transferring inmates to different facilities in order to prevent them from availing themselves of the grievance process. (*See* Am. Compl. at 27, 36; *see also* Pl. Resp. 26-28.) Plaintiff's allegations regarding the first purportedly unconstitutional policy are sufficient to state a claim against the City of New York, although his allegations regarding the second policy are insufficient to state a viable claim of municipal liability.

In *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that a city may be sued under Section 1983 where the action that is alleged to be unconstitutional implements or executes an official policy or custom of that city. *Id.* at 690;*see also Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir.2004) (explaining that a *Monell* claim may be asserted by alleging that a municipal policy or ordinance is itself unconstitutional). Nonetheless, where a plaintiff fails to plead an underlying constitutional violation, any corresponding cause of action against the municipality will necessarily fail, as a *Monell* claim is only actionable where some constitutional violation has actually occurred. *Amato v. City of Saratoga Springs,* 170 F.3d 311, 320 (2d Cir.1999); *see also Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

In this case, Plaintiff's Amended Complaint may be read to allege that the City has an unconstitutional policy of denying inmates at Rikers Island their medical diets. For example, Plaintiff appears to allege that he was not the only inmate who complained about not receiving a special diet, and that other inmates who faced similar difficulties had medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

problems that were worse than his. (Am. Compl. at 20.) Further, in the section of the Amended Complaint entitled "Relief," Plaintiff requests the creation of a new "system" to ensure that inmates receive their diet meals and appears to equate the current system with "cruel and unusual punishment." (*Id.* at 36.) As Plaintiff's allegations against the individual defendants are sufficient to state a claim for deliberate indifference to his medical needs (*see supra* at 18), Plaintiff may bring a claim against the City of New York for causing or encouraging that deliberate indifference through an unconstitutional policy or practice.

***16** On the other hand, Plaintiff has not stated a viable claim against the City regarding its grievance policy because he has failed to allege an underlying constitutional violation. Plaintiff claims that, on several occasions, he was transferred to a different facility shortly after filing a grievance, requiring him to submit new grievances each time and effectively preventing him from fully exhausting his administrative remedies. While such an allegation, if true, might excuse Plaintiff from complying with the PLRA's exhaustion requirement (*see* Section I(C)(1), *supra* ), it does not state a valid constitutional claim because "[i]t is well established that a claim of violation of a state grievance procedure is not cognizable in an action under 42 U.S.C. § 1983." *Lunney v. Brureton,* No. 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629, at *81 (S .D.N.Y. May 25, 2007) (citing cases), *adopted by* 2007 WL 2050301 (S.D.N.Y., July 18, 2007); *Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 U.S. Dist. LEXIS 3440, at *3 (S.D.N.Y. Mar. 29, 2001) ("[I]nmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983."). For this reason, Plaintiff's claim that the City of New York had an unconstitutional policy of transferring inmates who file grievances cannot proceed, and I recommend that any such claim be dismissed.

**5. *Plaintiff's Claim for Equitable Relief***

In his Amended Complaint, Plaintiff requested injunctive relief requiring the New York City Department of Correction to improve its polices and procedures for providing special diets to inmates (Am. Compl. at 36), and further requested an order that he be transferred to a facility where he could receive his prescribed meals (*id.* at 37). In their motion to dismiss, the City Defendants argued that Plaintiff's claims for equitable relief should be dismissed as moot because-as of the date of their motion-Plaintiff had been transferred out of City custody and into State custody. (*See* City Mem. at 5.) [FN21] Plaintiff, for his part, argued that the claims should not be viewed as moot because there was-at that time-a reasonable likelihood that he would be transferred back to Rikers Island. (*See* Pl. Resp. at 17.)

FN21. It appears that Plaintiff was transferred to a State facility after he was convicted on July 5, 2005. (*See, e.g.,* Docket Entry dated Oct. 25, 2005 (*Pro Se* Memorandum indicating that Plaintiff is housed at Sing Sing Correctional Facility, Ossining, New York).)

Plaintiff's argument was prescient, as he was, in fact, transferred back into City custody in February 2007. After that, Plaintiff was apparently released from custody altogether, then rearrested on a different charge, and then returned again to Rikers Island, where he was apparently moved through several different Rikers Island facilities.[FN22] Plaintiff is now again resident at AMKC (*see* Notice of Change of Address, filed Feb. 15, 2008 (Dkt.78) (indicating that Plaintiff's new address is Anna M. Kross Center, 18-18 Hazen St., East Elmhurst, NY, 11370)), and, at the Court's recent conference with the parties (*see* n.22, *supra* ), he informed the Court that, once again, the staff at AMKC is not ensuring that he receives his medical diet on a regular basis.

FN22. This information was provided to the Court by Plaintiff in a March 12, 2008 conference with the parties.

***17** "The purpose of an injunction is to prevent future violations, *Swift & Co. v. United States,* 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928), ... [b]ut the moving party must satisfy the court that ... there exists some cognizable danger of recurrent violation, something more than [a] mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). "A case is moot when 'it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.' " *Davis v. New York,* 316 F.3d 93, 99

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2002) (quoting *Associated Gen. Contractors of Conn. v. City of New Haven,* 41 F.3d 62, 66-67 (2d Cir.1994)).

Although "[a] prisoner's transfer to a different correctional facility generally moots his request for injunctive relief against employees of the transferor facility," *Thompson v. Carter,* 284 F.3d 411, 415 (2d Cir.2002) (citing *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam), it is difficult to say that, in the circumstances presented here, Plaintiff's claims for equitable relief have been rendered moot. While Plaintiff was apparently transferred to State custody at one point, and while there were other intervening events, Plaintiff is now back in one of the very same facilities where he alleges he was denied his prescribed diet. Further, Plaintiff has represented to the Court that he is again having difficulty obtaining his medical diet. Thus, it cannot be said with assurance that there is no reasonable expectation that Plaintiff will again be subject to the same deliberate indifference of which he previously complained. As there remains a cognizable danger that Plaintiff's rights will continue to be violated, I recommend that the Court deny the City Defendants' motion to dismiss Plaintiff's claims for equitable relief as moot.

**II. *PLAINTIFF'S MOTIONS***

**A. *Motion for an Injunction or Declaratory Judgment***

In May 2007, Plaintiff filed a motion entitled "Request for Injunction or Declaratory Judgment," in which he requested immediate equitable relief. (*See* undated Request for Injunction or Declaratory Judgment, received by the Court on May 8, 2007 (Dkt.72).) This motion explains that, after having been released from custody, Plaintiff was rearrested and again detained at Rikers Island. (*Id.* at 1.) According to the motion, Plaintiff "still suffers from the same medical condition [and] the facility has received his diet request and confirmed them [*sic* ] and they have failed to impl[e]ment his diet intentionally and deliberat[e]ly for a period from April 06 to the present." (*Id.*) Plaintiff attaches to his motion a one-page "Diet Prescription Request," dated April 18, 2007 and signed by a clinician with the Nutritional Services Division of the New York City Department of Correction. This document appears to indicate that Plaintiff suffers from diverticulosis and a tomato allergy, and requires a low fiber diet. The motion requests an "immediate injunction"-presumably requiring that Plaintiff be provided with this diet.

***18** In order to demonstrate entitlement to a preliminary injunction, Plaintiff would need to demonstrate: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [his] favor." *Random House, Inc. v. Rosetta Books LLC,* 283 F.3d 490, 491 (2d Cir.2002) (per curiam) (citing *Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 172 (2d Cir.2001)). While this Court has reasoned above that the claim for injunctive relief contained in Plaintiff's Amended Complaint should not be dismissed at this juncture as moot, that does not mean that Plaintiff has demonstrated an entitlement to immediate injunctive relief, under the applicable standard.

Plaintiff has never demonstrated that, without immediate relief, he will suffer irreparable harm. Plaintiff has proffered virtually no evidence as to the current state of his health, the frequency with which he is purportedly not receiving his prescribed diet, or the medical consequences that would likely flow from any deprivation of that diet. Nor has Plaintiff proffered evidence demonstrating that, in failing to provide him with his medical diet, the personnel at Rikers Island have knowingly and purposefully disregarded an excessive risk of harm to his health, as would be required for him to prevail on the merits of his Constitutional claim. *See Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Under the circumstances, I recommend that Plaintiff's motion for immediate relief be denied. Given Plaintiff's assertions that the deprivation of his rights has continued, however, I further recommend that the Court's denial his motion for an injunction be without prejudice, and that the Court direct Plaintiff: (1) to move for leave to supplement his Amended Complaint under Rule 15(d) of the Federal Rules of Civil Procedure, so as to "set[ ] out any transaction, occurrence, or event that happened after the date of [the Amended Complaint]," Fed.R.Civ.P. 15(d); and (2) to the extent Plaintiff continues to believe that present events warrant immediate equitable relief, to file a renewed motion for a preliminary injunction, supported by a sworn affidavit and such other evidentiary submissions as may be necessary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to detail his current situation, to describe the City Defendants' culpable conduct, and to document any claim that he will suffer irreparable harm absent the relief he seeks.

**B.** ***Motion for an Order of Protection***

On January 2, 2008, the Court received a second motion from Plaintiff, requesting an order of protection against four New York City police officers from the 113th Precinct, including Sergeant Scott Fields ("Fields"), a named defendant in this case who does not appear to have been served with process. (*See* Order of Protection Intimidated Witness, dated December 26, 2007.) In the motion, Plaintiff appears to allege that on April 4, 2007, he was accosted and beaten by the four officers, in an effort to intimidate him because of this lawsuit.

***19** While "[c]ourts have the 'inherent power to do all things that are reasonably necessary for the administration of justice within the scope of their jurisdiction,' " *United States v. Field,* 193 F.2d 92, 96 (2d Cir.1951); *see also* *Haitian Ctrs. Council v. Sale,* 817 F.Supp. 336, 337 (E.D.N.Y.1993) ("A district court may exercise its inherent power to protect the parties appearing before it."), "[t]he Supreme Court has cautioned that because of the 'very potency' of a court's inherent power, it should be exercised 'with restraint and discretion,' " *United States v. International Bhd. of Teamsters,* 948 F.2d 1338, 1345 (2d Cir.1991) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 115, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).

In this case, Plaintiff has not sought leave to plead any claim that Fields attacked him in retaliation for Plaintiff's filing of this lawsuit, and thus the relief Plaintiff seeks would be entirely incidental to his claims in this case. Further, as Plaintiff is presently incarcerated, and has apparently had no contact with Fields for nearly a year, he cannot plausibly allege that he is in any present danger. In any event, merely because Plaintiff has named Fields as a party in this case does not authorize the Court to exercise personal jurisdiction over him, where the record does not reflect that this defendant has ever been served with process. The relief requested by Plaintiff would require this Court to issue a restrictive order against an individual who, at this time, is not even a party appearing before the Court. For all of these reasons, the relief that Plaintiff requests would require an extraordinary-and unwarranted-exercise of the Court's inherent power, and I therefore recommend that Plaintiff's motion for an order of protection be denied.

***CONCLUSION***

For all the foregoing reasons, I hereby respectfully recommend that:

(1) *as to Dkt. 44,* the Court grant the motion of New York State Commissioner of Corrections Alan J. Croce to dismiss with prejudice Plaintiff's claim against him; FN23

FN23. While the complaint of a *pro se* plaintiff should not be dismissed without affording the plaintiff at least one opportunity to amend his complaint to cure the pleading defect, *see* *Cruz v. Gomez,* 202 F.3d 593, 597-98 (2d Cir.2000), here, Plaintiff has already been given such an opportunity (*see* Order, dated Feb. 4, 2005 (Dkt.3)).

(2) *as to Dkt. 52,* the Court grant the City Defendants' motion to dismiss with prejudice the following claims:

(a) Plaintiff's false arrest claim against defendants Rachel Alvarez and Rebecca Asman; and

(b) Plaintiff's *Monell* claim against defendant the City of New York, to the extent such claim is based on the City's alleged policy of transferring inmates to different prison facilities so as to thwart the inmates' ability to pursue the grievance process;

and otherwise deny the City Defendants' motion;

(3) *as to Dkt. 72,* the Court deny without prejudice Plaintiff's motion for an injunction or declaratory relief, and direct Plaintiff (a) to serve and file a motion to supplement his pleading under Rule 15(d) of the Federal Rules of Civil Procedure, and (b) if he wishes to pursue preliminary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

injunctive relief, to file a properly supported motion; and

(4) *as to Dkt. 79,* the Court deny Plaintiff's motion for an order of protection.

***20** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States Courthouse, 500 Pearl Street, Room 1310, New York, N.Y. 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, N.Y. 10007. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. FAILURE TO OBJECT WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

S.D.N.Y.,2008.
Wingate v. Gives
Slip Copy, 2008 WL 5649089 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
Mujahid FARID, Plaintiff-Appellant-Cross-Appellee,
v.
Dr. I. ELLEN, Clinton Correctional Facility, Commissioner Glenn S. Goord, of the New York State Department of Correctional Services, Lieutenant L. Jones, at the Woodbourne Correctional Facility, Superintendent John P. Keane, of The Woodbourne Correctional Facility, Thomas Miller, Deputy Superintendent at Woodbourne Correctional Facility, John Mitchell, Nurse Administrator at the Clinton Correctional Facility, Director Donald Selsky, of Special Housing Units, Superintendent Daniel Senkowski, of Clinton Correctional Facility, Dr. Lester Wright, Deputy Commissioner of NYS Department of Correctional Services; Individually and in their Official Capacities, Defendants-Appellees-Cross-Appellants.[FN*]
**Docket Nos. 07-4057-pr (L), 07-4070-pr (XAP).**

Argued: June 8, 2009.
Decided: Jan. 28, 2010.

**Background:** State prisoner brought suit against correctional officials under § 1983, alleging that he was deprived of rights protected by the First Amendment when he was disciplined by prison officials for possessing and distributing a booklet of which he was the principal author. The United States District Court for the Southern District of New York, Castel, J., 2003 WL 23018805, 2006 WL 59517, and 514 F.Supp.2d 482, granted in part and denied in part parties' summary judgment motions. Parties appealed and cross-appealed.

**Holdings:** The Court of Appeals, Calabresi, Circuit Judge, held that:
(1) prison rules prohibiting contraband and smuggling were unconstitutionally vague as applied to prisoner;
(2) prisoner's right, whether termed as right to not be punished under prison rules for violation of inmate group's internal bylaws or to not be punished under unconstitutionally vague prison rules, was clearly established;
(3) fact issues as to basis for prisoner's punishment precluded summary judgment on qualified immunity issue;
(4) officials reasonably should have known that prisoner's rights were clearly established and that their actions violated those rights; and
(5) prisoner failed to state claims as to confiscation of certain items from his cell and as to alleged disregard of medical condition.

Affirmed in part and vacated and remanded in part.

West Headnotes

**[1] Constitutional Law 92 1133**

92 Constitutional Law
92VIII Vagueness in General
92k1132 Particular Issues and Applications
92k1133 k. In General. Most Cited Cases

**Prisons 310 140**

310 Prisons
310II Prisoners and Inmates
310II(B) Care, Custody, Confinement, and Control
310k140 k. Reading and Writing Material; Libraries. Most Cited Cases
Prison disciplinary rule prohibiting contraband was unconstitutionally vague as applied to state prisoner in disciplining him for possessing and distributing brochure that violated inmate group's internal bylaws by not having been approved by group's staff advisor; bylaws did not indicate that violation of group's bylaws constituted violation of prison contraband rule, thus exposing prisoner to far greater penalties than group could have imposed, and prison rules conferred almost complete enforcement discretion on prison officials.

**[2] Prisons 310 111**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

310 Prisons
310II Prisoners and Inmates
310II(A) In General
310k111 k. Status, Rights, and Disabilities in General. Most Cited Cases
While inmates do not shed all constitutional rights at the prison gates, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights.

**[3] Prisons 310 327**

310 Prisons
310II Prisoners and Inmates
310II(H) Proceedings
310k326 Rulemaking and Rulemaking Proceedings
310k327 k. In General. Most Cited Cases
Courts apply a two-prong test for determining whether a prison rule is unconstitutionally vague as applied: the court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it.

**[4] Officers and Public Employees 283 114**

283 Officers and Public Employees
283III Rights, Powers, Duties, and Liabilities
283k114 k. Liabilities for Official Acts. Most Cited Cases
Qualified immunity protects government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits.

**[5] Civil Rights 78 1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Qualified immunity shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**[6] Civil Rights 78 1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
For a right to be clearly established, for purposes of qualified immunity analysis, it must have been recognized in a particularized rather than a general sense.

**[7] Civil Rights 78 1376(7)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
State prisoner's right to not be punished under prison rules for violation of inmate group's internal bylaws was clearly established, weighing against prison officials' claim of qualified immunity in § 1983 action arising from prisoner's discipline for possessing and distributing brochure that violated inmate group's internal bylaws by not having been approved by group's staff advisor; essence of constitutional prohibitions on vagueness was that rules must give notice of conduct that they, rather then another set of rules, prohibit and must constrain discretion of officials who apply them. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[8] Civil Rights 78 1376(7)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

State prisoner's right to not be punished under prison rules that were too vague to constrain official conduct and failed to give prisoners notice of what conduct was prohibited was clearly established, weighing against prison officials' claim of qualified immunity in § 1983 action arising from prisoner's discipline for possessing and distributing brochure that violated inmate group's internal bylaws by not having been approved by group's staff advisor; prisoner was under no obligation to read group's internal bylaws in conjunction with prison rules. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Qualified immunity can be denied where a rule is clearly foreshadowed by past precedent. 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

For a right to be clearly established for purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful. 42 U.S.C.A. § 1983.

**[11] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact existed as to whether state prison officials actually intended to punish prisoner under prison's contraband rule or for violating internal bylaw of inmate group, precluded summary judgment on issue of qualified immunity in prisoner's § 1983 action arising from prisoner's discipline for possessing and distributing brochure without approval from group's staff advisor. 42 U.S.C.A. § 1983.

**[12] Civil Rights 78 1376(7)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

State prison officials reasonably should have known that prisoner had right to not be punished under prison rules for violation of inmate group's internal bylaws was clearly established and that their actions violated this right, thus weighing against officials' claim of qualified immunity in § 1983 action arising from prisoner's discipline for possessing and distributing brochure that violated inmate group's internal bylaws by not having been approved by group's staff advisor; essence of constitutional prohibitions on vagueness was that rules must give notice of conduct that they, rather then another set of rules, prohibit and must constrain discretion of officials who apply. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[13] Civil Rights 78 1376(7)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
State prison officials acted in accordance with unreasonable belief that prisoner's violation of inmate group's internal bylaws subjected prisoner to discipline under otherwise vague prison rules against contraband, thus weighing against officials' claim of qualified immunity in § 1983 action arising from prisoner's discipline for possessing and distributing brochure that violated inmate group's internal bylaws by not having been approved by group's staff advisor. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[14] Civil Rights 78 1319**

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal Law Enforcement; Prisons. Most Cited Cases
State prisoner's § 1983 claim as to confiscation of certain papers and personal effects from his cell was not intertwined with his challenges to his disciplinary hearing, and thus, unlike disciplinary hearing challenge, prisoner failed to administratively exhaust remedies as to confiscation claim; confiscation was not constituent element of disciplinary hearing, but rather was part of scrutiny that arose in light of his political and organizational activities, involving discrete events outside purview of disciplinary hearing. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a); 42 U.S.C.A. § 1983.

**[15] Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment. Most Cited Cases
State prison officials did not act with conscious disregard of substantial risk of serious harm to prisoner, and at worst acted with mere negligence, precluding prisoner's § 1983 claim that officials had violated his Eighth Amendment rights through alleged deliberate indifference to his Hepatitis C, for which he claimed he received only sporadic treatment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[16] Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment. Most Cited Cases
Inmate attempting to show deliberate indifference to a serious medical need under the Eighth Amendment must demonstrate that the defendants acted or failed to act while actually aware of a substantial risk that serious inmate harm would result. U.S.C.A. Const.Amend. 8.

**[17] Civil Rights 78 1335**

78 Civil Rights
78III Federal Remedies in General
78k1334 Persons Liable in General
78k1335 k. In General. Most Cited Cases
Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. 42 U.S.C.A. § 1983.

Appeal and cross-appeal from a final judgment of the

United States District Court for the Southern District of New York (Castel, *J.*). We affirm the District Court's determination that prison prohibitions on "smuggling" and "contraband" were unconstitutionally vague as applied to Farid, who was disciplined under prison rules for possessing and distributing a pamphlet produced in violation of the internal by-laws of a prisoners' organization. We, however, vacate the District Court's grant of summary judgment with regard to Defendants' qualified immunity in the application of those rules. We affirm in all other respects. AFFIRM in part, VACATE in part, and REMAND for consideration of Farid's qualified immunity claims. On remand, we also ask the District Court to determine whether Farid adequately pled a separate retaliation claim.Eghann E. Donahue (Philip A. Irwin, on the brief), Covington & Burling LLP, New York, N.Y., for Plaintiff-Appellant-Cross-Appellee.

Sasha Samberg-Champion, Assistant Attorney General (Andrew M. Cuomo, Attorney General, Barbara D. Underwood, Solicitor General; and Michelle Aronowitz, Deputy Solicitor General, on the brief) New York, N.Y., for Defendants-Appellees-Cross-Appellants.

Before CALABRESI, SACK, and WESLEY, Circuit Judges.

CALABRESI, Circuit Judge:

***1** Plaintiff-Appellant-Cross-Appellee Mujahid Farid filed a Section 1983 claim against Defendants-all of whom are state prison officials at either Woodbourne Correctional Facility ("WCF") or Clinton Correctional Facility-asserting six claims for relief: first, due process and state law violations based on the filing and conduct of a disciplinary hearing; second, First Amendment violations based on disciplinary actions resulting from his possession and distribution of a booklet called "The Politics of Parole"; third, constitutional and state law violations based on the seizure of documents related to "The Politics of Parole"; fourth, constitutional violations arising out of his transfer to another facility while he was undergoing medical treatment; fifth, constitutional and state law violations arising out of the alleged deprivation of follow-up medical treatment; and sixth, constitutional violations arising from a prison transfer that disrupted a scheduled trial. All but the first and sixth claims are before us here.

The present appeal involves three separate opinions by the District Court. *First,* the United States District Court for the Southern District of New York (Castel, *J.*) dismissed without prejudice Farid's third and sixth claims due to his failure to exhaust available administrative remedies, as required by the Prison Litigation Reform Act of 1995 (the "PLRA"), 42 U.S.C. § 1997e(a). *Farid v. Ellen,* No. 01 Civ. 8292, 2003 WL 23018805 (S.D.N.Y. Dec.23, 2003) ("*Farid I* "). Then, after denying Farid's motion to supplement his complaint with new defendants and allegations, the Court granted Defendants' motion for summary judgment on the first, fourth and fifth claims, holding that Farid had failed to come forward with evidence upon which a reasonable jury could find in his favor on those claims. *Farid v. Ellen,* No. 01 Civ. 8292, 2006 WL 59517 (S.D.N.Y. Jan.11, 2006) ("*Farid II* "). Finally, in a published decision, the District Court addressed Farid's second claim (his First Amendment allegations), and held that the prison's catch-all contraband and anti-smuggling rules were unconstitutionally vague as applied to Farid. The court entered a permanent injunction ordering defendant Goord (a) to reinstate Farid's lost good-time credits and (b) to strike the violation from his disciplinary record. But, on the grounds of qualified immunity, the court also granted Defendants summary judgment with respect to the award of any monetary relief on this claim. *Farid v. Ellen,* 514 F.Supp.2d 482 (S.D.N.Y.2007) ( "*Farid III* ").

The parties have appealed and cross-appealed these decisions. We affirm them in all respects save one: Because we find that Defendants' conduct violated clearly established rights, the existence of which a reasonable prison official should have known, we vacate the finding of qualified immunity and remand for further proceedings consistent with this opinion.

**I. Background**

*A. Facts*

***2** Farid is serving an indeterminate sentence with a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

maximum of life imprisonment. *See Farid v. Travis,* 17 A.D.3d 754, 792 N.Y.S.2d 258 (3d Dep't 2005). From December 1997 to June 2000, he was incarcerated at WCF, a state prison in Woodbourne, New York. During this time, he was a member of an inmate organization known as the Long Termers Committee ("LTC"). The New York Department of Corrections ("DOCS") recognized and approved the existence of the LTC, whose stated purpose, inter alia, was "to advocate for positive and constructive change in the criminal justice system, particularly as it relates to the unique concerns of long term prisoners." Members of the LTC, including Farid, agreed to be governed by the Committee's by-laws, one of which provides that all "correspondence, callouts and fiscal expenditures must be reviewed and approved by the staff advisor [to the LTC]." Section 11 of the by-laws lists the consequences of violation, including censure or reprimand for one violation; suspension from LTC for multiple violations; and expulsion from LTC for "repeated and serious violations." None of the listed consequences entail, or even suggest, discipline under *prison* rules.

Of course, prison officials regulate group and organizational activities within the prison, but they do so pursuant to DOCS rules, not under those of internal prisoner groups. Thus, for example, inmates are not permitted to engage in unauthorized organizational activities or meetings, or to possess or distribute unauthorized materials. *See, e.g.,* DOCS Institutional Rule of Conduct 105.12, 7 N.Y.C.R.R. § 270.2(B)(6)(v) ("An unauthorized organization is any gang or any organization which has not been approved by the deputy commissioner for program services.").

DOCS rules also prohibit "contraband" and "smuggling." The catch-all contraband provision, Rule 113.23, 7 N.Y.C.R.R. § 270.2(B)(14)(xiii) reads as follows:

> In addition to those items of contraband specifically identified by this rule series, an inmate shall not possess any item unless it has been specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility.

And, the anti-smuggling rule, Rule 114.10, 7 N.Y.C.R.R. § 270(B)(15)(i), provides that "[a]n inmate shall not smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another." Transfer of items which are contraband under Rule 113.23 constitutes smuggling under Rule 114.10. It is these two rules under which Farid was eventually disciplined.

On April 6, 2000, officers conducted random searches of cells at WCF. No contraband was found in Farid's cell during this search. However, in another inmate's cell, officials discovered a copy of a booklet called "The Politics of Parole: An Analysis by The Woodbourne Long Termers Committee," which among other things criticized parole policies and practices. The twenty-one page booklet also contained profiles of nine prisoners, including Farid. The District Court noted that the booklet "has the appearance of a professionally formatted document." The booklet argued, inter alia, that the "Parole board is prone to corruption [and] political influence," that "[t]he weight of the injustice of the criminal justice system falls disproportionately on communities of color," and that "[i]t will require the unified effort of every element of the community, including prisoners, to bring about the needed change ." The booklet is dated April 2000 and-critically for the proceedings here-listed the WCF address of the LTC on its cover page, thus arguably giving the impression that it was prepared by the LTC.

***3** On or about April 7, 2000, while Farid was at his work assignment, corrections officers searched his cell and confiscated various written materials. Among the papers seized were "2 envelopes of papers and approximately 150 pages of parole related articles." Also confiscated were seven copies of "The Politics of Parole." Other materials taken included "[m]ultiple letters to civilians explaining the book and its distribution, envelopes to civilians that coincide with letters and [a] list of addresses that correspond to envelopes and letters."

At a later deposition, Farid acknowledged that he was the principal author of "The Politics of Parole" and that he created it "working with" the LTC. He accepted the characterization of the work as having been prepared by the LTC. Farid also acknowledged that the work was not "authorized" by DOCS.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On April 8, 2000, Farid received an Inmate Misbehavior Report ("IMR") alleging that he had committed several disciplinary violations by possessing and distributing, without authorization, copies of the booklet, letters and envelopes. Specifically, Farid was charged with: (1) violating the catch-all contraband provision, Rule 113.23, through his possession of "The Politics of Parole" and associated items; (2) smuggling or attempting to smuggle in violation of Rule 114.10; (3) possessing unauthorized organizational materials in violation of Rule 105.12; (4) giving unauthorized legal assistance in violation of Rule 103.20; (5) soliciting foods or services in violation of Rule 103.20; and (6) violating Rule 180.11, which provides that "[a]n inmate shall comply with and follow the guidelines and instructions given by staff regarding facility correspondence procedures." *See* *Farid III,* 514 F.Supp.2d at 487.

Deputy Superintendent of Administration Thomas Miller, a defendant in this action, presided at an April 12, 2000 "Tier III" disciplinary hearing regarding the charges set forth in the April 8, 2000 IMR. *See* *Porter v. Coughlin,* 421 F.3d 141, 142 n. 1 (2d Cir .2005) ("The most serious violations are the subject of Tier III hearings and may result in [Special Housing Unit] confinement for the remainder of the inmate's prison time, as well as forfeiture of 'good time' credits."). Farid was provided with an opportunity to select an individual to assist him in the hearing, and chose Corrections Counselor Charles Davis, a non-defendant. At the hearing, Farid raised a variety of defenses, including allegations that Defendant (and Superintendent of the Facility) John P. Keane had targeted him because he-along with other members of the LTC-had invited state legislators to visit the prison the previous August as part of a conference on parole and prison issues. Farid also argued that the IMR should be dismissed for lack of "clear notice of any particular conduct ... [he] supposed[ly] violated."

Lieutenant Lawrence Jones, also a defendant in this action, testified that another officer had found "The Politics of Parole" in an inmate's cell during an April 6 search. Jones had checked with the staff advisor to the LTC and the deputy superintendent and determined that the pamphlet had not been properly authorized, and so he "instituted an investigation to determine who was making the pamphlet." Jones and Keane testified that they would have had no objection to Farid's possession of the pamphlet if he had written and possessed it himself, but that it was contraband *because it purported to be an official LTC publication,* which it was not, as it had not been approved. Moreover, Jones said that Farid had violated the contraband ban by possessing other inmates' parole materials, since an inmate should not possess "another inmate's papers showing their crime and ... other facts about their criminal history."

***4** At the conclusion of the hearing on April 13, Miller found Farid guilty of the possession of contraband, soliciting goods or services and smuggling. Miller found Farid not guilty of all other offenses. Miller imposed sanctions against Farid of confinement for ninety days in the Special Housing Unit ("SHU"),[FN1] a loss of ninety days of various privileges-packages, commissary, special events and phones-and a loss of three months of "good time" credits. Farid's disciplinary history indicates that he served the SHU portion of the punishment between April 7, 2000 and July 6, 2000.

In June of 2000, Farid appealed the disciplinary findings to defendant Glenn Goord, the DOCS Commissioner. Acting on behalf of defendant Goord, defendant Donald Selsky, the DOCS Director of SHUs, dismissed the charge of soliciting goods or services but allowed the other disciplinary findings and the punishments to stand. Hence, the disciplinary charges that were sustained and form the basis for the discipline imposed were violations of the rules governing "contraband" and "smuggling." These are the rules whose constitutionality we must consider in the present appeal.

*B. Proceedings Below*

Farid filed his 1983 claim in September 2001. As noted above, the District Court resolved the issues that are on appeal here in three separate opinions and an order.

In *Farid I,* 2003 WL 23018805, issued on December 23, 2003, the Court dismissed without prejudice Farid's third and sixth claims on the basis that he had failed to exhaust available administrative remedies as required by the PLRA.[FN2]

In *Farid II,* 2006 WL 59517, issued on January 11, 2006, after the close of discovery, the District Court granted Defendants' motion for summary judgment on the first, fourth and fifth claims, finding that Farid had failed to show evidence upon which a reasonable jury could find in his favor. The court, however, denied, without prejudice, summary judgment as to Farid's First Amendment claim, and invited the parties to pursue the issue through more fully developed briefing. The Court remarked that "[t]he briefs submitted by the parties have left many questions unanswered" as to the First Amendment claim, and then urged the plaintiff to "explain precisely what speech or conduct he argues was constitutionally protected and precisely what adverse action he suffered." *Id.* at *8.

Instead of doing that, Farid tried to take an interlocutory appeal to our Court. On November 11, 2006, we dismissed that appeal, and Defendants again moved for summary judgment on the First Amendment claim. In an Order filed on July 26, 2007, the District Court made its suggestion more explicit, this time specifically asking the parties to submit further argument on whether the rules were vague as applied. They complied.

Finally, in a published opinion issued on August 15, 2007, *Farid III,* 514 F.Supp.2d 482, the District Court held that the "contraband" and "smuggling" prison regulations under which Farid had been disciplined were unconstitutionally vague, but that Defendants were nevertheless entitled to qualified immunity. First, the court concluded that

> ***5** on this record ... Rules 113.23 and 114. 10, as they were applied to Farid, did not contain explicit standards and gave prison officers unfettered discretion in interpreting what conduct is prohibited. That unfettered discretion impermissibly permitted the viewpoint expressed by the inmate to enter into an evaluation of whether the conduct was violative of the rules.

*Id.* at 492. Despite finding a First Amendment violation, the court held that Defendants were entitled to qualified immunity:

> All defendants are entitled to summary judgment on the defense of qualified immunity because the right was not clearly established. Alternatively, and assuming, arguendo, that the right was clearly established, summary judgment in favor of defendants would be proper because reasonable prison officials could have disagreed as to whether the right would be violated by their actions.

*Id.* at 495. The District Court therefore declined to grant money damages to Farid, but did order Defendants to remove the punishment from his disciplinary record, and to restore to him the three months of good time credits he had lost. *Id.* at 496.

Farid appealed the District Court's grants of summary judgment and qualified immunity, and we appointed counsel. Defendants cross-appealed the District Court's finding of a First Amendment violation. We consider each of these issues in turn.[FN3]

**II. Farid's Vagueness Challenge**

[1] The first question we consider is whether, in the special constitutional context of prison regulations, the rules under which Farid was disciplined were unconstitutionally vague as applied to him. We agree with the District Court that they were.

[2][3] It is well established that "while inmates do not shed all constitutional rights at the prison gates, ... [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *Chatin v. Coombe,* 186 F.3d 82, 87 (2d Cir.1999) (internal quotation marks omitted). In light of this background principle, we have approved a two-prong test for determining whether a prison rule is unconstitutionally vague as applied: "[A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Id.*

In *Chatin,* which the parties agree is the most relevant precedent, we considered whether a DOCS disciplinary rule barring "[r]eligious services, speeches or addresses by inmates other than those approved by the Superintendent"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

was unconstitutionally vague as applied to silent, individual prayer. *Id.* at 84 (quoting Rule 105.11). We found that it was, rejecting DOCS's argument that the rule's vagueness was cured by an internal DOCS Directive and memorandum from prison staff, which together clarified that silent prayer was covered by the rule. *Id.* at 87-89, 91. We held that prisoners are not required to integrate multiple directives in order to divine the rules governing their conduct. *Id.* at 88-89.

***6** Here, Farid was charged with violating the prison's bans on contraband (Rule 113.23) and smuggling (Rule 114.10).[FN4] As noted above, the catch-all *contraband* provision states:

> In addition to those items of contraband specifically identified by this rule series, an inmate shall not possess any item unless it has been specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility.

This Rule, "by its express terms[,] is addressed to 'possess[ion]' of an 'item.' It is not directed to organizational activity, distribution of materials within the prison facility or the manner in which the mails are used." *Farid III,* 514 F.Supp.2d at 490.

The *anti-smuggling* rule provides that

> an inmate shall not smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another.

In Farid's case, the application of the smuggling prohibition was based entirely on his alleged violation of the contraband rule-the fact that the booklet was found to be contraband meant that distributing it was smuggling.

We agree with the District Court that these rules were unconstitutionally vague as applied to Farid, both because they failed to give him adequate notice and because they failed adequately to constrain the discretion of the prison officials who had the power to impose them.

Because the "smuggling" charge under Rule 114.10 was based entirely on the status of the materials as contraband, we begin with Rule 113.23, the catch-all contraband rule. (If the contraband charge is constitutionally infirm, it follows that the smuggling charge also must fail.) The basic shortcoming with the contraband rule, as applied here, is precisely the one identified by the District Court: There is nothing in the rule indicating that materials which violate a prison organization's *internal* by-laws are contraband in violation of the *prison's* rules. The internal by-laws of the LTC require each member to receive and become familiar with their contents. They expressly provide that "[a]ll correspondence ... must be reviewed and approved by the staff advisor." All communications with the staff advisor are to be made through the Chairman of the LTC. Section 11.02 of the by-laws states that "[a] member determined to have violated a provision of the Constitution, By-laws or facility or departmental policies and procedures may, after being afforded an opportunity to be heard and to present his views, be sanctioned in accordance with this section." Sanctions include censure, suspension or expulsion from the group. Assuming-as seems to be the case-that the pamphlet here violated these by-laws, Farid was subject to these specific sanctions. But he was instead disciplined under *prison* regulations. There is nothing at all in the by-laws that gives notice that discipline under prison regulations, which permit far more severe sanctions-such as the three months in the SHU which Farid had to serve-than expulsion from a prisoner organization, can be a consequence of doing nothing more than infringing the LTC's by-laws. Farid's knowledge of the LTC by-laws, therefore, did not suffice to give him notice, actual or constructive, that his breach of the by-laws could be deemed to violate prison regulations. Accordingly, unless he had other reasons to know that what he did was against *prison* rules, these regulations were improperly applied to him.

***7** Of course, a breach of a group's by-laws can also, independently, violate prison rules. And Defendants argue that this is the case here. They point out that the contraband rule is broad, and contend that this breadth saves it from Farid's challenge. As we have seen, the rule identifies as contraband that which is not "specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility." Defendants assert that far from demonstrating vagueness,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the breadth of this prohibition sufficed to let Farid know that *anything* lacking the prior approval of the superintendent was contraband under prison regulations.

But this explanation is neither convincing nor consistent with Defendants' other statements, such as Defendant Miller's testimony that Farid would not have been in violation of the prison rules if he had simply produced and possessed the pamphlet himself without including the LTC's imprimatur on it. *Farid III,* 514 F.Supp.2d at 490 ("Defendant Miller[,] who presided at the hearing, asserted that had defendant complied with the by-laws of LTC, 'The Politics of Parole' would not have been contraband."). "As applied"-that is, on the facts before us-it was solely the alleged violation of the LTC's by-laws (i.e., the failure to have the document approved according to that organization's rules) which led to the pamphlet's classification as contraband. And that is not sufficient to give Farid adequate notice of a potential punishment under the prison's regulations. The law does not require Farid to engage in some kind of interpretive construction, combining the LTC's by-laws with the prison rules in order to determine whether materials that violate the former might at the will of prison officials be read to constitute contraband under the latter. That is precisely the kind of interpretive burden that we rejected in *Chatin,* and we do so again here.

Defendants repeatedly emphasize that Farid had *actual* notice of the LTC rules, particularly since he and other LTC members had been notified-recently and specifically-that LTC correspondence must be authorized. In the spring of 1999, about a year before Farid was disciplined, members of the LTC violated prison rules by organizing a conference at WCF without following proper procedures. Defendant Keane, WCF's Superintendent, sent a letter to members of the LTC informing them that they must follow "the proper procedures for inviting community guests to participate in correctional facility functions." Keane attached to this letter the LTC by-laws and the DOCS Directive regarding inmate organizations.[FN5] And, that Farid was aware of the regulations is evident, Defendants say, because of the "furtive nature" of his activity in producing the pamphlet-it was written on a computer that he was not authorized to use for private purposes. Defs' Br. 28.

All of this, they argue, differentiates the present case from *Chatin,* because the prisoner in that case was neither warned that his conduct was proscribed nor subjectively believed it to be. *See* *Chatin,* 186 F.3d at 87-88. And unlike *Chatin,* where discipline was based solely on DOCS rules which were "not distributed to inmates," 186 F.3d at 84, Farid violated the LTC by-laws, which were available to, and signed by, all members of the LTC. So long as Farid actually knew that his conduct was prohibited, Defendants assert his failure-of-notice vagueness claim must fail. *See* *Duamutef v. O'Keefe,* 98 F.3d 22, 25 (2d Cir.1996).

***8** This argument did not convince the District Court, and it does not convince us. *See* *Farid III,* 514 F.Supp.2d at 491 ("The respondents [fare] no better by trying to link possession and distribution of the booklet to an earlier warning by the Superintendent to the LTC that members of the outside community may not be invited to the prison without advance notice and permission."). The warning surely served to remind Farid and the other members of the LTC that they had signed by-laws and were bound by them. But that does not cure the problem the District Court identified, which is that, in Farid's case, his behavior was punished not as a violation of the by-laws of the LTC but as a breach of *prison* rules.[FN6]

Moreover, even if we agreed with Defendants that Farid had adequate notice that failure to have the pamphlet approved in accordance with LTC by-laws might subject him to prison discipline, that conclusion would only satisfy half of the vagueness inquiry we outlined in *Chatin.* In addition to being unconstitutional for failure to provide notice, a statute or regulation may be unconstitutionally vague when it "fails to provide sufficiently explicit standards for those who apply it when it 'impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis.' " *Chatin,* 186 F.3d at 89 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). In other words, in order to survive a vagueness challenge, a rule must both provide adequate notice to those who are governed by it *and* adequately cabin the discretion of those who apply it.

The prison rules against contraband and smuggling, as applied to Plaintiff here, gave almost complete

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

enforcement discretion to prison officials. Although the District Court did not give extensive consideration to this issue, it concluded that "the application of the contraband and anti-smuggling rules contained no explicit standards and placed unfettered discretion in the hands of the prison staff insofar as the rules were applied to written materials." *Farid III,* 514 F.Supp.2d at 492. Indeed, the catch-all contraband rule allowed prison officials to determine in their unbounded discretion what was and was not "specifically authorized" in the facility.

Farid was disciplined under prison rules prohibiting "smuggling" and the possession of "contraband." But the only thing that made his pamphlet contraband-which in turn meant that he engaged in "smuggling" by giving it to other inmates-was the fact that the pamphlet was not approved in accordance with the *internal* by-laws of his prisoner organization, the LTC. We agree with the District Court that the application of prison rules in these circumstances was unconstitutionally vague both because it failed to give Farid notice that his actions were prohibited and because it failed adequately to cabin the discretion of prison officials.

**III. Defendants' Claim of Qualified Immunity**

***9** Our finding that the regulations were unconstitutionally vague, however, does not by itself mean that Defendants are liable. The District Court, having found a violation of Farid's First Amendment rights, held that Defendants were entitled to qualified immunity. Their conduct, the court concluded, did not violate any clearly established rights about which a reasonable person would have known. Having carefully considered the record, we cannot agree.

[4][5] Qualified immunity protects government officials "from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Such immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. A defendant is entitled to summary judgment on the issue of qualified immunity

> if [he] "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (quoting *Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, *J.,* sitting by designation)).

[6] We first consider whether Defendants' actions violated a clearly established statutory or constitutional right. For a right to be clearly established, it "must have been recognized in a particularized rather than a general sense." *Moore v. Andreno,* 505 F.3d 203, 214 (2d Cir.2007) (internal quotation marks and citation omitted). We must therefore define the disputed right "at the appropriate level of specificity." *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

In the present case, Defendants have suggested two potential justifications for Farid's punishment under the prison regulations: either as a direct result of his violation of the LTC by-laws; or as a consequence of the contraband rule, which Farid allegedly breached indirectly *by* violating the LTC by-laws. We have explained why we think that neither of these justifications is constitutionally adequate. For qualified immunity purposes, however, we must more precisely define the rights at issue, and only then determine whether they were "clearly established."

In keeping with Defendants' two possible characterizations of their conduct, we find that there are two characterizations of the relevant right: either as a right not to be punished under Rule A (*e.g.,* the prison's contraband regulation) for violating Rule B (*e.g.,* the LTC by-law); or as a right not to be punished under prison regulations that are too vague to constrain official conduct or to give prisoners notice of what conduct is prohibited, unless read in conjunction with the LTC by-laws-and then only

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

arguably. We find that both of these rights are clearly established, albeit for different reasons, and that a jury might well find that a reasonable officer should have known that they were so established. Moreover, fact questions exist as to Defendants' justification for their conduct and therefore as to which of the rights described above has arguably been infringed. Summary judgment on the question of qualified immunity was therefore inappropriate, and must be vacated.

***10**[7] First, Defendants seem to suggest that Farid's violation of LTC by-laws was *by itself* sufficient to justify discipline under prison regulations. *See* *Farid III,* 514 F.Supp.2d at 490 ("Defendant Miller[,] who presided at the hearing, asserted that had [Farid] complied with the by-laws of the LTC, 'The Politics of Parole' would not have been contraband."). We have already explained why this is not constitutionally sufficient. *See supra* at **[14].** For qualified immunity purposes, however, there is a separate question, which is whether the right violated by this conduct was clearly established. We have no trouble concluding that the right not to be punished under one set of rules for violations of another is clearly established. The very essence of constitutional prohibitions on vagueness is that rules must give notice of the conduct that *they* (not another set of rules) prohibit, and must constrain the discretion of officials who apply *them*. This is impossible where prohibitions and punishments are set out in one set of rules, but officials remain free to impose punishments established in an entirely different set of rules not referenced by the first.

[8] There is another way to read Defendants' argument, however-that any vagueness in the application of the prison's contraband regulation is cured by the fact that Farid had notice of the LTC by-laws. This seems to be the main thrust of Defendants' argument on appeal, and it is different from the first argument because it begins with the prison regulations, not the LTC by-laws, and essentially argues that prisoners must read them in conjunction. In this way, it is not so much a direct defense of the prison's contraband regulation as it is an argument that the regulation can be read alongside the internal by-laws of a prisoners' organization to achieve a constitutional result. We have explained above why we do not think that the existence of the LTC by-laws cures the vagueness of the prison's contraband and smuggling regulations as they were applied in this instance. *See supra* at **[15-17].** But for qualified immunity purposes, we must also consider Defendants' second characterization of the rights they might have violated. Under this second purported justification, the relevant question is whether prisoners' right not to be punished under DOCS rules, without sufficient notice that their conduct is prohibited by those rules, is clearly established-even where that conduct is prohibited by other rules.[FN7]

[9] We conclude that it is. Although we are aware of no cases involving the vagueness of the precise regulations challenged here, our conclusion is strongly supported by caselaw in this Circuit. Qualified immunity can be denied where a rule is "clearly foreshadow[ed]" by past precedent, *Tellier v. Fields,* 280 F.3d 69, 84 (2d Cir.2000) (internal quotation marks omitted), and similar cases, applying similar regulations, have come to similar conclusions. Most notably for present purposes, in *Chatin* we found that a prison regulation banning unauthorized "religious services" was unconstitutionally vague as applied to a prisoner's silent, individual prayer, where the prisoner had no actual or imputed knowledge that he would be subjected to discipline for such prayer. The District Court distinguished *Chatin*-the same case on which it had relied in finding the rules unconstitutionally vague-on the grounds that "different prison rules are at issue and the nature of the conduct included the implied representation in the written materials that an officially approved organization of inmates had been given institutional permission to transmit the materials." *Farid III,* 514 F.Supp.2d at 494.

***11**[10] But "for a right to be clearly established for purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful." *Zahrey v. Coffey,* 221 F.3d 342, 357 (2d Cir.2000). And *Chatin* comes mighty close to holding the conduct here at issue to be unlawful. As noted above, in that case we rejected DOCS's argument that a rule's potential vagueness could be cured where it was read in conjunction with an internal DOCS Directive and memorandum specifying the rule's reach. *See* *Chatin,* 186 F.3d at 87-89, 91. We held that prisoners are not required to synthesize prison regulations with other potentially relevant restrictions on their conduct. Here, too, we reject Defendants' argument that Farid should have read the contraband and smuggling rules alongside the LTC's internal by-laws and interpreted them in conjunction as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

saying that conduct barred under the latter is punishable under the former. And, as a result of *Chatin,* we also reject the argument that it was not clearly established that prisoners could not be expected to synthesize disparate regulations.

[11] Multiple questions of material fact exist regarding these two potential theories of qualified immunity. First and most prominently, questions of material fact exist as to *which* of the two theories is properly the focus of Defendants' claim. That is, it is unclear whether Defendants actually intended to punish Farid under the prison contraband rule, or whether they were instead punishing him simply for violating the LTC by-laws. The thrust of their argument on appeal tends to suggest the former, but as the District Court noted, many of their statements below suggest the latter. *See, e.g., Farid III,* 514 F.Supp.2d at 490. This is a distinction with an important difference, because it is impossible-especially on summary judgment-to evaluate Defendants' claims of qualified immunity without knowing the basis for those claims. These questions of material fact would constitute sufficient reasons in and of themselves to vacate and remand the grant of summary judgment with regard to qualified immunity.

[12] Moreover, and for substantially the same reasons that we find the rights at issue here to be clearly established, we conclude that a jury could have found that reasonable prison officials should have known that these rights were established, and that their conduct here violated them. This is true whichever of the two possible theories of qualified immunity we consider. We have little trouble concluding that the first construction-the right not to be punished directly under Rule A (the prison's contraband rule) for violating Rule B (the LTC's internal by-law)-should have been clear to any reasonable officer. Accordingly, insofar as Defendants argue that they are entitled to qualified immunity because Farid's violation of LTC rules automatically subjected him to punishment under prison regulations, we find that the grant of qualified immunity was inappropriate.

***12**[13] The same conclusion follows if we instead focus on the second issue noted above: whether otherwise-vague prison regulations can be saved so long as the disciplinary authorities also invoke the internal by-laws of a prisoner organization. This seems to be the issue that the District Court found dispositive. That court found that "even if this Court assumed that the right was clearly established, the defendants would be entitled nevertheless to summary judgment on qualified immunity." *Farid III,* 514 F.Supp.2d at 494. Specifically, it concluded that "a reasonable prison official could have considered the LTC by-law requiring staff approval of correspondence from the LTC to have been sufficient notice of prohibited conduct." *Id.* at 494-95. We disagree. Especially in light of *Chatin,* a jury could very well decide that it is unreasonable for a prison official to act on the belief that violation of a prisoner organization's internal by-laws can properly subject a prisoner to discipline under the prison's rules.

Accordingly, we conclude (a) that Farid's rights are clearly established under either possible construction-either as a right not to be punished under Rule A for violating Rule B, or as a right not to be punished under a prison rule which does not give adequate notice (unless read in conjunction with unrelated prisoner organization by-laws) that the conduct is prohibited, and (b) that a reasonable officer should know that these rights were so established. We emphasize however, that because this case comes to us following a grant of summary judgment for the Defendants, the question at this stage is not whether Defendants might ultimately be entitled to qualified immunity under either of these theories, but only whether Farid has adduced sufficient facts such that a reasonable jury, looking at the evidence in the light most favorable to Farid, could conclude that it was objectively unreasonable for Defendants to believe that they were acting in a fashion that did not clearly violate an established federally protected right. *Robison,* judgment and remand for further proceedings, as to the ultimate merits of which we express no opinion.

**IV. Farid's Retaliation Claim**

Farid contends that his First Amendment claim includes a retaliation claim that was not addressed by the District Court. In his *pro se* complaint, Farid alleged generally that "defendants have violated [his] rights under the First Amendment ... when they applied disciplinary sanctions upon [him] for engaging in conduct that was constitutionally and statutorily protected." Compl. ¶ 101.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In *Farid II,* the District Court appeared initially to treat this language as raising a retaliation claim under the First Amendment. *See*2006 WL 59517, at *8. As previously recounted, the District Court then denied, without prejudice, summary judgment as to Farid's First Amendment claim and invited further briefing. Subsequently, in *Farid III,* the District Court addressed Farid's First Amendment claim, but the Court did not treat it as a retaliation claim. Instead, the District Court decided the issue exclusively on vagueness grounds. *See*514 F.Supp.2d at 488-93.

***13** It is unclear from the record whether the District Court-with the benefit of further briefing to supplement Farid's *pro se* complaint-ultimately read that complaint as raising only a First Amendment vagueness claim rather than a separate retaliation claim as well. Both parties, however, seem to argue that the claims are in fact separate. *See* Defs.' Br. at 30 ("As Farid observes, the district court, having converted Farid's First Amendment claim into a void-for-vagueness challenge, did not rule on any retaliation claim that Farid may have pleaded."); *id.* at 30-34 (presenting a substantive argument for why the State should be granted summary judgment on Farid's retaliation claim).

Because we are remanding this case with respect to Farid's vagueness claim, we deem it appropriate to remand as to this issue also. On remand, the District Court should determine in the first instance whether Farid adequately pled a separate claim for retaliation under the First Amendment. The Court may then hold such further proceedings as it believes appropriate in the light of its reading of Farid's complaint.

**V. Farid's Confiscation Claims**

[14] Farid has also raised § 1983 claims regarding the confiscation of certain papers and personal effects from his cell. The District Court found that this claim, unlike his vagueness challenge, was not administratively exhausted. We agree.

The Prison Litigation Reform Act requires a prisoner petitioner to exhaust "such administrative remedies as are available" before filing suit in federal court. 42 U.S.C. § 1997e(a). The Supreme Court has made clear that "the PLRA's exhaustion requirement applies to all inmate suits about prison life." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Here, Farid concededly has not exhausted his administrative remedies.

Farid argues, however, that his confiscation claim is intertwined with his challenge to the disciplinary hearing, which *was* administratively exhausted. He says that he reasonably believed that the claims were so interrelated that he could not be expected to distinguish them. *See* *Giano v. Goord,* 380 F.3d 670, 679 (2d Cir.2004). This argument is unavailing. We agree with, and affirm, the District Court's finding that "Farid's concern here is *not* confiscation as a constituent element of the disciplinary hearing," but rather "confiscation as part of a scrutiny that arose in light of his political and organizational activities." *Farid I,* 2003 WL 23018805, at *3 (emphasis added). That is because "[t]he act of confiscation was not a constituent aspect to the disciplinary hearing," and instead "involved discrete events outside the purview of a disciplinary hearing, [events] that should have been grieved through the IGP." *Id.* Since it was not, Farid's confiscation claim cannot be heard by us.

**VI. Farid's Medical Claims**

[15][16] Farid has also alleged that Defendants violated his Eighth Amendment rights through their alleged deliberate indifference to his medical condition-primarily his Hepatitis C, for which he received only sporadic treatment. An inmate attempting to show deliberate indifference must demonstrate that the defendants "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm w[ould] result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

***14** Having carefully and independently reviewed the record, we agree with the District Court that Farid has not shown that Defendants acted with "conscious disregard of a substantial risk of serious harm." *Farid II,* 2006 WL 59517, at *11. At best, Farid has produced evidence tending to show that Defendants may have been negligent. But negligence is insufficient to support an Eighth Amendment claim.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[17] The parties also dispute whether Defendants were personally involved in Farid's medical treatment or lack thereof. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Because we affirm the District Court's determination that Farid has not shown deliberate indifference, we need not reach the separate question of whether Defendants were personally involved in his treatment. For similar reasons, we do not consider whether Farid's medical condition would be grave enough to support an 8th Amendment claim if his treatment had been shown to be deliberately indifferent.

For the reasons above, we AFFIRM the District Court in every particular except one. We agree with the District Court that Farid's rights were violated by the application of unconstitutionally vague prison regulations, but we do not agree that Defendants are entitled to qualified immunity for that violation. We therefore VACATE that portion of the District Court's decision in *Farid III,* and REMAND for further proceedings consistent with this opinion.

FN* The Clerk of Court is directed to amend the official caption to conform to the listing of the parties stated above.

FN1. SHU confinement generally involves being placed in solitary confinement for twenty-three hours per day, limited to two showers per week, and denied various privileges granted the general prison population. *See Palmer v. Richards,* 364 F.3d 60, 65 n. 3 (2d Cir.2004).

FN2. On September 22, 2004-three years after filing his initial complaint and well after Defendants' motion to dismiss had been granted in *Farid I*-Farid sought to amend his complaint to add new allegations and new defendants. The District Court denied leave to amend without prejudice to Farid filing separately in the Northern District of New York, where the additional defendants were located, which Farid later did successfully. He nonetheless argues in his appeal from *Farid I* that the District Court erred by denying him leave to amend. We review such determinations for abuse of discretion, *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990), find none here and affirm the District Court's decision.

FN3. Farid's appeal of the District Court's denial of his motions to supplement his complaint is dealt with at footnote 2, *supra.*

FN4. As the District Court noted, Farid was *not* disciplined under other regulations which would, at first blush, appear to be more relevant: Rules 110.21 (possession of unauthorized papers); 180 .11 (noncompliance with guidelines regarding correspondence); 180.17 (providing unauthorized legal assistance); and 105.12 (unauthorized organizational activities). Charges were brought under these rules as well, but were dismissed by Deputy Superintendent Thomas Miller, who oversaw the Tier III disciplinary hearing.

FN5. Aside from this reprimand, no members of the LTC were disciplined as a result of the incident, but Defendants correctly point out that this does not necessarily matter, so long as the members of the LTC were put on notice that what they had done was wrong.

FN6. We note in passing that we do not accept as evident that Farid produced the pamphlet in a particularly furtive or suspicious way. Although it is true that he failed to obtain proper authorization and wrote it on a computer not intended for such projects, Farid noted that while he was drafting the document he showed it to Corrections Officer Floyd, the prison's law librarian, who did not object. This of course is not the same as getting proper approval, but it does suggest that Farid was not attempting to cover up his activity entirely.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN7. The District Court determined that "an appropriately tailored formulation would be the right not to be punished for possession or distribution of a written expression of ideas pursuant to prison rules that do not give notice of the basis by which the written expression would be determined to be improper to possess or distribute." *Farid III,* 514 F.Supp.2d at 493-94. This construction is not wrong. But, we believe, that the District Court did not follow through on the implications of its own correct formulation.

C.A.2 (N.Y.),2010.
Farid v. Ellen
--- F.3d ----, 2010 WL 308971 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn Correctional Facility; Donald Selsky, Assistant Deputy Commissioner, Director of Special Housing/Disciplinary Program; Anthony Graceffo, Chief Medical Officer, Auburn Correctional Facility; Glenn S. Goord; Hans Walker; Gary Hodges; D.W. Seitz; Terry Halcott; Christine Coyne Nancy O'Connor; Ann Driscoll; John McClellen; John Rourke, Captain, Security Services at Auburn Correctional Facility; Koors, Head Pharmacist at Auburn Correctional Facility; Robrt Mitchell, Correctional Counselor at Auburn Correctional Facility; and Androsko, Registered Nurse, Auburn Correctional Facility, Defendants.
**No. 9:01-CV-1039.**

Sept. 24, 2008.

Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, David L. Fruchter, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

***1** Plaintiff, Samuel Cabassa, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated June 30, 2008, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' second motion for summary judgment (Docket No. 81) be granted in part and denied in part. Objections to the Report Recommendation have been filed by the parties.

Based upon a de novo review of the portions of the Report-Recommendation to which the parties have objected, the Report-Recommendation is accepted and adopted. *See*28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in its entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to the extent that it asserts:

(a) Any Fourteenth Amendment procedural due process claim whatsoever;

(b) A First Amendment access to courts claim against defendant Hans Walker;

(c) A First Amendment retaliation claim against defendant Hans Walker;

2. Defendants' second motion for summary judgment is otherwise DENIED, so that, surviving that motion is:

(a) Plaintiffs First Amendment access-to-courts claim against defendants D.W. Seitz and Craig Gummerson asserted in the Fourth Amended Complaint's Fifth Cause of Action; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) Plaintiffs First Amendment retaliation claim against defendants D.W. Seitz and Craig Gummerson also asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

***2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) [FN1] For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

**I. APPLICABLE LEGAL STANDARD**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN3]

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

FN3.*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN4 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN5 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN6

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* FN7 In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. FN8 (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.) FN9 In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. FN10 An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. FN11 Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN12

FN7. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN8. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10.*See*Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11.*See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,*474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12.*See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,*136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the conditions of his confinement.[FN13] In one of those actions, he was awarded $1,000 following a jury trial.[FN14] (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.[FN15]

FN13. *See, e.g.,* *Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County, filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See* *Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord,* *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also* *Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

***3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,[FN16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by

*pro se* litigants or not), under Fed.R.Civ.P. 8. *See*Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

***4** Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

**1. Continuing Violation Doctrine**

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[FN17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

FN18.*Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

***5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) [FN20] Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) FN21

FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf*. Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

***6** 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [FN22]

FN22. I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false.[FN23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.[FN24] The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

FN23. *See* *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

FN24. A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See* *Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See* *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

For example, there is no record evidence that Defendant Seitz issued his written recommendation of January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) FN25

FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

***7** Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) FN26

FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin,* 775 F.Supp. 84, 87-88 (W.D.N .Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. FN27

FN27. *See* *Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also* *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

***8** The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,FN28 (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

> where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6 [23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

***9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were part of an express and openly espoused *policy.* Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

***10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor,* 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

***11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days

which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

FN29. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

FN30. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN31. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord,* Warren, 985 F.Supp. at 354-55; *see also* Ruiz, 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN32. *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord,* Warren, 985 F.Supp. at 354.

FN33. *See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-andsignificant-hardship analysis.) [FN34]

FN34. *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998.[FN35] For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

***12** As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) FN36 The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) FN37

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN36. I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ....“].)

FN37. For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

***13** Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandlin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin's* atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced

atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

***14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. Claims Under the First Amendment**

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**a. Access-to-Courts Claim**

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson. FN39

FN39. *See* *Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

***15** Plaintiff's "Fifth Cause of Action" alleges as follows:

The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy" is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [FN40]

FN40. I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

***16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [FN41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

FN41. "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act.[FN45]

FN42. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of

religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN43. *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN44. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

> ***17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....
>
> .... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin [v. Connor,* 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles,* 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[FN46]

FN46. *Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable'

under the [Prison Litigation Reform Act].") [citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See* *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord,* *Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official liable *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

> ***18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU*.... This principle is not disturbed by *Sandin* [*v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also* *Acre,* 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf.* *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

FN47. *Accord,* *Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. [FN48] The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

***19** Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See* *Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan,* 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady,* 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments).[FN49] In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN49. *Cf.* *Brass v. County of Los Angeles,* 328 F.3d 1192,1195,1199-1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must

come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

FN50.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN51.*See* *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

***20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment accessto-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

written notice of its entry [FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998). [FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional accessto-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay).[FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

FN52. *See* *Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state court").

FN53. (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54. N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55. *See* *Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf.* *Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

***21** In order to convert the claim raised in this allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of* ] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) [FN56]

FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See*Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [FN57] Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se. See Albert v. Carovano,* 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord, Wynder v. McMahon,* 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), *Northrup v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997).

FN57. It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See*408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (*"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [FN58] in his complaint in order to assert a retaliation claim. *See Williams v. Manternach,* 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").[FN59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

FN58. *See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

***22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[FN60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

FN60. To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently*

*connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

FN61. (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

***23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[FN62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary.[FN63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground .[FN64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14]

[Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning].") [internal quotation marks omitted].) As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See*Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See*Fed.R.Evid. 803(3).

FN64. (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be ***GRANTED*** in part and ***DENIED*** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be ***DISMISSED*** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be ***DISMISSED*** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment accessto-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise *DENIED*** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and (b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

***24 ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.***See*28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN65]

FN65.*See, e.g., Paddington Partners v.*

*Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also* *Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by* *U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.
Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Sean TAPP, Plaintiff,
v.
Chaplain T. STANLEY, Defendants.
**No. 04-CV-6400 CJS.**

Nov. 17, 2008.

Sean Tapp, Lancaster, PA, pro se.

Gary M. Levine, New York State Office of the Attorney General, Rochester, NY, for Defendant.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

***1** This is an action pursuant to 42 U.S.C. § 1983, in which Plaintiff, a prison inmate, alleges that Defendant, a prison chaplain, violated his federal statutory and constitutional rights to freedom of religion. Now before the Court is Defendant's motion for summary judgment [# 26] and Plaintiff's cross-motion [# 37] for the same relief. For the reasons that follow, Defendant's application is granted and Plaintiff's application is denied.

BACKGROUND

Unless otherwise noted the following are the facts of this action viewed in the light most-favorable to Plaintiff. At all relevant times Plaintiff was an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), and was housed at Southport Correctional Facility ("Southport"). At all relevant times, Defendant was employed as a prison chaplain at Southport.

Plaintiff claims that Defendant denied him kosher meals from April 4, 2004 until July 23, 2004. (Tapp Deposition at 17). Actually, though, Plaintiff was not housed at Southport during that entire period. Instead, Plaintiff spent the period of May 7, 2004 to June 8, 2004 at Upstate Correctional Facility ("Upstate"). *Id.* at 56-57.[FN1] Accordingly, the period that Plaintiff was allegedly denied kosher meals at Southport is seventy-seven (77) days.

FN1. Plaintiff indicated that he did not recall the precise dates that he was at Upstate during the period at issue in this lawsuit. (Tapp Deposition at 57). However, he indicated that he was away at Upstate for most of the month of May 2007. *Id.* at 58. DOCS records submitted by Defendant indicate that the actual period was May 7, 2004 to June 8, 2004. (Stanley Affidavit [# 30], Exhibit 8).

Prior to April 4, 2004, Plaintiff did not eat kosher food. *Id.* at 20. In fact, prior to that date Plaintiff had "no religion." *Id.* at 24. Accordingly, on prison forms completed prior to April 2004, Plaintiff had indicated that he did not belong to a particular religion. *Id.* at 24-25. In or about April 2004, Plaintiff decided that he would practice Judaism. *Id.* at 27 ("I just decided one day that's what I wanted to do."). On April 4, 2004, Plaintiff wrote to Defendant and announced that he was Jewish, and that he wanted his "institutional records ... properly marked to reflect that." Plaintiff also asked that a "religious designation" form be sent to him so that he could "formally declare" his religious beliefs. Defendant responded by sending plaintiff a "change of religion" form and directing him to complete the form and return it to her. Plaintiff completed the forms and returned them to Defendant. In turn, Defendant forwarded the form to Southport's Jewish chaplain, Rabbi Chill. On April 11, 2004, Plaintiff wrote to Defendant, and stated that he wished to receive "the cold Jewish kosher alternative meal." Defendant responded that Plaintiff's "change of religion" request was "in Rabbi Chill's folder awaiting his visitation to Southport and his approval." On April 20, 2004, Rabbi Chill indicated that Plaintiff could not convert to Judaism, stating: "Refused. We don't do

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

conversion in NYSDOCS." On May 5, 2004, Defendant wrote to Plaintiff, stating: "This comes in response to your inquiry about your change of religion. Your request for conversion to Judaism has been denied by Rabbi Chill. Conversions to Orthodox Judaism are not allowed."

***2** On May 7, 2004, Plaintiff was transferred to Upstate, and did not return to Southport until June 8, 2004. On July 8, 2004, Plaintiff wrote to Defendant, to reiterate that he was "a follower and practicer of Jud[aism], and that he wanted to "receive the meals that follow [his] faith." On July 12, 2004, Defendant signed the change of religious designation form, despite Rabbi Chill's statement that Plaintiff could not convert to Judaism. In that regard, Defendant described the established procedure as follows:

> The procedure to obtain a change of religion is to first have the religious official, in this case the Rabbi, review the request. If the Rabbi does not authorize the request and the inmate still wishes to change his designation, I will change the religion as a 'self-declared' change in religious status.

> In this matter, when I learned that the Rabbi denied the change of religion, I notified the inmate. I did not do anything further until I heard from the inmate on July 12, 2004. Once I heard that the inmate wanted to continue with his request, I promptly processed the paperwork. I did not know of any grievances before July 12, 2004 regarding Plaintiff's desire to change religions or being denied kosher meals.

(Stanley Affidavit [# 30] at ¶ ¶ 15-17). In regard to having Plaintiff execute the religious designation form, Defendant states that she was following DOCS Directive 4202.[FN2] (*Id.* at ¶ 18). On July 12, 2004, the same day that she received Plaintiff's letter, Defendant "approved Plaintiff's kosher diet request." (Stanley Affidavit [# 30] ¶ 11). Defendant also conveyed Plaintiff's request for kosher meals to prison officials, and on or about July 13, 2004, the Assistant Deputy Superintendent for Program Services at Southport sent Plaintiff a form on which to indicate that he wanted to receive the Cold Alternative Diet Program. Plaintiff completed and returned the form. On July 17, 2004, Defendant also signed the form, after which, "[i]t was [her] understanding that the inmate would obtain his meal shortly after this date and [she] had no further involvement with Plaintiff's request for kosher meals." (*Id.* at ¶ 14). On July 20, 2004, the food service administrator at Southport wrote to Plaintiff and informed him that he would begin receiving the "Cold Alternative Meal Program" on July 21, 2004. According to Plaintiff, he did not actually begin receiving kosher meals until July 23, 2004.

> FN2. The Second Circuit has observed that Directive 4202, entitled "Religious Programs and Practices," is the "official policy" of DOCS and is "applicable to prison facilities throughout New York." *Jackson-Bey v. Hanslmaier,* 115 F.3d 1091, 1093 (2d Cir.1997).

During the period between April 2004 and July 2004 when Plaintiff did not directly receive kosher meals, and excluding the month of May when Plaintiff was at Upstate, Plaintiff ate "a lot of breads, fruits [and] cold cereal." *Id.* at 67. Additionally, Plaintiff obtained kosher food by trading with inmates who were receiving kosher meals. *Id.* at 68. In that regard, Plaintiff testified:

> A. I trade[d] ... with somebody who was getting a kosher meal.

> Q. So, you were able to eat kosher meals?

> ***3** A. Yes. That's how I would get kosher meals.

> Q. I'm just trying to understand. So, from the time period where you were waiting to get your kosher meals, you were eating other inmates' kosher meals?

> A. Yes. Sometimes.

> Q. How often?

> A. I can't recall.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Id.* at 68. As indicated Plaintiff began receiving kosher meals from Southport's food service on July 23, 2004. Plaintiff does not identify any Jewish holidays as having occurred during the period between April and July. (Tapp Deposition at 32).

Plaintiff claims that he exhausted his administrative remedies concerning his kosher diet claim, as required by 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). On June 17, 2004, Plaintiff filed Grievance SPT-30301-04, demanding, in part, that a grievance concerning "denial to practice Judism" be answered. The grievance was denied, on the basis that there was no record of such earlier grievance, and Defendant states in an affidavit that she had no knowledge of the grievance. Plaintiff is unsure whether he exhausted his administrative remedies as to this grievance. (Tapp Deposition at 85-86). On July 18, 2004, Plaintiff wrote another grievance, complaining that he was being denied the right to practice Judaism and that he was being denied kosher meals. Apparently, this grievance was not processed in the usual manner. Instead, someone wrote on the grievance, "meals begin 4-21-04." FN3 Additionally, on July 22, 2004, Plaintiff filed a grievance (Grievance No. SPT-30603-04), complaining that he did not receive a kosher lunch the previous day. On September 22, 2004, Plaintiff exhausted his administrative remedies as to this grievance, when the Central Office Review Committee ("CORC") granted his grievance in part. Plaintiff claims that he filed other grievances related to the kosher diet request that were either lost or not answered.

FN3. The Court is at a loss to explain why the response to the grievance, written in July 2004, would state that "meals begin 4-21-04," unless the number "4" is a typographical error. In that regard, it seems highly likely that the writer intended to write "7-21-04," since that is the same date that the food service administrator indicated that Plaintiff would begin receiving kosher meals, the writer did not use the past tense, and there is no claim or suggestion that Plaintiff actually began receiving kosher meals in April 2004.

Apart from the issue of kosher food, Southport offered inmates the opportunity to participate in the "Angel Tree" program, which is a Christian ministry that provides gifts to the children of prison inmates at Christmas time. Plaintiff obtained and completed an Angel Tree participation form, which did not purport to state any requirements for participation in the program, and did not refer to any specific religious denomination. On July 20, 2004, Defendant returned the application to Plaintiff along with a memo stating: "Enclosed is your Angel Tree Application. This year only Christians can request presents for their children. Because of your recent change of religion, you cannot participate." There is no indication that Plaintiff filed a grievance concerning the denial of his Angel Tree request.

On August 25, 2004, Plaintiff commenced the instant action. The Amended Complaint purports to state claims against Defendant under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a). Plaintiff alleges that Defendant violated his right to freedom of religion by denying him kosher meals, and that she retaliated against him by denying his request to participate in the Angel Tree program. Following a period of discovery, Defendant filed the subject motion for summary judgment. Defendant contends that Plaintiff's claims must be dismissed for failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a). For example, Defendant states that although Plaintiff exhausted his remedies as to Grievance No. SPT-30603-04, such exhaustion does not satisfy 42 U.S.C. § 1997e(a) since Plaintiff began receiving kosher meals within a day of filing the grievance. Defendant also argues that Plaintiff's religious diet claim must be dismissed, since Plaintiff did not request the kosher diet because of a sincerely-held religious belief. Alternatively, Defendant contends that the diet claim should be dismissed since the delay was reasonable and did not impose a substantial burden on Plaintiff's religious beliefs. In that regard, Defendant argues that she was entitled to a reasonable amount of time to process Plaintiff's request, and that Plaintiff was able to eat kosher food obtained from other inmates. Finally, Defendant maintains that she is entitled to qualified immunity. In addition to Defendant's own affidavit, the Food Service Administrator at Southport has submitted an affidavit, stating that kosher meals cost approximately $3.98 per day more than regular

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

meals, and that "[i]n order to minimize prison expenses only those inmates that obtain approval from the appropriate prison officials [are] served kosher meals." (Irizarry Affidavit [# 29] at ¶ ¶ 2-3).

***4** Plaintiff countered with a cross-motion for summary judgment. In support of his application, Plaintiff insists that Defendant was required to begin providing him with kosher meals as of April 4, 2004, the date that he first decided to become Jewish. (*See, e.g.,* Cross Motion [# 37] at 8) ("[Defendant] was suppose[d] to make sure I receive[d] my kosher meals since 4-6-04 once she received Plaintiff's self-declared note."). Plaintiff also contends that Defendant acted maliciously toward him, since she was "a Catholic racist chaplain coordinator." *Id.* at 6, ¶ 23.

DISCUSSION

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied,*517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249;*see also,*FED. R. CIV. P. 56(e) ("W hen a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party ." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). Moreover, since Plaintiff is proceeding *pro se,* the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).[FN4]

> FN4. Plaintiff was served with an *Irby* notice. *See,* Docket [# 33].

*Exhaustion of Administrative Remedies*

***5** As discussed above, 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Generally, in order to satisfy 42 § 1997e(a), a plaintiff must file a grievance with respect to the challenged behavior. Assuming that the grievance is denied, he must then exhaust the grievance appeal process, by appealing to the facility Superintendent, and then to CORC. However, the Second Circuit has identified circumstances in which an inmate's unsuccessful attempt to exhaust may still meet the exhaustion requirements of § 1997e(a). *See Hemphill v. N.Y.,* 380 F.3d 680 (2d Cir.2004), *Giano v. Goord,* 380 F.3d 670 (2d Cir .2004), *Johnson v. Testman,* 380 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 (2d Cir.2004). In this case, there is no evidence that Plaintiff attempted to exhaust his claim concerning the Angel Tree gift program. Accordingly, the Angel Tree claim must be dismissed for failure to comply with 42 U.S.C. § 1997e(a).[FN5] As for the remaining claims, the Court need not decide whether Plaintiff exhausted his administrative remedies or was excused from doing so, since as will be discussed below, such claims fail on their merits in any event.

FN5. Even assuming that Plaintiff had exhausted the claim, he has produced no evidentiary proof in admissible form to refute Defendant's statement that the Angel Tree program was restricted to Christian inmates.

*Delay in Providing Kosher Diet*

Plaintiff alleges that the delay in his receipt of kosher meals violated his rights under the First Amendment and under RLUIPA. A detailed description of the legal principles applicable to such claims was recently set forth as follows:

Courts have long understood that prisoners retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.") (citations omitted); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (A "prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) ("Prisoners retain their right to religious freedom even when incarcerated."); *Jackson-Bey v. Hanslmaier,* 115 F.3d 1091, 1096 (2d Cir.1997) ("[I]nmates are not stripped of their constitutional rights simply by virtue of their imprisonment, including their right to religious freedom.") (citation omitted).

Since 1975 this Circuit has consistently recognized that the free exercise of religion includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495-96 (2d Cir.1975) (denial of Kosher food to a Jewish inmate is not justified by an important or substantial governmental objective); *see, e.g., McEachin v. McGuinnis,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights. This principle was established in our circuit at least as early as 1975."); *Ford v. McGinnis,* 352 F.3d at 597 (Second Circuit decisions "have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."); *Jackson v. Mann,* 196 F.3d at 320;*Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992) ("At least as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples. Kahane has never been overruled and remains the law.") (citation to *Kahane* omitted); *Benjamin v. Coughlin,* 905 F.2d 571, 574, 579 (2d Cir.), *cert. denied,*498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990); *Moorish Science Temple of America, Inc. v. Smith,* 693 F.2d 987, 990 (2d Cir.1982) ("[T]he denial of kosher food to a Jewish inmate is not justified by an important or substantial governmental objective.").

***6** " 'Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system.' " *Ford v. McGinnis,* 352 F.3d at 588 (*quoting Benjamin v. Coughlin,* 905 F.2d at 574);*see, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. at 348-49, 107 S.Ct. at 2404;*Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804;*Jackson-Bey v. Hanslmaier,* 115 F.3d at 1096. A prison inmate retains First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804;*accord, e.g., Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004); *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995).

The standard to determine whether a prison official's

conduct violates an inmate's First Amendment free exercise rights is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d at 574;*accord, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. at 349, 107 S.Ct. at 2404-05;*Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006); *Young v. Coughlin,* 866 F.2d 567, 569 (2d Cir.), *cert. denied,*492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989); *see also, e . g., Ford v. McGinnis,* 352 F.3d at 588 ("The free exercise claims of prisoners are ... judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.") (internal quotations omitted).

In evaluating the constitutionality of a restriction on an inmate's religious rights, four factors are considered: "1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest." *Salahuddin v. Coughlin,* 993 F.2d 306, 308-09 (2d Cir.1993) (*quoting Benjamin v. Coughlin,* 905 F.2d at 574);*accord, e.g., Salahuddin v. Goord,* 467 F.3d at 274;*United States v. El-Hage,* 213 F.3d 74, 81 (2d Cir.), *cert. denied,*531 U.S. 881, 121 S.Ct. 193, 148 L.Ed.2d 134 (2000). "In this analysis, we give deference to defendants because 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations.' " *Graham v. Mahmood,* 2008 WL 1849167 at *12;*see also, e.g., Fromer v. Scully,* 874 F.2d 69, 73 (2d Cir.1989); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (this deference, however, is "by no means unlimited"); *Byrd v. Goord,* 00 Civ. 2135, 2005 WL 2086321 at *6 (S.D.N.Y. Aug.29, 2005) (Daniels, D.J.).

***7** As in other areas of the law, a burden shifting approach applies:

The prisoner must show at the threshhold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; "the burden remains with the prisoner to 'show that these [articulated] concerns were irrational.' "

*Salahuddin v. Goord,* 467 F.3d at 274-75 (citations & fn. omitted); *accord, e.g., Johnson v. Guiffere,* 2007 WL 3046703 at *5;*Sproul v. Goord,* 2007 WL 2609787 at *11.

RLUIPA claims are similar to First Amendment free exercise claims, although RLUIPA "proceeds under a slightly different framework," protecting "inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d at 273-74 (fn.omitted); *see also, e.g., Chavis v. Goord,* No. 00-CV-01418, 2007 WL 2903950 at *3 n. 3 (N.D.N.Y. Oct. 1, 2007); *Rahman v. Goord,* 2007 WL 1299408 at *5 (RLUIPA "imposes a more exacting standard on prison officials" than the First Amendment does.).

*Tafari v. Annets,* No. 06 Civ 11360(GBD)(AJP), 2008 WL 2413995 at *12-15 (S.D.N.Y. Jun. 12, 2008) (footnotes omitted), *report and recommendation adopted by Tafari v. Annets,* No. 06 Civ 11360(GBD) (AJP), 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008). With regard to RLUIPA claims, "[a] 'substantial burden' is defined as a 'situation where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Id.* at *14, n. 32 (citations omitted).

Plaintiff's First Amendment claim is brought pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. *See, e.g., Monroe v. Pape,* 365 U.S. 167,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

*Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004).

Applying all of the foregoing legal principles to the facts of the instant case, the Court finds, at the outset, the Defendant is entitled to summary judgment on Plaintiff's First Amendment claim. First, Plaintiff cannot meet his burden of demonstrating that "the disputed conduct substantially burdens his sincerely held religious beliefs." In that regard, even assuming that Plaintiff's religious beliefs are sincerely held, the Court agrees with those cases that have held that, where a delay in providing an inmate with a religious diet is brief and caused by ordinary administrative delay, the inmate's religious rights are not violated. *See, Davidson v. Murray,* No. 92-CV-0283C, 2005 WL 1123756 at *4 (W.D.N.Y. May 10, 2005) (Delay in inmate receiving kosher diet was the result of "typical and acceptable institutional delay which does not implicate the Free Exercise Clause.") (citations omitted); *McCormack v. Myers,* No. 6:06-2344-HFF-WMC, 2007 WL 1704905 at *4 (D.S.C. Jun.12, 2007) (No constitutional violation where delay in processing inmate's request for kosher meals resulted in him not receiving kosher meals for two and a half months: "The court agrees with the defendants that the plaintiff has failed to establish a claim that rises to the level of a constitutional deprivation with regard to his temporary delay in obtaining kosher meals at the detention center."); *Holiday v. Giusto,* NO. CIV. 03-01385-AS, 2004 WL 1792466 at *5 (D.Or. Aug 10, 2004) (Holding that eighteen-day delay in providing religous meals, caused by administrative delay, was not a substantial burden) FN6, *report and recommendation adopted by Holiday v. Giusto,* NO. CV 03-1385-AS, 2004 WL 2403823 (D.Or. Oct 26, 2004).

FN6. "Viewing the record as a whole, the relatively minor delays in processing Plaintiffs' religious diet requests do not rise to the level of a free exercise violation. Prison officials have a legitimate penological interest in ascertaining whether an inmate requesting a religious diet is truly of the religion he professes to be before granting his religious diet request. *See Resnick v. Adams,* 317 F.3d 1056 (9th Cir.2003) (upholding requirement that inmates submit applications before prison officials provide kosher diet). An eighteen-day delay in processing Plaintiff Holiday's religious dietary request simply is not a substantial burden, but rather an inconvenience. Moreover, the undisputed evidence suggests that the delay was caused by a verification process which the Ninth Circuit has recognized as a legitimate penological interest." *Holiday v. Giusto,* 2004 WL 1792466 at *5.

***8** Moreover, even assuming that Plaintiff could meet that burden, Defendant has shown that the delay in providing Plaintiff with kosher food was the result of policies that serve legitimate penological concerns. Namely, the delay was due to the fact that Plaintiff's religious designation form and his request for kosher meals had to be administratively processed. Such regulations affecting the distribution of special religious diets serve legitimate penological concerns:

Registration of religious affiliation ... entails only a modest act of commitment by the inmate, while serving several legitimate penological interests. By registering, the inmate formally declares his religious affiliation. This has significance because prison officials are not required to accommodate an inmate's religious demands without regard to whether or not the inmate is actually a member of the religion. *See, e.g., Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) (summary judgment appropriate where inmate failed to prove that he sincerely held any religious belief mandating use of Tarot cards).

Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times.... Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be

needed. In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial 'bright line' that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.

*Jackson-Bey v. Hanslmaier,* 115 F.3d 1091, 1096-1097 (2d Cir.1997); *see also, Id.* at 1096 ("[R]easonable limitations on the accommodation of religious practices necessary to achieve [legitimate penological] objectives are permitted. Registration is one such limitation."). Plaintiff has not shown that such concerns were irrational.

Nor has Plaintiff shown that Defendant is responsible for any unreasonable delay in processing Plaintiff's request. In that regard, upon receiving Plaintiff's letter expressing his decision to become Jewish, Defendant promptly sent Plaintiff a religious designation form, and then promptly forwarded the completed form to Rabbi Chill for his consideration. In the interim, Defendant received Plaintiff's request for kosher meals. Defendant's response to that letter indicated that she was awaiting Rabbi Chill's determination before processing the kosher diet request. Upon learning of Rabbi Chill's decision that Plaintiff could not convert to Judaism, Defendant promptly notified Plaintiff of that fact. Defendant did not know whether Plaintiff agreed or disagreed with Rabbi Chill's assessment until July 12, 2004, when Plaintiff wrote to her and reiterated his request to receive kosher meals. Defendant immediately processed and forwarded the request, and Plaintiff began receiving kosher food eleven days later. Based upon all of the foregoing factors, Defendant is entitled to summary judgment on the First Amendment claim.

***9** Defendant is also entitled to summary judgment on the RLUIPA claim, since Plaintiff cannot show that Defendant imposed a substantial burden on the exercise of his religion. In that regard, in addition to the factors already discussed, it is significant that during the period that Plaintiff was waiting formal approval of his request for kosher meals, he was able to obtain kosher food by trading with other inmates. Additionally, Plaintiff was not prevented from observing any Jewish holidays.

CONCLUSION

Defendant's motion for summary judgment [# 26] is granted, Plaintiff's cross-motion [# 37] for the same relief is denied and this action is dismissed. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

W.D.N.Y.,2008.
Tapp v. Stanley
Not Reported in F.Supp.2d, 2008 WL 4934592 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.